# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE No.: | 2021AP1450-OA |

COMPLETE TITLE:

Billie Johnson, Eric O'Keefe, Ed Perkins and Ronald Zahn,
            Petitioners,
Black Leaders Organizing for Communities, Voces de la Frontera, League of Women Voters of Wisconsin, Cindy Fallona, Lauren Stephenson, Rebecca Alwin, Congressman Glenn Grothman, Congressman Mike Gallagher, Congressman Bryan Steil, Congressman Tom Tiffany, Congressman Scott Fitzgerald, Lisa Hunter, Jacob Zabel, Jennifer Oh, John Persa, Geraldine Schertz, Kathleen Qualheim, Gary Krenz, Sarah J. Hamilton, Stephen Joseph Wright, Jean-Luc Thiffeault, and Somesh Jha,
            Intervenors-Petitioners,
        v.
Wisconsin Elections Commission, Marge Bostelmann in her official capacity as a member of the Wisconsin Elections Commission, Julie Glancey in her official capacity as a member of the Wisconsin Elections Commission, Ann Jacobs in her official capacity as a member of the Wisconsin Elections Commission, Dean Knudson in his official capacity as a member of the Wisconsin Elections Commission, Robert Spindell, Jr. in his official capacity as a member of the Wisconsin Elections Commission and Mark Thomsen in his official capacity as a member of the Wisconsin Elections Commission,
            Respondents,
The Wisconsin Legislature, Governor Tony Evers, in his official capacity, and Janet Bewley Senate Democratic Minority Leader, on behalf of the Senate Democratic Caucus,
            Intervenors-Respondents.

## ORIGINAL ACTION

| | |
|---|---|
| OPINION FILED: | March 1, 2022 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | January 19, 2022 |

SOURCE OF APPEAL:
  COURT:

COUNTY:

JUDGE:

---

JUSTICES:

NOT PARTICIPATING:

---

ATTORNEYS:

For the petitioners, there were briefs filed by *Richard M. Esenberg, Anthony F. LoCoco, Lucas T. Vebber* and *Wisconsin Institute for Law & Liberty,* Milwaukee. There was oral argument by *Richard M. Esenberg.*

For the intervenors-petitioners Black Leaders Organizing for Communities, Voces de la Frontera, League of Women Voters of Wisconsin, Cindy Fallona, Lauren Stephenson and Rebecca Alwin, briefs, including amicus briefs, were filed by *Douglas M. Poland, Jeffrey A. Mandell, Rachel E. Snyder, Richard A. Manthe, Carly Gerads* and *Stafford Rosenbaum LLP*, Madison; *Mel Barnes* and *Law Forward, Inc.*, Madison; *Mark P. Gaber* (pro hac vice), *Christopher Lamar* (pro hac vice) and *Campaign Legal Center*, Washington, D.C.; *Annabelle Harless* (pro hac vice) and *Campaign Legal Center*, Chicago. There was oral argument by *Douglas M. Poland.*

For the intervenors-petitioners Congressmen Glenn Grothman, Mike Gallagher, Bryan Steil, Tom Tiffany and Scott Fitzgerald there were briefs, including amicus briefs, filed by *Misha Tseytlin, Kevin M. LeRoy*, and *Troutman Pepper Hamilton Sanders LLP*, Chicago. There was oral argument by *Misha Tseytlin.*

For the intervenors-petitioners Lisa Hunter, Jacob Zabel, Jennifer Oh, John Persa, Geraldine Schertz and Kathleen Qualheim, there were briefs, including amicus briefs filed by *Charles G. Curtis, Jr.* and *Perkins Coie LLP*, Madison; *Marc Erik Elias* (pro hac vice), *Aria C. Branch* (pro hac vice), *Daniel C.*

*Osher* (pro hac vice), *Jacob D. Shelly* (pro hac vice), *Christina A. Ford* (pro hac vice), *William K. Hancock* (pro hac vice) and *Elias Law Group LLP*, Washington, D.C. There was oral argument by *John Devaney (*pro hac vice*), Perkins Coie LLP*, Washington, D.C.

For the intervenors-petitioners Citizens Mathematicians and Scientists Gary Krenz, Sarah J. Hamilton, Stephen Joseph Wright, Jean-Luc Thiffeault and Somesh Jha, briefs were filed by *Michael P. May, Sarah A. Zylstra, Tanner G. Jean-Louis* and *Boardman & Clark LLP*, Madison, and *David J. Bradford* (pro hac vice) and *Jenner & Block LLP*, Chicago. There was oral argument by *Sam Hirsch* (pro hac vice), *Jenner & Block LLP*, Washington, D.C.

For the respondents Wisconsin Elections Commission, Marge Bostelmann, Julie Glancey, Ann Jacobs, Dean Knudson, Robert Spindell, Jr. and Mark Thomsen there were letter-briefs filed by *Steven C. Kilpatrick*, assistant attorney general, *Karla Z. Keckhaver*, assistant attorney general, *Thomas C. Bellavia*, assistant attorney general.

For the intervenors-respondents the Wisconsin Legislature there were briefs, including amicus briefs, filed by *Kevin M. St. John* and *Bell Giftos St. John LLC*, Madison; *Jeffrey M. Harris* (pro hac vice), *Taylor A.R. Meehan* (pro hac vice), *James P. McGlone* and *Consovoy McCarthy PLLC*, Arlington, Virginia and *Adam K. Mortara* and *Lawfair LLC*, Chicago. There was oral argument by *Taylor A.R. Meehan*.

For the intervenor-respondent Governor Tony Evers there were briefs filed by *Joshua L. Kaul*, attorney general, *Anthony D. Russomanno*, assistant attorney general and *Brian P. Keenan*, assistant attorney general. There was oral argument by *Anthony D. Russomanno.*

3

For the intervenor-respondent Janet Bewley, State Senate Democratic Minority Leader on behalf of the State Senate Democratic Caucus there were briefs filed by *Tamara B. Packard*, *Aaron G. Dumas* and *Pines Bach LLP*, Madison. There was oral argument by *Tamara B. Packard*.

There was an amicus brief filed on behalf of William Whitford, Hans Breitenmoser, Mary Lynne Donohue, Wendy Sue Johnson and Deborah Patel by *Ruth M. Greenwood* (pro hac vice), *The Election Law Clinic, Harvard Law School*, Cambridge, MA; with whom on the brief were law student-practitioners *Mary F. Brown*, *Mark R. Haidar*, *Meredith A. Manda*, *Sarah A. Sadlier*, *Corey M. Stewart*, *Harvard Law School* and *Jakob Feltham* and *Hawks Quindel, S.C.*, Madison.

There was an amicus brief filed on behalf of Concerned Voters of Wisconsin by *Joseph S. Goode*, *Mark M. Leitner*, *John W. Halpin* and *Laffey, Leitner & Goode, L.L.C.*, Milwaukee.

There was an amicus brief filed on behalf of Non-Party Legal Scholars by *Allison Boldt, Robert Yablon* and the *University of Wisconsin Law School*, Madison.

There was an amicus brief filed by *Daniel R. Suhr*, Thiensville.

4

**2022 WI 14**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No.  2021AP1450-OA

STATE OF WISCONSIN                    :          IN SUPREME COURT

Billie Johnson, Eric O'Keefe, Ed Perkins and
Ronald Zahn,

        Petitioners,

Black Leaders Organizing for Communities, Voces
de la Frontera, League of Women Voters of
Wisconsin, Cindy Fallona, Lauren Stephenson,
Rebecca Alwin, Congressman Glenn Grothman,
Congressman Mike Gallagher, Congressman Bryan
Steil, Congressman Tom Tiffany, Congressman
Scott Fitzgerald, Lisa Hunter, Jacob Zabel,
Jennifer Oh, John Persa, Geraldine Schertz,
Kathleen Qualheim, Gary Krenz, Sarah J.
Hamilton, Stephen Joseph Wright, Jean-Luc
Thiffeault, and Somesh Jha,

        Intervenors-Petitioners,

    v.

Wisconsin Elections Commission, Marge
Bostelmann in her official capacity as a member
of the Wisconsin Elections Commission, Julie
Glancey in her official capacity as a member of
the Wisconsin Elections Commission, Ann Jacobs
in her official capacity as a member of the
Wisconsin Elections Commission, Dean Knudson in
his official capacity as a member of the
Wisconsin Elections Commission, Robert
Spindell, Jr. in his official capacity as a
member of the Wisconsin Elections Commission
and Mark Thomsen in his official capacity as a
member of the Wisconsin Elections Commission,

        Respondents,

**FILED**

**MAR 3, 2022**

Sheila T. Reiff
Clerk of Supreme Court

**The Wisconsin Legislature, Governor Tony Evers, in his official capacity, and Janet Bewley Senate Democratic Minority Leader, on behalf of the Senate Democratic Caucus,**

**Intervenors-Respondents.**

---

HAGEDORN, J., delivered the majority opinion of the Court, in which ANN WALSH BRADLEY, DALLET, and KAROFSKY, JJ., joined. ANN WALSH BRADLEY, J., filed a concurring opinion, in which DALLET and KAROFSKY, JJ., joined. ZIEGLER, C.J., filed a dissenting opinion, in which ROGGENSACK and REBECCA GRASSL BRADLEY, JJ., joined. ROGGENSACK, J., filed a dissenting opinion, in which ZIEGLER, C.J., and REBECCA GRASSL BRADLEY, J., joined. REBECCA GRASSL BRADLEY, J., filed a dissenting opinion, in which ZIEGLER, C.J., and ROGGENSACK, J., joined.

---

ORIGINAL ACTION. *Relief granted.*

¶1 BRIAN HAGEDORN, J. Every ten years, states are required to redraw the boundaries for congressional and legislative districts to account for population changes. This means the maps enacted into law in 2011 cannot constitutionally serve as the basis for future elections. The responsibility to adopt new district boundaries is not ours in the first instance, but that of the legislature and governor via the legislative process.

¶2 Shortly after the completion of the 2020 decennial census, a group of voters petitioned this court to declare the 2011 maps unconstitutional and remedy the malapportionment. We granted the petition, and subsequently granted intervention to all parties that sought it, mindful that relief from this court

would be necessary only if the legislative process failed.[1] We have given the political branches a fair opportunity to carry out their constitutional responsibilities. They have not done so. Both this court and the United States Supreme Court have held that this failure implicates the constitutional rights of voters. State ex rel. Reynolds v. Zimmermann, 22 Wis. 2d 544, 562, 126 N.W.2d 551 (1964); Reynolds v. Sims, 377 U.S. 533, 566 (1964). We are therefore left with the unwelcome task of filling the gap.

¶3 The members of this court were not of one mind regarding how——or even whether——to approach this undertaking. But having taken this case, we sought input from the parties on the law that governs, as well as the process by which we should fashion a remedy.

¶4 In an order issued on November 17, 2021, and an opinion issued on November 30, 2021, we set out the basic process and criteria we would use to guide our decision. Johnson v. Wis. Elections Comm'n, 2021 WI 87, 399 Wis. 2d 623, 967 N.W.2d 469. Rather than craft our own map, we invited all parties to this litigation to submit one proposed map for each set of districts where new district boundaries are required: congress, state senate, and state assembly. We said we would choose maps that minimize changes from current law and evaluate maps for compliance with state and federal law. Id., ¶¶38, 72.

---

[1] For a summary of this case's prior procedural history, see Johnson v. Wis. Elections Comm'n, 2021 WI 87, ¶¶5-6, 399 Wis. 2d 623, 967 N.W.2d 469.

3

In so concluding, we rejected an approach that involved this court making significant policy decisions or weighing competing policy criteria. We also rejected invitations to consider the partisan makeup of proposed districts. By focusing on legal requirements and using the maps currently reflected in Wisconsin law as a reference point, we sought to minimize our involvement in the numerous policy and political decisions inherent in map-drawing.

¶5 Following our November 30 opinion, parties submitted proposed maps, briefs, and expert reports. And we heard over five hours of argument regarding which proposed maps best comply with the parameters we established.

¶6 Although not bound by any map proposal, we approached this task hoping to select submissions from the parties that best satisfied the criteria we set forth. We did so both at the suggestion of the parties and in recognition of our limitations. While we appreciate the hard work of the parties, we must acknowledge that each proposal makes changes that appear unnecessary to account for population changes or to otherwise comply with the law. But rather than modify submissions we received, we determine that the best approach is to choose the maps that best conform with our directives, imperfect though they may be.

¶7 <u>Congressional maps</u>. We received proposed congressional maps from four parties: the Citizen

4

Mathematicians and Scientists,[2] the Congressmen,[3] Governor Tony Evers, and the Hunter intervenors-petitioners.[4] The first question is which map most complies with our least-change directive. With only eight districts, core retention——a measure of voters who remain in their prior districts——is the best metric of least change, and the map submitted by Governor Evers easily scores highest. His map moves 5.5% of the population to new districts, leaving 94.5% in their current districts. In raw numbers, the Governor's proposal to move 324,415 people to new districts is 60,041 fewer people than the next best proposal. In addition, Governor Evers' submission complies with the federal Constitution and all other applicable laws. We therefore adopt Governor Evers' proposed congressional map.

¶8 <u>State legislative maps</u>. We received six state legislative map proposals from: the BLOC intervenors-

---

[2] The Citizen Mathematicians and Scientists include Gary Krenz, Sarah J. Hamilton, Stephen Joseph Wright, Jean-Luc Thiffeault, and Somesh Jha.

[3] The Congressmen include Congressmen Glenn Grothman, Mike Gallagher, Bryan Steil, Tom Tiffany, and Scott Fitzgerald.

The Wisconsin Legislature endorsed the Congressmen's proposed congressional map, but did not advance any arguments on the merits of this proposed map.

[4] The Hunter intervenors-petitioners include Lisa Hunter, Jacob Zabel, Jennifer Oh, John Persa, Geraldine Schertz, and Kathleen Qualheim.

petitioners,[5] the Citizen Mathematicians and Scientists, Governor Evers, the Hunter intervenors-petitioners, Senator Janet Bewley,[6] and the Wisconsin Legislature.  The proposed senate and assembly maps making the least changes from current law are once again those of Governor Evers.  In their senate proposals, both Governor Evers and the Legislature move a nearly identical 7.8% of voters to different districts (92.2% core retention), with a slight edge to the Legislature for moving 1,958 fewer people.  However, in their assembly map proposals, Governor Evers moves 14.2% of voters to new districts, while the Legislature moves 15.8% (85.8% vs. 84.2% core retention), a difference that affects 96,178 people.  No other proposal comes close.  And beyond core retention, no other measure of least change alters the picture.  The Governor's proposed senate and assembly maps produce less overall change than other submissions.

¶9  We also conclude that Governor Evers' proposals satisfy the requirements of the state and federal constitutions. Under the Wisconsin Constitution, all districts are contiguous, sufficiently equal in population, sufficiently compact, appropriately nested, and pay due respect to local boundaries. Governor Evers' proposed maps also comply with the federal constitution's population equality requirement.

---

[5] The BLOC intervenors-petitioners included the organizations Black Leaders Organizing for Communities, Voces de la Frontera, and League of Women Voters of Wisconsin, in addition to Cindy Fallona, Lauren Stephenson, and Rebecca Alwin.

[6] Senate Minority Leader Janet Bewley intervened as a respondent on behalf of the Senate Democratic Caucus.

¶10  Regarding the Voting Rights Act (VRA), the 2011 maps enacted into law include six majority-Black assembly voting districts in the Milwaukee area.  Governor Evers, along with several other parties, argues the VRA now requires a seventh majority-Black assembly district in the Milwaukee area.  As a map-drawer, we understand that our duty is to determine whether there are "good reasons" to believe the VRA requires a seven-district configuration.  In assessing the information presented by the parties, we conclude there are good reasons to believe a seventh majority-Black district is needed to satisfy the VRA.  Governor Evers' assembly map accomplishes this.  For these reasons, we adopt Governor Evers' proposed remedial state senate and state assembly maps.

## I.  FRAMEWORK FOR OUR DECISION

¶11  In our prior opinion in this case, we laid out more fully the analytical framework for our final decision.  For completeness, we briefly summarize our approach here.  Before our November 30 opinion, the parties offered a variety of arguments regarding which factors we could or should consider in providing remedial maps.  See Johnson, 399 Wis. 2d 623, ¶7.  We concluded we would minimize judicial policymaking by starting with the 2011 maps previously enacted into law, and change only what is "necessary to resolve constitutional or statutory

deficiencies."[7] Id., ¶72. We further concluded that the partisan makeup of districts would not play a role in our decision. Id., ¶39. We were not unanimous in these conclusions, but it is how we as a court decided to proceed.[8] So we invited parties to submit maps that minimize deviations from existing district boundaries and abide by all relevant laws.

¶12 With this framework in mind, we begin our analysis by probing which maps make the least change from current district boundaries. From there, we examine the relevant law to ensure that the map producing the least change also comports with all state and federal legal requirements.

---

[7] The concurrence agreed with this approach and added that if there were equally compelling arguments on least change, we could look to traditional redistricting criteria to assist our decision-making. Johnson, 399 Wis. 2d 623, ¶83 (Hagedorn, J., concurring). Our selection of remedial maps in this case is driven solely by the relevant legal requirements and the least change directive the majority adopted in the November 30 order——not a balancing of traditional redistricting criteria.

[8] The dissent argued that "[t]rue neutrality could be achieved by instead adhering to the neutral factors supplied by the state and federal constitutions, the Voting Rights Act, and traditional redistricting criteria." Johnson, 399 Wis. 2d 623, ¶94 (Dallet, J., dissenting). Thus, the dissent proposed conducting a more open balancing of various policy interests, including population equality, compactness, and respect for political subdivision boundaries. Id. It also viewed partisanship as "one of the many factors a court must balance when enacting remedial maps." Id., ¶110.

## II.  CONGRESSIONAL MAP

### A.  Least Change

¶13 Wisconsin has eight congressional districts, so evaluating which maps changed the least is far simpler than for legislative maps, where modifications are necessarily more numerous and granular.  The core retention figures are therefore especially helpful.  Core retention represents the percentage of people on average that remain in the same district they were in previously.  It is thus a spot-on indicator of least change statewide, aggregating the many district-by-district choices a mapmaker has to make.  Core retention is, as multiple parties contended from the beginning of this litigation, central to a least change review.[9]

¶14 The parties' submissions rate as follows on core retention:

---

[9] Three parties asked us to adopt a least change approach, and each made it abundantly clear that core retention is central to that inquiry.  In briefing advocating a least change approach (before our November 30 opinion), the Legislature explained that a least change approach is one that "maximizes core retention."  The Congressmen agreed, arguing that a "'least-change' approach would simultaneously 'minimize voter confusion,' and maximize 'core retention' by limiting the number of people placed in different congressional districts."  The Johnson petitioners were in full accord:  "Preserving the cores of prior districts is the foundation of 'least change' review."  While core retention is not the only relevant metric, every party understood that our adoption of a least change approach would place core retention at the center of the analysis.

|  | Total People Moved | Average Core Retention |
|---|---|---|
| Governor Evers | 324,415 | 94.5% |
| Congressmen | 384,456 | 93.5% |
| Hunter | 411,777 | 93.0% |
| MathSci[10] | 500,785 | 91.5% |

¶15 As these numbers reveal, the Governor's map moves the fewest number of people into new districts. It is not a close call. The Governor's proposal moves 60,041 fewer people than the next closest submission, that of the Congressmen.[11] The parties do not offer any other measures of least change that counterbalance the Governor's superior core retention.

¶16 The most significant counterargument on least change comes from the Congressmen. They argue that the Governor's proposal makes what they call "gratuitous changes" that are unexplained. For example, they point to the swapping of communities between congressional districts 4 and 1. These changes are unnecessary, the Congressmen maintain, because district 4 is already substantially underpopulated. In other

---

[10] In briefing, the Citizen Mathematicians and Scientists helpfully employed the "MathSci" moniker to refer to their maps.

[11] Before oral argument, the Congressmen sought leave to submit a second map for consideration in addition to their initial proposal. We granted motions by two other parties to modify their proposals, but we denied the Congressmen's motion because our November 17 order limited parties to a single congressional map. Granting the Congressmen's motion would have allowed them to present two congressional maps, while everyone else was permitted only one.

words, they argue that the unstated and unexplained motives behind these changes should doom the Governor's proposal. We see two problems with this argument.

¶17 First, nothing in our prior orders or opinion required an explanation of changes at any level of granularity. In fact, the November 30 opinion did not give the parties any specific instructions beyond our rubric for deciding the case generally. The concurrence encouraged parties to explain "why their maps comply with the law, and how their maps are the most consistent with existing boundaries." Johnson, 399 Wis. 2d 623, ¶87 (Hagedorn, J., concurring). But neither that concurrence nor any order of the court asked for an explanation for every change or provided guidance regarding what level of specificity would satisfy the court.[12]

¶18 Second, the Congressmen's argument elevates form over substance. In their submission, the Congressmen propose significant changes to congressional districts 3 and 7. They explain these changes by referencing population changes in district 2. But the districts most in need of change are district 2 in and around Dane County (which needs to shrink), and district 4 in Milwaukee County (which needs to grow). Applying a least change approach, the more logical place to adjust district boundaries to account for these population changes would be the districts both adjacent to and in between

---

[12] Moreover, rejecting every map with unexplained changes would require us to exclude every proposed state legislative map. All of them contain numerous unexplained changes.

congressional districts 2 and 4——not district 3 on Wisconsin's western border and district 7 in the north and northwest.  So while the Congressmen offer an explanation for the change, it does not appear to be a particularly good one.  Perhaps, as the Congressmen posited, the Governor has other motives; perhaps so do the Congressmen.  But rather than weigh motives and pick and choose which changes we approve of and which we don't, we look to which maps actually produce the least change, not which explained their changes the most comprehensively.

¶19  The most principled way to address least change for congressional maps is to choose the map that, in the aggregate, moves the fewest number of people into new districts.  In this regard, the Governor's proposed map is superior to every other proposal.  It is the map with the least change.

## B.  Compliance with the Law

¶20  Having concluded the Governor's proposal best complies with our directive to minimize deviations from current district boundaries, we next consider whether it complies with all relevant laws.  The Wisconsin Constitution contains no explicit requirements related to congressional redistricting.  And no party develops an argument that the Wisconsin Constitution requires something for congressional districts not already

necessary under the United States Constitution.[13] Further, no one argues that any congressional submission we received runs afoul of the VRA. The only legal question that remains concerns population equality under the United States Constitution.

¶21 The Governor's map comes close to perfect equality. The mathematically ideal district contains 736,714.75 persons, and the Governor's districts have either 736,714 people, 736,715 people, or 736,716 people. Thus, the total deviation between the most and least populated districts is two persons. Several parties argue——mostly at oral argument——that the Governor's two-person deviation violates the United States Constitution. This is, at best, a strained reading of the law.

¶22 To be sure, the Supreme Court has explained that there is "no excuse for the failure to meet the objective of equal representation for equal numbers of people in congressional districting other than the practical impossibility of drawing equal districts with mathematical precision." Mahan v. Howell, 410 U.S. 315, 322 (1973). On the other hand, the Supreme Court has been willing to accept "small differences in the population of congressional districts" "so long as they are consistent with constitutional norms." Karcher v. Daggett, 462 U.S. 725, 740 (1983). As the Court explained, "Any number of consistently

---

[13] As we noted in our prior opinion, the parties previously disputed whether the Wisconsin Constitution imposes requirements consistent with the Equal Protection Clause of the federal Constitution. But that issue would not have any substantive impact on our decision, so we did not (and here do not) address it. See Johnson, 399 Wis. 2d 623, ¶13 n.4.

applied legislative policies might justify some variance, including, for instance, making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent Representatives." Id. In Tennant v. Jefferson County Commission, the Supreme Court upheld a 4,871-person deviation in West Virginia's congressional districts, noting the deviation advanced the state's interests in maximizing core retention and maintaining whole counties. 567 U.S. 758, 762, 764-65 (2012) (per curium).

¶23 Moreover, many states have adopted districts with minor variations. According to one source cited in briefing, following the 2010 census, 14 states implemented maps with greater than single-person deviations: Arkansas (428), Georgia (2), Hawaii (691), Idaho (682), Iowa (76), Kansas (15), Kentucky (334), Louisiana (249), Mississippi (134), New Hampshire (4), Oregon (2), Texas (32), Washington (19), and West Virginia (4,871).[14] If the law is clear that a two-person deviation (or more) is unacceptable, then nearly a third of states with more than one congressional district have apparently not gotten the message. We know of no case in which a court has struck down a map based on a two-person deviation.

¶24 In addition, this minor population deviation is justified under Supreme Court precedent by our least change objective. In this very proceeding, we have determined that the

---

[14] https://www.ncsl.org/research/redistricting/2010-ncsl-redistricting-deviation-table.aspx

14

least change approach should guide our decision. Core retention is central to this analysis, and as our prior discussion reveals, the Governor's map does far better on this metric than any other map. Selecting a map from among those submitted to us with a maximum deviation of one person would require us to adopt a map that does substantially worse on core retention. The United States Supreme Court held that maximizing core retention was an acceptable justification for a far greater deviation in Tennant. We see no reason why that rationale would not apply with equal force here. We conclude the two-person deviation between the most- and least-populated districts in the Governor's proposed map does not violate the United States Constitution.

¶25 In sum, we adopt Governor Evers' proposed congressional map because it best follows our directive to make the least changes from existing congressional district boundaries while complying with all relevant state and federal laws.

### III. STATE LEGISLATIVE MAPS

#### A. Least Change

¶26 Our least change inquiry for state legislative maps is a bit more complicated. This is due in part to the sheer number of districts involved. In addition, the Wisconsin Constitution requires that three assembly districts be nested within each senate district, meaning we need to analyze assembly and senate maps jointly. Wis. Const. art. IV, § 5. Nevertheless, we again

15

begin our least change inquiry by comparing core retention scores for each senate and assembly map we received.

¶27  The parties' senate map submissions rate as follows on core retention, in order from least to most change:

|                | Total People Moved | Average Core Retention |
|----------------|--------------------|------------------------|
| Legislature    | 459,061            | 92.2%                  |
| Governor Evers | 461,019            | 92.2%                  |
| Senator Bewley | 576,321            | 90.2%                  |
| BLOC           | 610,568            | 89.6%                  |
| Hunter         | 1,128,878          | 80.8%                  |
| MathSci        | 1,513,824          | 74.3%                  |

¶28  The parties' assembly map submissions rate as follows on core retention, again in order from least to most change:

|                | Total People Moved | Average Core Retention |
|----------------|--------------------|------------------------|
| Governor Evers | 837,426            | 85.8%                  |
| Legislature    | 933,604            | 84.2%                  |
| BLOC           | 939,513            | 84.1%                  |
| Senator Bewley | 984,336            | 83.3%                  |
| Hunter         | 1,586,059          | 73.1%                  |
| MathSci        | 2,299,629          | 61.0%                  |

¶29  Taken together, the Governor's maps score best on core retention.  Although the Legislature's senate map moves 1,958

16

fewer people than the Governor's senate map, that slightly better performance is outstripped by the Governor's vastly superior core retention in the assembly, where the Governor moves 96,178 fewer people than the Legislature. No maps from any other party perform nearly as well as the Governor's on core retention.

¶30 Other metrics of least change are helpful, but only minimally so in this case. Both the Legislature and the Governor do comparably well minimizing the number of voters who would have to wait six years between senate elections.[15] The Legislature's senate map has this effect on 138,753 people, whereas the Governor's does so for 139,606 people. On geographic core retention, the Governor's senate map moves 5.0% of the state's geography from one district to another, versus the Legislature's 7.1%. And the Governor's assembly map moves 11.3% of the state's geography from district to district, against the Legislature's 16.5%. Finally, both the Governor and the Legislature pair three incumbents——one pair of senators and two pairs of representatives for the Governor, and three pairs of representatives for the Legislature.[16] Ultimately, none of these considerations outweigh the Governor's superior performance on core retention.

---

[15] See Johnson, 399 Wis. 2d 623, ¶83 n.9 (Hagedorn, J., concurring); id., ¶94 n.5 (Dallet, J., dissenting).

[16] Some parties argue that considering incumbency is improper. As a standalone value, that may be true. But as an indicator of least change from existing districts, it could constitute a helpful data point.

¶31 Two other least-change approaches offered by the parties are worth further discussion. First, the Legislature argues that the Governor's maps are not acceptable because they change Milwaukee-area districts more than other submissions. Looking to the degree of change region-by-region has merit, but we see little benefit to its application here. Some of the changes to the Governor's maps in the Milwaukee area are driven by modifications arguably required by the VRA (more on this below). This necessarily creates a cascading effect on nearby districts. But even if the Legislature's Milwaukee-specific complaints have merit, its conclusion does not. Although the Legislature's proposed maps may move fewer voters in some Milwaukee-area districts, the Governor's proposed maps move fewer voters throughout the rest of the state, leaving 13 assembly districts outside Milwaukee entirely unchanged from their prior configurations. The Legislature does not explain why we should reject the Governor's map for its changes to Milwaukee, while accepting the Legislature's proposal to change districts even more elsewhere.

¶32 Second, the Legislature argues that we should weigh as a measure of least change the total number of counties and municipalities split under each proposal. We fail to see why this is a relevant least-change metric, however. If a municipality was split under the maps adopted in 2011, reuniting that municipality now——laudable though it may be——would produce more change, not less. Particularized data about how many counties or municipalities remain unified or split may be a

18

useful indicator of least change.  But no party saw fit to provide that data.[17]  What we did receive was raw counts of the total county and municipal splits under each proposal, and that information provides no insight into which map makes the least change to existing district boundaries.[18]

¶33 Viewing various least change metrics as a whole, and relying most heavily on the preeminent core retention metric, we conclude the Governor's legislative maps produce the least change from current law.

### B.  Compliance with the Law

¶34 Next we consider whether the Governor's legislative maps adhere to all relevant laws, starting with the Wisconsin Constitution.  As we explained in our prior opinion, the Wisconsin Constitution requires that districts be compact,

---

[17] The Legislature provided an accounting of county and municipal splits in the proposed legislative maps, but no one submitted data documenting how many of those splits were present in the 2011 maps, or how many previously split municipalities were unified.  The Legislature highlighted a handful of new municipal splits in the Governor's map, but those examples were limited to Waukesha County and Dane County.  Without statewide data, these geographically-limited data points do not allow for a meaningful comparison of each proposal's overall performance on this metric.

[18] Similarly, population deviation is not an indicator of least change.  Quite the opposite.  Given the malapportionment here, maximizing population equality requires more change to current districts, not less.  That is why, recognizing the tension between these two goals, our instructions to the parties were to redistrict according to population while minimizing change to existing districts.

19

contiguous, and proportionally populated; they must respect certain local political boundaries; and the districts must "nest" three assembly districts within each senate district. Johnson, 399 Wis. 2d 623, ¶¶28-38; Wis. Const. art. IV, §§ 3-5. Our cases have long recognized these requirements operate as a floor with space for mapmaker discretion. Zimmerman, 22 Wis. 2d at 566 ("[T]here are choices which can validly be made within constitutional limits.").

¶35 Therefore, in analyzing compliance with the Wisconsin Constitution, we look to whether the maps meet constitutional standards, not whether they perform comparatively better or worse on these metrics than other maps we received. We do not, for example, scrutinize proposed maps to determine which are more compact or which contain the smallest population deviations. Our concern is simply whether districts are sufficiently compact and sufficiently equal in population to comply with the constitution. Proposed maps are either lawful or they are not; no constitutional map is more constitutional than another. For our purposes, so long as a map complies with constitutional requirements, better performance on these metrics becomes commendable, but not constitutionally required. In other words, they become policy choices——maybe good ones, but policy choices nonetheless. And we have already stated our aim to avoid deciding between competing policies. Johnson, 399 Wis. 2d 623, ¶3.

¶36 The Governor's proposed maps fall comfortably within the relevant constitutional requirements as laid out in our

cases. The districts are contiguous and properly nested. See Wis. Const. art. IV, §§ 4-5. And with respect to the other requirements, the Governor's maps are consistent with historical practice and court-sanctioned requirements for compactness, respect for local boundaries,[19] and population equality. Regarding population equality in particular, the Governor's population deviations——1.20% for the senate and 1.88% for the assembly——are well under the deviations previously adopted by the legislature and those prescribed by this court.[20] See Wis. Stat. § 4.001(1) (1971-72) (noting that under the 1972 maps "no district deviates from the state-wide average for districts of its type by more than one per cent" (for an absolute population

---

[19] As explained in our prior opinion, the geographic limitations in the Wisconsin Constitution can no longer be fully enforced given the United States Supreme Court's directives on population equality. Johnson, 399 Wis. 2d 623, ¶35.

[20] The Legislature's expert in this case agreed, explaining that the "conventional maximum[]" for population deviation is "+/- 5.0%," for an absolute deviation of 10%. The Governor's maps are far below this.

If the Wisconsin Constitution requires better performance than this on population deviation, we have never said so. Nor have we understood State ex rel. Attorney General v. Cunningham, 81 Wis. 440, 51 N.W. 724 (1892), and State ex rel. Lamb v. Cunningham, 83 Wis. 90, 53 N.W. 35 (1892), to afford mapmakers no leeway on population deviation. To the contrary, in State ex rel. Bowman v. Dammann, we declined to strike down maps despite our conclusion that "fairer results with respect to equality of representation" could have been accomplished. 209 Wis. 21, 30, 243 N.W. 481 (1932). We explained that only a "wide and bold departure" from population equality was beyond the mapmaker's discretion. Id. Were it otherwise, every map submitted would violate the constitution, since better performance on population deviation is certainly possible.

21

deviation of 2%)); State ex rel. Reynolds v. Zimmerman, 23 Wis. 2d 606, 618-25, 128 N.W.2d 16 (1964) (adopting legislative districts after legislative impasse with substantially larger population deviations than those proposed here). They are also well within the population equality requirements of the Equal Protection Clause, which are more relaxed for state legislative districts than for congressional districts.[21] Harris v. Az. Indep. Redistricting Comm'n, 578 U.S. 253, 259 (2016) ("[W]e have refused to require States to justify deviations of 9.9% and 8%." (citations omitted)); Wis. St. AFL-CIO v. Elections Bd., 543 F. Supp. 630, 634 (E.D. Wis. 1982) ("We believe that a constitutionally acceptable plan . . . should, if possible, be kept below 2%.").

¶37 We next examine whether the Governor's proposed maps comply with the Equal Protection Clause's limits on race-based districting and the VRA.

¶38 Under the Equal Protection Clause, "strict scrutiny applies when race is the predominate consideration in drawing the district lines such that the legislature subordinates traditional race-neutral districting principles to racial considerations." Shaw v. Hunt, 517 U.S. 899, 907 (1996) (cleaned up). If racial considerations predominate in a map's configuration, the state must "prove that its race-based sorting

---

[21] In the last decennial redistricting cycle, dozens of states enacted legislative maps with population deviations exceeding those in the Governor's maps——most by a wide margin. https://www.ncsl.org/research/redistricting/2010-ncsl-redistricting-deviation-table.aspx

22

of voters serves a 'compelling interest' and is 'narrowly tailored' to that end." Cooper v. Harris, 137 S. Ct. 1455, 1464 (2017) (quoting another source).  The Supreme Court "has long assumed that one compelling interest is complying with operative provisions of the Voting Rights Act."  Id.

¶39 "Section 2 [of the VRA] prohibits any 'standard, practice, or procedure' that 'results in a denial or abridgement of the right . . . to vote on account of race.'"  Id. (quoting 52 U.S.C. § 10301(a)).  The Supreme Court has "construed that ban to extend to vote dilution——brought about, most relevantly here, by the dispersal of a group's members into districts in which they constitute an ineffective minority of voters."  Id. (cleaned up).  This means the VRA, when triggered, may require the race-conscious drawing of majority-minority districts.  Id. at 1470.

¶40 Our VRA inquiry comes in an unusual procedural posture.  Often cases under the VRA present as a challenge to particular districts in legislatively drawn maps.  But our task is to produce districts in the first instance without the benefit of a trial and a fully-developed factual record regarding the performance of specific districts.  Sitting in this posture, we follow the instructions provided by the Supreme Court in Cooper:

> When a State invokes the VRA to justify race-based districting, it must show (to meet the "narrow tailoring" requirement) that it had "a strong basis in evidence" for concluding that the statute required its action.  Or said otherwise, the State must establish that it had "good reasons" to think that it would

23

transgress the Act if it did <u>not</u> draw race-based district lines. That "strong basis" (or "good reasons") standard gives States "breathing room" to adopt reasonable compliance measures that may prove, in perfect hindsight, not to have been needed.

<u>Id.</u> at 1464 (citations omitted). Under this precedent, a mapmaker may draw districts with racial considerations in mind provided "a strong basis in evidence," or "good reasons," suggest the VRA requires the mapmaker to do so.

¶41 A typical § 2 challenge is analyzed under a two-step framework, beginning first with the so-called <u>Gingles</u>[22] preconditions, then proceeding to whether minority voting power is diluted under the totality of the circumstances. <u>See</u> <u>Rodriguez v. Bexar County</u>, 385 F.3d 853, 859 (5th Cir. 2004). Here, the Governor argues——as do several other parties——that seven majority-Black assembly districts are required by the VRA.[23] Applying <u>Cooper</u>, we analyze whether a strong basis in evidence suggests the <u>Gingles</u> preconditions are satisfied, and if so, whether there are good reasons to think minority voting power would be diluted under the totality of the circumstances with fewer majority-Black districts. We see our inquiry as limited to determining whether the Governor's proposal is within the "leeway" states have "to take race-based actions reasonably

---

[22] <u>Thornburg v. Gingles</u>, 478 U.S. 30, 50-51 (1986).

[23] No one suggests the Governor's senate map violates either the Equal Protection Clause or the VRA.

judged necessary under a proper interpretation of the VRA."[24] Cooper, 137 S. Ct. at 1472.

¶42 Beginning with step one, we first determine whether there are "good reasons" to think the three Gingles preconditions are met for the Black voting age population in the Milwaukee area. In Cooper, the Court explained the preconditions as follows:

> First, a minority group must be sufficiently large and geographically compact to constitute a majority in some reasonably configured legislative district. Second, the minority group must be politically cohesive. And third, a district's white majority must vote sufficiently as a bloc to usually defeat the minority's preferred candidate. . . . If a State has good reason to think that all the Gingles preconditions are met, then so too it has good reason to believe that § 2 requires drawing a majority-minority district. But if not, then not.

Id. at 1470 (cleaned up).

¶43 First, it is undisputed that the Black voting age population in the Milwaukee area is "sufficiently large and geographically compact" to form a majority in seven "reasonably configured legislative district[s]."[25] Id. (quoting another

---

[24] To be clear, this case does not involve a claim under the Equal Protection Clause or VRA. Rather, as remedial map-drawers, we strive to act in compliance with the Constitution and applicable federal laws necessarily relying on the more limited record before us. A standard VRA claim is brought after the adoption of new districts. Such a claim would proceed much differently, requiring a fully developed factual record and detailed findings regarding the performance of specific districts.

[25] Several parties, including the Governor, calculate Black voting age population by including "multi-race subcategories" in addition to "non-Hispanic Black" and "non-Hispanic (Black +

25

source). Six such districts were created by the 2011 maps, and the parties' submissions demonstrate that it is now possible to draw a seventh sufficiently large and compact majority-Black district.

¶44 Second, it is also undisputed that Black voters in the Milwaukee area are politically cohesive. Experts from multiple parties analyzed voting trends and concluded political cohesion existed; no party disagreed.

¶45 Finally, turning to the third Gingles precondition, the parties offered a strong evidentiary basis to believe white voters in the Milwaukee area vote "sufficiently as a bloc to usually defeat the minority's preferred candidate." Id. (quotation marks omitted). Experts from multiple parties argued this requirement was satisfied by looking at various election contests, with the most comprehensive expert analysis calculating that white voters in the Milwaukee area defeat the preferred candidate of Black voters 57.14% of the time when relevant elections are analyzed.[26] We received little in the way

---

White)" categories. The Legislature excludes "multi-race subcategories" from its calculations but raises no objection to the inclusion of those categories. See Georgia v. Ashcroft, 539 U.S. 461, 473 n.1 (2003) ("[W]e believe it is proper to look at all individuals who identify themselves as black."), superseded by statute on other grounds, Ala. Legis. Black Caucus v. Alabama, 575 U.S. 254, 276-77 (2015).

[26] BLOC's expert "analyzed eight elections between Black and white candidates in nonpartisan or Democratic primaries and Spring generals in jurisdictions that cover either Milwaukee County, Milwaukee City, or both." In a subsequent report, the expert explained that he omitted the 2018 lieutenant governor primary from his analysis because "it [did] not simulate an

26

of alternative data or analysis to counter this. To the contrary, throughout briefing, all parties appeared to assume the VRA requires at least some majority-Black districts in the Milwaukee area. This can only be true if racially polarized voting that usually defeats the minority's preferred candidate exists. It was not until oral argument that anyone meaningfully contended the third Gingles precondition was not met. To the extent it was suggested in the substantial briefing we received, it was virtually unsupported by expert analysis or argument.[27] It is telling that no party saw fit to develop an argument supported with data suggesting the VRA preconditions are not satisfied with respect to the Black voting age population in and around Milwaukee. We further observe that the federal court drawing maps in 1992 assumed racially polarized voting in Milwaukee and drew majority-Black districts to comply with the VRA. Prosser v. Elections Bd., 793 F. Supp. 859, 868-71 (W.D. Wis. 1992). No court has concluded otherwise since then. Based on the data we were provided, historical practice, and the

---

election in which white bloc voting might defeat the choice of Black voters." The Legislature's expert critiqued the omission, and noted that supplementing BLOC's election data with it could alter the analysis. The Legislature's expert did not argue that any other additional elections besides the 2018 lieutenant governor primary should have been included in BLOC's analysis.

[27] Before oral argument, the strongest suggestion that the Gingles preconditions might not be satisfied was a comment in one of the Legislature's expert reports suggesting "serious doubts about whether the Gingles threshold standard is currently met in Milwaukee County." But an alternative analysis was not conducted, nor did the Legislature's briefing advance or develop this in any meaningful way.

27

absence of any sufficiently developed counterargument, we conclude there are good reasons to think all three Gingles preconditions are satisfied.

¶46 Moving to the second step, § 2 of the VRA requires consideration of the totality of the circumstances to determine whether members of a racial group "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b). The Supreme Court has pointed to various factors that might be relevant to this determination, including those listed in a Senate Report from the 1982 amendments to the VRA, and most pertinently here, "whether the number of districts in which the minority group forms an effective majority is roughly proportional to its share of the population in the relevant area."[28] League of United Latin Am. Citizens v. Perry,

---

[28] The Senate Report factors include:

the history of voting-related discrimination in the State or political subdivision; the extent to which voting in the elections of the State or political subdivision is racially polarized; the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group . . .; the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; the use of overt or subtle racial appeals in political campaigns; and the extent to which members of the minority group have been elected to public office in the jurisdiction. The Report notes also that evidence demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group and that the

28

548 U.S. 399, 426 (2006).  In Johnson v. De Grandy, the Court explained that proportionality is highly relevant, but not the exclusive measure of minority voting strength.  512 U.S. 997, 1020-21 (1994).  The Court added that § 2 does not require a mapmaker to maximize minority representation.  Id. at 1017.  In all of this, we keep in mind that "States retain broad discretion in drawing districts to comply with the mandate of § 2."  Shaw, 517 U.S. at 917 n.9.

¶47  Here, we cannot say for certain on this record that seven majority-Black assembly districts are required by the VRA. But based on our assessment of the totality of the circumstances and given the discretion afforded states implementing the Act, we conclude the Governor's configuration is permissible.

¶48  The 2011 maps enacted into law created six majority-Black districts in the Milwaukee area.  Over the last decade,

---

policy underlying the State's or the political subdivision's use of the contested practice or structure is tenuous may have probative value.

League of United Latin Am. Citizens v. Perry, 548 U.S. 399, 426 (2006) (quoting Gingles, 478 U.S. at 44-45).

Like other courts in this posture, we find these factors less helpful in the context of this case.  In Prosser, for example, the federal court that provided new maps for Wisconsin in 1992 did not even mention the Senate Report factors, focusing instead other relevant considerations.  See Prosser, 793 F. Supp. at 869-71.  Similarly, when the U.S. Supreme Court has faced VRA challenges regarding the number of majority-minority districts drawn, it has focused much of its attention on considerations not mentioned in the Senate Report, such as proportionality.  See Johnson v. De Grandy, 512 U.S. 997, 1017-21 (1994); Perry, 548 U.S. at 436-42.

the Black population in Wisconsin grew by 4.8% statewide, while the white population fell by 3.4%. Based on the current census, the Black voting age population statewide is between 6.1% and 6.5%, although the precise number is subject to some dispute. Proportionality would therefore suggest somewhere between six and seven majority-Black assembly districts are appropriate. Looking a bit deeper, a significant proportion of Wisconsin's Black population lives in Milwaukee County where the subject districts are principally located. And there, the Black voting age population increased 5.5%, while the white voting age population decreased 9.5%. The baseline of six districts ten years ago, combined with population trends since then and statewide population numbers now, suggest a seventh majority-Black district may be required.

¶49 In addition, we have some concern that a six-district configuration could prove problematic under the VRA. The Legislature, for example, submitted a configuration with five majority-Black districts, and a sixth just under a majority. One of its proposed districts has a Black voting age population of 73.28%, a level some courts have found to be unlawful "packing" under the VRA. Ketchum v. Byrne, 740 F.2d 1398, 1418 (7th Cir. 1984). Packing occurs when a mapmaker draws district lines that pack minority voters "into one or a small number of districts to minimize their influence in the districts next door." De Grandy, 512 U.S. at 1007. The risk of packing Black voters under a six-district configuration further suggests

30

drawing seven majority-Black districts is appropriate to avoid minority vote dilution.

¶50 Viewing the totality of the circumstances, we see good reasons to conclude a seventh majority-Black assembly district may be required.  To be clear, the VRA does not require drawing maps to maximize the number of majority-minority districts, and we do not seek to do so here.  See De Grandy, 512 U.S. at 1016-17.  Rather, on this record, we conclude selecting a map with seven districts is within the leeway states have to take "actions reasonably judged necessary" to prevent vote dilution under the VRA.  Cooper, 137 S. Ct. at 1472.

¶51 Based on the foregoing, we conclude the Governor's legislative maps comply with all relevant legal requirements. Because they are also the maps that produce the least change from the previously enacted maps, we adopt them.

## IV.  CONCLUSION

¶52 To remedy the unconstitutional malapportionment of the 2011 congressional and state legislative maps, we adopt the Governor's proposed congressional and state legislative maps. Beginning with the August 2022 primary elections, the Wisconsin Elections Commission is enjoined from conducting elections under the 2011 maps and is ordered to implement the congressional and legislative maps submitted by Governor Evers for all upcoming elections.  This order shall remain in effect until new maps are enacted into law or a court otherwise directs.

*By the Court.*——Relief granted.

31

¶53 ANN WALSH BRADLEY, J. *(concurring).* I join the majority opinion, which selects the Governor's congressional and state legislative maps, not because I approve of the "least change" approach. I do not.

¶54 Having previously voiced my dissent to the adoption of that approach, a majority of the court in a prior order nevertheless embraced "least change" as the framework that would govern the proceedings in this case. Circumscribed by that decision and the parties' reliance upon it when crafting their submissions, I join today's majority opinion because the Governor's maps adhere most closely to the court's earlier directive. Accordingly, I respectfully concur.

I

¶55 This case came to us as an original action petition filed before the legislature and Governor had even acted on any redistricting legislation. I joined the dissent from the order granting the petition due to the myriad "reasons for preferring a federal forum" and because this court had "no experience in drawing district maps." Johnson v. Wis. Elections Comm'n, No. 2021AP1450-OA, unpublished order, at 16, 18 (Wis. Sept. 22, 2021, amended Sept. 24) (Dallet, J., dissenting).

¶56 The court then solicited briefing from the parties on several topics, ranging from procedure to substance to timing. Specifically, the court sought the parties' input on how it should conduct these proceedings, what criteria it should consider, and when final maps should be in place.

1

¶57 After redistricting legislation was passed by the legislature and vetoed by the Governor, thus failing the political process, a majority of the court advised that it would apply the "least change" approach to reapportion Wisconsin's congressional and state legislative districts in light of the 2020 census. That is, the existing maps would serve as a template and this court would implement "only those remedies necessary to resolve constitutional or statutory deficiencies." Johnson v. Wis. Elections Comm'n, 2021 WI 87, ¶72, 399 Wis. 2d 623, 967 N.W.2d 469; see also id., ¶85 (Hagedorn, J., concurring). I again joined the dissent from this decision because it had "potentially devastating consequences for representative government in Wisconsin." Id., ¶88 (Dallet, J., dissenting). We then received initial map submissions followed by additional rounds of briefing, culminating in over five hours of oral argument.

## II

¶58 The shortcomings of "least change" were on display throughout these proceedings. For example, "least change," as set forth in the court's prior order, is unmoored from any legal requirement for redistricting. The parties struggled with reconciling it with the United States Constitution, Wisconsin Constitution, and Voting Rights Act.

¶59 Further, beyond core retention, it was unclear if some metrics would carry more weight than others. Throughout briefing and oral argument, the "least change" approach did not and could not offer an explanation for the tradeoffs and

2

discretionary decisions that are intrinsic to map-drawing. If this process has shown us anything, it is that the court should depart from the "least change" approach if and when redistricting arrives before it in the decades to come.

¶60 Although some advance that "least change" is an apolitical approach, this court recognized that redistricting is "inherently political" when it previously (and wisely) refrained from jumping into the fray. Jensen v. Wis. Elections Bd., 2002 WI 13, ¶10, 249 Wis. 2d 706, 639 N.W.2d 537. It dictates where candidates can run for office and for whom voters can cast their vote. The process affords the chance to "restore the core principle of republican government, namely, that voters should choose their representatives, not the other way around." Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n, 576 U.S. 787, 824 (2015) (internal citation omitted).

¶61 The people of Wisconsin deserve both a fair process and fair maps. We have cautioned that "[j]udges should not select a plan that seeks partisan advantage." Jensen, 249 Wis. 2d 706, ¶12 (quoting Prosser v. Elections Bd., 793 F. Supp. 859, 867 (W.D. Wis. 1992)). Here, the "least change" approach necessarily enshrines the partisan advantage adopted by the political branches ten years ago. Its application undermines, rather than fulfills, the promise of a truly representative government.

¶62 That being said, I am bound by the court's earlier determination in this case. Although I disapprove of the "least

3

change" approach, I am limited by that prior determination and obligated to apply it here.

¶63 Indeed, a majority of the court previously placed limitations on the parties' submissions by setting forth general criteria to be employed. The parties relied on those limitations when preparing their maps and arguments. Because they were directed to use a "least change" approach, the parties did not sufficiently argue any other standard for distinguishing between the submitted maps. Furthermore, the submitted maps may have been far different had the parties known this court would entertain criteria other than "least change" as preeminent. Thus, as the majority opinion well explains, the Governor's maps adhere most closely to the court's prior order.

¶64 I therefore join the majority opinion in its entirety and respectfully concur.

¶65 I am authorized to state that Justices REBECCA FRANK DALLET and JILL J. KAROFSKY join this concurrence.

4

¶66 ANNETTE KINGSLAND ZIEGLER, C.J. *(dissenting).* The majority opinion demonstrates a complete lack of regard for the Wisconsin Constitution and the Equal Protection Clause. Short on legal analysis and long on ipse dixit, the majority opinion amounts to nothing more than an imposition of judicial will. The majority deems the language of the Wisconsin and United States Constitutions to be mere policy. I dissent because here, the majority's decision to select Governor Tony Evers' maps is an exercise of judicial activism, untethered to evidence, precedent, the Wisconsin Constitution, and basic principles of equal protection. Even those in the majority recognize that that there exists a "struggle[]" to reconcile the least change approach they adopt with the United States Constitution, Wisconsin Constitution, and the Voting Rights Act ("VRA").[1] Concurrence, ¶58.

---

[1] Three of the four justices in the majority would have preferred the federal courts to have drawn the maps for Wisconsin. See Johnson v. Wis. Elections Comm'n, No. 2021AP1450-OA, unpublished order (granting petition for leave to commence original action), at 15-18 (Wis. Sep. 22, 2021) (Dallet, J., dissenting) (explaining the advantages of federal court litigation and concluding that the court should not have accepted this original action). They clearly disagree with the least change approach, and the concurrence is far from a wholesale endorsement of the analysis in the majority opinion, which adopts its own version of least change. See concurrence, ¶¶53-64. Those three justices assert there was a "struggle[]" the parties were forced to confront when attempting to reconcile least change with the United States Constitution, the Wisconsin Constitution, and the VRA. Id., ¶58. Yet the majority opinion neither recognizes nor resolves any "struggle[]" that exists between its version of least change and the law. This calls into question whether the majority opinion is really a lead opinion with only Justice Hagedorn fully adopting the reasoning therein. Id.

1

¶67 Lacking in substantive legal analysis, the majority is imbued with personal preference. The majority disrespects the VRA and instead cabins voters for purportedly "good reasons" in districts based solely on race, which is nothing short of a violation of the Equal Protection Clause. But to the majority, the Equal Protection Clause is a mere box to check, a speedbump on the path to dividing Wisconsin into racial categories. Not one case cited by the majority supports its race-based determination.[2] Moreover, the majority implements a previously unknown, judicial test: "core retention." Because the majority's adoption of the Governor's maps is unconstitutional, and conflicts with the record and well-established jurisprudence, I must dissent.

¶68 For the reasons explained below, I conclude that the court should have adopted the maps submitted by the Wisconsin Legislature ("the Legislature") and Congressmen Glenn Grothman, Mike Gallagher, Bryan Steil, Tom Tiffany, and Scott Fitzgerald ("the Congressmen"), or in the alternative, the maps submitted by the Citizen Mathematicians and Scientists ("CMS"). The court could have also drawn its own maps or directed the parties to submit new maps that had record support and complied with the law. The maps submitted by the Governor are unconstitutional and fatally flawed.

---

[2] See Cooper v. Harris, 581 U.S. ___, 137 S. Ct. 1455 (2017); Shaw v. Hunt, 517 U.S. 899 (1996); League of United Latin Am. Citizens v. Perry, 548 U.S. 399 (2006) ("LULAC"); Johnson v. De Grandy, 512 U.S. 997 (1994). VRA caselaw, including these precedents, are discussed in greater detail in Section II.A, infra.

2

## I.  SUMMARY

### A.  No Support For Drawing Districts On The Basis Of Race.

¶69 Because the Governor has not demonstrated a VRA violation, there can be no race-based remedy, let alone one constructing a new district and changing six others in Milwaukee to include exactly 51% black populations.  It is undisputed that the Legislature's maps and the maps submitted by CMS are the only race-neutral maps submitted.  Either performs better than the Governor's maps under the constitution and the law. Alternatively, we could design or draw our own maps, or combine positive characteristics of several maps.  Further, we could have requested additional briefing to direct the parties, or the Legislature or Governor specifically, to improve their maps and provide greater record justification for their decisions.  We now are the map drawers, we are the government actors, and we are the ones that must satisfy strict scrutiny by using racial classifications.  It is our duty to be responsible to the law.

¶70 The majority adopts the Governor's maps, which unambiguously divided districts in the Milwaukee area on the basis of race alone.  The only valid justification for doing this is if a VRA violation were shown, requiring a race-based remedy.  Completely absent, however, is any demonstration of a VRA violation.  Without a violation, there can be no remedy because to take race-based action would violate the Equal Protection Clause.  In other words, a VRA remedy is constitutionally permissible only as required to remedy a VRA violation.  Stated even differently, specific evidence must

3

demonstrate that white voters block a minority group's vote, and due to a variety of local conditions the minority group does not have the opportunity to effectively participate in democratic elections, inside a district or area where a minority could be made into an effective electoral majority. District-specific evidence must demonstrate that the majority-minority group is unable to elect the candidate of its choice in a specific district. We have exactly zero evidence of any such thing happening in these districts in Milwaukee. There is zero evidence on the conditions and environment of local communities warranting a race-based remedy. Yet, the majority incorrectly surmises that there is "good reason" to nonetheless invent this remedy.

¶71 The parties were free to engage in discovery, depose experts, and gather the requisite information to advocate for their positions. The Governor completely failed to evidence any factual support for his race-based designs. The only party that even attempted to provide the evidence sufficient to justify a race-based remedy, the Black Leaders Organizing for Communities ("BLOC"), agrees that when examining the existing record, the Governor's maps do not comply with the VRA, and are thus unconstitutional.

¶72 Nonetheless, the majority places its imprimatur on the Governor's maps, which carve seven Assembly districts with populations that are curiously at almost exactly 51% African-American populations. His maps reduce, not increase, the minority percentage in most majority-minority districts. His

4

maps add what was referred to in VRA parlance as "white filler,"[3] to these districts. The majority cites no support for its VRA remedy that adds white voters and reduces black voter percentage.

¶73 The majority fails to follow VRA jurisprudence and instead the majority invents a new, heretofore unknown standard, evolved from its own creation of the law and relying heavily on alleged party concessions, not evidence. So says the majority, if there are "good reasons" to create race-based districts, the court is endowed with the authority to do as it wishes, regardless of the complete lack of evidence to support any VRA violation. Tellingly, the majority engages in no substantive strict scrutiny analysis of the racial assignment of Milwaukee voters, even though such scrutiny is required as a part of the legal analysis.

### B. Least Change Is Not Core Retention.

¶74 In our November 30, 2021 opinion in this case, we concluded that our "judicial remedy should reflect the least change necessary for the maps to comport with relevant legal requirements." Johnson v. Wis. Elections Comm'n, 2021 WI 87, ¶¶24-63, 72, 399 Wis. 2d 623, 967 N.W.2d 469. Nowhere in that opinion did we use the phrase "core retention". Not only were the parties not advised that core retention would be the decisive factor in the court's decision, but the parties were explicitly "invited" by the concurrence to consider factors

---

[3] Counsel from CMS at oral argument explained how map drawers construct majority-minority districts when considering race.

5

wholly unrelated to least change.[4] Johnson, 399 Wis. 2d 623, ¶¶83, 87 (Hagedorn, J., concurring) (noting that "traditional redistricting criteria" would assist in the selection of maps). The concurrence, which received no votes in support, was perfectly free to include core retention in its analysis. It did not, and for a very simple reason: no one, neither among the parties nor the court, understood core retention was the sole factor for determining least change and further, for selecting maps. The core retention analysis in the majority is an invention, made after-the-fact to justify a policy preference.

¶75 The law instructs us to consider more than one number: population deviation and local government divisions, fundamentally underlie the validity of any core retention number. Even so, the Governor's core retention numbers are worse than the Legislature's in the Wisconsin Senate. While the Governor's maps move fewer individuals overall, those same maps have inordinately high population deviations among districts, far greater than the deviations in the Legislature's maps. The Governor's maps also divide an extraordinary number of local communities, orders of magnitude more than the Legislature's maps. We are constitutionally required to minimize population deviations and local government splits. Given this significant constitutional interest, we should adopt either the

---

[4] Sitting as a court of seven, the concurrence had no authority to alone direct the court's business. For further explanation on the November 30 concurrence, see footnote 19, infra.

Legislature's or CMS's maps, which score the best out of all the submitted maps, or the court should create a map out of the best of each.

¶76 We were tasked with selecting legislative and congressional maps that best conform with the law while also making as little change as possible to existing district lines. We accepted another round of briefing and expert reports, and we held over five hours of oral argument. Despite this extensive opportunity to prepare, Governor Tony Evers presented maps that had marked population deviation and divided dozens and dozens of local municipalities.

C. The Governor's Congressional Maps Are Unconstitutional.

¶77 Knowing that the Legislature and the Congressmen intended to submit legislative and congressional maps that were already passed by the Wisconsin Legislature in 2021, the Governor simply designed maps that met his own partisan ends, which appear to be based solely on core retention. In so doing, the Governor substantially increased population deviation and local government splits and engaged in an unsubstantiated racial gerrymander. In other words, the Governor inflated the core retention number at the expense of the Wisconsin public. Inexplicably, the majority now adopts the Governor's maps in full, resting entirely on "core retention" as determinative.

¶78 The court refused to allow the Congressmen to submit amended maps, conflicting with our duty to consider all available information and the fact that other parties, including the Governor, were permitted to amend their maps. Nonetheless,

7

the Governor has a greater population deviation, and under well-established constitutional law, there is no de minimus deviation for congressional districts. The Governor explained that his deviation was caused by his lack of understanding that a lower deviation was required. But carelessness is not a valid justification for excessive deviation. The Governor's (and now Wisconsin's) congressional maps are unconstitutional. The court should have adopted the Congressmen's map, or in the alternative CMS's map, which includes the lowest deviation available, and are both least change.

## II. STATE LEGISLATIVE MAPS

¶79 In our November 30 opinion, we indicated that any map would need to comply with federal and state legal requirements and be the least change possible to existing legislative districts. Six parties submitted maps for the Wisconsin Senate and Assembly: the Legislature, CMS, the Hunter Intervenor-Petitioners ("Hunter"), Senator Janet Bewley, the Governor, and BLOC. The maps submitted by the Legislature and CMS achieve minimal changes to existing district lines while best complying with the demands of the Wisconsin Constitution and federal law. For the most part, the parties argued for the adoption of either the Legislature's or the Governor's maps.

### A. The Equal Protection Clause And The VRA

¶80 The maps adopted by the majority are nothing short of a racial gerrymander, and the Governor failed to present any material evidence warranting this substantial departure from the principles of equal protection.

8

¶81 Fatally, the majority provides at most a cursory analysis on the VRA and the Equal Protection Clause, mustering a mere five pages to apply an incredibly important and complex area of law. See Ipse Dixit, Oxford English Dictionary (2022) ("An unproved assertion resting on the bare authority of some speaker."). Just as BLOC warned, the majority's VRA analysis is woefully inadequate at best. Its use of an aggressive race-based remedy for no showing of a VRA violation, simply because it can, is untenable and legal error.

¶82 The majority's use of race to draw seven bare-majority-minority districts undermines that which the VRA was properly meant to correct. It utilizes racial categories to move minority voters into newly created districts, with newly defined constituencies, which could not have been reasonably created using traditional race-neutral redistricting methods. Notably, the majority cites broad quotes taken from United States Supreme Court precedent, but it conspicuously omits any detailed description of the facts and outcomes of those cases, i.e., what those cases actually stand for.[5] No real attempt at grappling with the vast nuances of VRA caselaw, from lower courts to the United States Supreme Court, was given. By

---

[5] For instance, the majority cites Cooper, 137 S. Ct. 1455, Shaw v. Hunt, 517 U.S. 899, LULAC, 548 U.S. 399, De Grandy, 512 U.S. 997. In Cooper and Shaw, the Court struck down race-based district maps under the Equal Protection Clause due to the lack of support for VRA compliance. In LULAC, the Court found that maps drawn in Texas lacked support under the VRA, and in De Grandy, the Court held that the VRA did not apply at all, where a plaintiff sought maximization of majority-minority districts. A more complete analysis on the VRA is provided below.

9

adopting the Governor's maps, the majority is now bringing to the fore the incendiary and constitutionally suspect category of race. The majority has a legal responsibility to more fully and thoroughly explain itself. Below, I attempt to fill the void in substance the majority leaves for future courts and the public.

¶83 What's next? Perhaps a federal court challenge before the United States Supreme Court.[6] Although braving a face of finality, the majority opinion practically begs that the adopted maps be subject to further litigation.

¶84 I first discuss the legal background of the Equal Protection Clause, and then turn to a discussion on the VRA and its application to this case.

## 1. The Equal Protection Clause

[6] The parties to this lawsuit were given the opportunity to present evidence, advance support for their favored maps, and critique and oppose the maps ultimately adopted. The next step for the case is appeal to the United States Supreme Court. See Coleman v. Thompson, 501 U.S. 722, 730 (1991) (explaining that the Supreme Court "reviews a state court decision on direct review pursuant to 28 U.S.C. § 1257"). The parties are precluded from relitigating this case in a separate federal lawsuit. Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 81 (1984) (explaining that "a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered"); Wickenhauser v. Lehtinen, 2007 WI 82, ¶22, 302 Wis. 2d 41, 734 N.W.2d 855 (stating the elements of claim preclusion). "Congress had empowered only [the United States Supreme] Court to exercise appellate authority to reverse or modify a state-court judgment." Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 284 (2005). Further, under the "Rooker-Feldman" doctrine, "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments" fall outside federal district courts' subject matter jurisdiction. Lance v. Dennis, 546 U.S. 459, 464 (2006).

¶85 Recognizing the deeply American value that individuals should be equally protected under the law, the United States Supreme Court has repeatedly held that government cannot sort or distinguish individuals on the basis of race without extraordinary justifications. "Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people, and therefore are contrary to our traditions and hence constitutionally suspect." Fisher v. Univ. of Texas, Austin, 570 U.S. 297, 309 (2013) (citations and quotations omitted). The Court has recognized that government-sanctioned distinctions "threaten to stigmatize individuals by reason of their membership in a racial group and to incite racial hostility." Shaw v. Reno, 509 U.S. 630, 643 (1993). "Because racial characteristics so seldom provide a relevant basis for disparate treatment, the Equal Protection Clause demands that racial classifications be subjected to the most rigid scrutiny." Fisher, 570 U.S. at 309-10 (cleaned up). Classifications based on race "are constitutional only if they are narrowly tailored to further compelling governmental interests." Grutter v. Bollinger, 539 U.S. 306, 326 (2003). This is a "searching judicial inquiry," id., that rejects "any but the most exact connection between justification and classification." Parents Involved in Community Schools v. Seattle Sch. Dist. No. 1, 551 U.S. 701, 720 (2007) (quotations removed).

¶86 The Supreme Court has understood the pernicious nature of dividing up individuals into legislative districts based on

11

race, and has applied the Equal Protection Clause to redistricting. The Court is exacting in its scrutiny:

> The idea is a simple one: At the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class. When the State assigns voters on the basis of race, it engages in the offensive and demeaning assumption that voters of a particular race, because of their race, think alike, share the same political interests, and will prefer the same candidates at the polls. Race-based assignments embody stereotypes that treat individuals as the product of their race, evaluating their thoughts and efforts——their very worth as citizens—— according to a criterion barred to the Government by history and the Constitution. They also cause society serious harm. . . .
>
> Racial classifications with respect to voting carry particular dangers. Racial gerrymandering, even for remedial purposes, may balkanize us into competing racial factions; it threatens to carry us further from the goal of a political system in which race no longer matters——a goal that the Fourteenth and Fifteenth Amendments embody, and to which the Nation continues to aspire.

Miller v. Johnson, 515 U.S. 900, 911-12 (1995) (cleaned up).

¶87 With this is mind, it is striking how explicitly the Governor——and the majority——divide up Wisconsin districts solely by race. While in 2011 the Legislature drew six assembly districts that have a majority of black voting-age populations ("BVAP"), ranging from 51% to 62%, the Governor carves seven districts by race with the exactness of only the most gifted social scientists. According to the Governor himself, he drew seven districts with BVAP ranging from 50.1% to 51.4%. At oral argument and in briefing, it was clear that race imbued the decisions of the Governor in drawing districts. Explaining his

12

district boundaries, he stated the intent was "to produce seven majority Black districts in the Assembly." There is simply no way to deny that the Governor created "[d]istinctions between citizens solely because of their ancestry," and if his maps are adopted, they must overcome strict scrutiny. Fisher, 570 U.S. at 309; Grutter, 539 U.S. at 326.

¶88 On the other hand, it is undisputed that the Legislature drew race-neutral maps. The Legislature sought to retain districts that have high percentages of black individuals to as close to the same as they were drawn in 2011, i.e., "least change." See Johnson, 399 Wis. 2d 623, ¶72. The core retention statistics from high BVAP districts differ dramatically between the Legislature and the Governor. For the Legislature, the core retention numbers for those districts were 87.7%, 85.4%, 88.1%, 100.0%, 94.3%, and 86.4%. By contrast, high BVAP districts for the Governor had core retention percentages of 85.8%, 56.1%, 58.7%, 91.3%, 58.5%, 75.9%, and 12.7%. It is clear from the data that the Legislature emphasized as little disruption as possible for districts representing high percentages of African-American citizens, as it did for all citizens, regardless of race. By contrast, the Governor's driving motivation was race. The Legislature confirmed at oral argument that the drawing of its districts was driven by race-neutral constitutional criteria and least change, not race.

¶89 Core retention numbers for high BVAP districts were not available for CMS. However, the varying percentages of BVAP in the maps presented help satisfy any concern that their

13

district choices were "motivated by a racial purpose or object." Miller, 515 U.S. at 913. CMS has seven districts varying from 35.2% to 83.2% BVAP.[7] The Legislature similarly has six districts ranging from 45.8% to 71.5%. By comparison, the Governor has seven districts with pinpoint accuracy of 50% to 51% BVAP. While the Governor has the hallmarks of an unconstitutional racial gerrymander in violation of the Equal Protection Clause, the Legislature and CMS do not.

## 2. The VRA

¶90 The Governor contends that his maps would survive strict scrutiny because his seven districts are required under § 2 of the VRA. Through argument, it was made clear that the Governor believed seven majority-minority districts with exactly 51% BVAP must be drawn because it is mathematically possible to do so. That has never been the law. Fundamentally, drawing a map based on race, to create another district because it can be created, is a clear violation of equal protection. No VRA violation has been demonstrated by district-specific evidence. Despite the opportunity to engage in discovery, the Governor presents no evidence on Wisconsin election history at all, no evidence on the unique and specific history and socio-economic experiences of minorities in the districts they seek to manufacture. At most, BLOC (not the Governor) submitted

---

[7] At oral argument, CMS also noted the striking degree to which race infused the court's consideration and discussions, along with the Governor's and others' race-based proposals. Unlike the Governor, CMS affirmed that race should not and cannot be the motivating factor behind drawing districts.

14

argument (not evidence) about Milwaukee as a county. Absent the requisite showing, no district can be reconfigured based upon race without violating the constitutional prohibition against race-based action. Because there is no such evidence, the Governor's maps fail and do not withstand constitutional scrutiny.

¶91 The only support presented in an attempt to justify race-based districts was submitted by a party who contends the Governor's maps violate the VRA: BLOC. The majority does not explain this but cites to BLOC's VRA record evidence to support its choice of the Governor's map. See majority op., ¶45 (restating BLOC's number that African-American preferred candidates are blocked "57.14%" of the time). Even BLOC offers only broad assertions that are county specific, and a dearth of district-specific race vote blocking. No party except BLOC presented any details on the state and condition of minority communities in the districts at issue, and even that evidence is deeply flawed.

¶92 The United States Supreme Court has "assumed that . . . complying with operative provisions of the Voting Rights Act of 1965" can serve as a compelling interest. However, the government must still satisfy the narrow tailoring and "searching judicial inquiry" that strict scrutiny requires. Parents Involved in Community Schools, 551 U.S. at 720; Bush v. Vera, 517 U.S. 952, 978 (1996) ("Strict scrutiny remains, nonetheless, strict."). There must be a "strong basis in evidence" that the VRA requires the drawing of districts on race

15

to ameliorate harm and lack of access experienced by a minority community. Miller, 515 U.S. at 922; accord Shaw v. Reno, 509 U.S. at 653 ("[R]acial bloc voting and minority-group political cohesion [the requirements of a VRA redistricting violation] never can be assumed, but specifically must be proved in each case in order to establish that a redistricting plan dilutes minority voting strength in violation of § 2."). "Strong" in the context of evidence is defined as "convincing; hard to refute, ignore, or deny." Strong, Oxford English Dictionary (2022). This is not, as the majority appears to take it, a minor procedural speedbump on the way toward racialized district lines. See, e.g., Cooper v. Harris, 581 U.S. ___, 137 S. Ct. 1455, 1464 (2017) (holding that the State of North Carolina lacked evidence to support race-based district boundaries after examining in detail electoral history in the districts at issue); Vera, 517 U.S. at 965-83 (examining in detail the record justifying the district lines in Texas, concluding that race motivated the district boundaries, and reasoning that the districts at issue were insufficiently compact to justify application of the VRA); Miller, 515 U.S. at 920-27 (reviewing in the context of § 5 of the VRA that the record of the case, the justifications underlying district lines in Georgia, and communications between the state and federal government, and concluding that race-based district lines were not justified under the VRA); Shaw v. Hunt, 517 U.S. at 916 (concluding, even assuming the existence of "strong evidence" to support the use of race under the VRA, simply creating majority-

16

minority districts where racially polarized voting occurs absent a targeted remedy for the geographically compact voters harmed fails to satisfy strict scrutiny).[8]

¶93 The operative language in § 2 of the VRA is that election procedures and practices cannot, in the "totality of the circumstances," create

> political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a [protected] class of citizens . . . in that its members have less opportunity than other members of the electorate to

---

[8] The majority contends that a complete record to support racially motivated district lines can be produced in a lawsuit after the maps are enacted. Majority op., ¶41 n.24 (distinguishing a "VRA claim brought [] after the adoption of new districts" from the review provided by the majority, reliant upon a "limited record"). Under the majority's theory, VRA requirements apply only when a government is brought to court. However, state actors must consider whether there is a "strong basis" to support race-based distinctions prior to engaging in remedial action. See Shaw v. Hunt, 517 U.S. at 910 ("[T]he institution that makes the racial distinction must have had a strong basis in evidence to conclude that remedial action was necessary, before it embarks on an affirmative-action program."); see, e.g., Cooper, 137 S. Ct. at 1469-72 (examining the motivation and support for applying a race-based remedy under the VRA at the time of redistricting); Miller v. Johnson, 515 U.S. at 920-27 (reviewing the justifications for a state's use of race in redistricting at the time of adoption of the maps); Bethune-Hill v. Vir. State Bd. of Elections, 580 U.S. ___, 137 S. Ct. 788, 801-02 (2017) (examining the evidence and justifications for a race-based distinctions at the time legislative districts were drawn). As a court, the majority should be considering the law when it selects its maps; the VRA is the law.

participate in the political process and to elect representatives of their choice.[9]

52 U.S.C. § 10301(b). The United States Supreme Court has recognized that a violation of the statute is not dependent on an "intent to discriminate against minority voters." Thornburg v. Gingles, 478 U.S. 30, 44 (1986). Instead, courts must look at effects to determine if the votes of a minority group have been "diluted" to impair the ability of those minorities "to elect representatives of their choice." 52 U.S.C. § 10301(b). "[T]he 'essence' of a [VRA] § 2 vote dilution claim is that a certain electoral law, practice, or structure causes an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." Georgia v. Ashcroft, 539 U.S. 461, 478 (2003).

¶94 Recognizing the broad remedial goals of § 2 of the VRA and its more generalized application, untied to discriminatory intent, the Supreme Court has held that the drawing of districts could constitute an illegal impairment of minority voting rights by permitting a white majority to override the minority's choice in candidate. "[I]nteracting with social and historical conditions," district lines that prevent a cohesive minority from electing their preferred candidate "impairs the ability of

___

[9] The statute also states that "nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 52 U.S.C. § 10301(b). The United States Supreme Court has made clear that there is a difference between minority-preferred candidates and minority candidates. "[T]he ultimate right of § 2 is equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race." De Grandy, 512 U.S. at 1014 n.11.

18

a protected class to [exercise voting rights] on an equal basis with other voters." Johnson v. De Grandy, 512 U.S. 997, 1007 (1994). If certain conditions are met, a map may require the "drawing of majority-minority district[s]." Cooper, 137 S. Ct. at 1470.

¶95 The Supreme Court has demanded that three specific elements be met before it finds that the creation of additional majority-minority districts are necessary: "(1) the racial group is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) the racial group is politically cohesive; and (3) the majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate." League of United Latin American Citizens v. Perry, 548 U.S. 399, 425 (2006) (cleaned up) ("LULAC").

¶96 These three elements of the so-called "Gingles test" are necessary prerequisites for the creation of majority-minority districts. They do not necessarily prove that an election scheme fits the standard of "imped[ing] the ability of minority voters to elect representatives of their choice" under § 2 of the VRA. Gingles, 478 U.S. at 48. To meet the standard, there must be a proven record of discriminatory effects. Taken from a 1982 report from the United States Senate, courts have recognized as potentially significant:

> the history of voting-related discrimination in the State or political subdivision; the extent to which voting in the elections of the State or political subdivision is racially polarized; the extent to which the State or political subdivision has used voting

19

practices or procedures that tend to enhance the opportunity for discrimination against the minority group . . . ; the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; the use of overt or subtle racial appeals in political campaigns; and the extent to which members of the minority group have been elected to public office in the jurisdiction. The Report notes also that evidence demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group and that the policy underlying the State's or the political subdivision's use of the contested practice or structure is tenuous may have probative value.

LULAC, 548 U.S. at 426 (citing Gingles, 478 U.S. at 44-45).

¶97 None of the factors above are dispositive; however, the three Gingles factors must be met before a court considers whether the totality of the circumstances justifies a race-based remedy. Courts consider the "totality of the circumstances" as a second step to determine if the minority opportunities to participate in the electoral process have been impeded. This is an intensively fact-based analysis; it requires submission of testimony and detailed expert reports on the state and conditions of a localities' minority community, the extent they face discrimination, the extent past discrimination still impairs their ability to participate, current election rules, and how those rules impact minorities. De Grandy, 512 U.S. at 1011 ("[E]quality or inequality of opportunity were intended by Congress to be judgments resting on comprehensive, not limited, canvassing of relevant facts"); Gingles, 478 U.S. at 45 ("[T]he question whether the political processes are 'equally open' depends upon a searching practical evaluation of the 'past and

20

present reality,' and on a 'functional' view of the political process.").

¶98 To show that a district map is in violation of the VRA and requires the creation of additional majority-minority districts, there must be thorough factual findings. The Supreme Court has repeatedly refused to apply a VRA remedy without detailed factual evidence demonstrating the existence of the Gingles factors, even prior to engaging in the more fact-intensive "totality of the circumstances," i.e., the characteristics of the minority community and their voter behavior. See, e.g., Cooper, 137 S. Ct. at 1471-72 (concluding that a majority-minority district created for VRA compliance was unconstitutional because past election data showed super-majority vote percentages by the candidate preferred by African-Americans and effective white-bloc voting, the third Gingles factor, was not proven, despite the possibility that new white voters were added who could change the voting results); Bartlett v. Strickland, 556 U.S. 1, 19-20 (2009) (plurality) (concluding that § 2 of the VRA does not apply where the parties did not prove a change in district lines would create a majority African-American district, reasoning that the first Gingles factor was not met); LULAC, 548 U.S. at 432 (holding that a majority-Hispanic district was required but an existing map creating a majority-Hispanic district failed to satisfy the VRA because different Hispanics in different areas had "differences in socio-economic status, education, employment, health, and other characteristics," and there was insufficient evidence of

21

"compactness" under the first Gingles factor); Gonzalez v. City of Aurora, 535 F.3d 594, 600 (7th Cir. 2008) (concluding that no evidence was provided that voting opportunities for Hispanics in a municipality were impaired, the plaintiff did not "build . . . a factual record," and no VRA claim lay despite Hispanics being dramatically less represented as a portion of their population); Clarke v. City of Cincinnati, 40 F.3d 807, 812-13 (6th Cir. 1994) (noting that the electoral history for the public offices at issue demonstrated that "47 percent of blacks' preferred black candidates were elected" and thus there was "no reason to find that blacks' preferred black candidates have 'usually' been defeated" under Gingles).

¶99 Furthermore, well-established Supreme Court precedent states that § 2 violations are determined by examining individual districts and specific voting groups. Cooper, 137 S. Ct. at 1471-72, 1471 n.5 ("[G]eneralized conclusion[s]" of state-wide racial polarization in voting "fails to meaningfully (or indeed, at all) address the relevant local question: whether, in a new version of District 1 created without a focus on race, black voters would encounter sufficient white bloc-voting to cancel their ability to elect representatives of their choice." (cleaned up)); LULAC, 548 U.S. at 432, 437 (explaining that VRA analysis requires "an intensely local appraisal" of the relevant district); Shaw v. Hunt, 517 U.S. at 917 ("For example, if a geographically compact, cohesive minority population lives in south-central to southeastern North Carolina, as the Justice Department's objection letter suggested, District 12 that spans

22

the Piedmont Crescent would not address that § 2 violation."); Abbott v. Perez, 585 U.S. \_\_\_, 138 S. Ct. 2305, 2333-34 (2018) (noting, despite evidence of a "long history of discrimination" in Texas, a "pattern of disadvantage" for minorities, and racially polarized voting in the region, there was insufficient evidence of "present local conditions" to support a VRA remedy); United States v. City of Euclid, 580 F. Supp. 2d 584, 604-12 (N.D. Ohio 2008) (examining in detail the need for a race-based VRA remedy by considering the conditions and experiences of specific African-American communities in a town of 50,000); Comm. for a Fair & Balanced Map v. Ill. State of Bd. of Elections, 835 F. Supp. 2d 563, 583 (N.D. Ill. 2011) (noting that "northern and southern enclaves" of a Hispanic district had "a common heritage and share[d] common core value[s]").

¶100 The inquiry is emphatically not to create "the maximum number of majority-minority districts," regardless of the on-the-ground characteristics of the minority neighborhoods and communities at issue. De Grandy, 512 U.S. at 1016 (reversing a district court's finding of § 2 violation because more Hispanic majority-minority districts could have been created); Gonzalez, 535 F.3d at 598 ("But neither § 2 nor Gingles nor any later decision of the Supreme Court speaks of maximizing the influence of any racial or ethnic group."); Bartlett, 556 U.S. at 15 ("Nothing in § 2 grants special protection to a minority group's right to form political coalitions.").

¶101 Thus, from these legal principles a picture of narrow VRA compliance for this court emerges. Legislative boundaries

23

must be drawn to create effective majority-minority districts only where proof is offered, and accepted by a court, that existing districts or districts drawn using race-neutral criteria would result in white voters, as a bloc, preventing minorities from electing candidates that they support and that represent them. In addition, evidence must be offered and accepted that the minority needs representation from their choice candidate due to depressed socio-economic statistics as a result of current and historical discrimination, election practices and procedures that encourage or facilitate racial discrimination, and the lack of non-choice candidates to respond to the "particularized needs of the members of the minority group," among other factors. LULAC, 548 U.S. at 426, 440.

¶102 Further, there must be available the creation of districts with majority-minority composition. Id. (stating the first Gingles factor of "the racial group is sufficiently large and geographically compact to constitute a majority in a single-member district" (emphasis added)); Bartlett, 556 U.S. at 19 (holding that § 2 does not require the creation of below-majority "opportunity districts," reasoning that "a party asserting § 2 liability must show by a preponderance of the evidence that the minority population in the potential election district is greater than 50 percent."). As the United States Supreme Court explained in Cooper, when voters outside the minority group act as sufficient "crossover" to "help [the] minority to elect its candidate of choice," "it is difficult to see how the majority-bloc-voting requirement could be met" under

24

Gingles. Cooper, 137 S. Ct. at 1471. If there is not substantial proof that a majority-minority district can be created, that minority voters are barred from effective participation, or that minorities are blocked by white voters from having representation, any consideration of race during redistricting would violate the constitution. Id. at 1464-65. Without the need to draw districts under the VRA, race-neutral "traditional districting principles such as compactness, contiguity, and respect for political subdivisions" must control this court's decision. Shaw v. Reno, 509 U.S. at 647.

### i.   Gingles Factors and Bloc Voting

¶103 Despite the high demands of the VRA, coupled with the need to meet VRA standards to justify the use of race to create government policy under the Equal Protection Clause, it is striking how insubstantial a record the Governor has provided to support his racially driven maps. Courts have made it very clear that substantial evidence must be produced of all three Gingles factors to permit racial motivations in district boundaries. Cooper, 137 S. Ct. at 1471-72; Bartlett, 556 U.S. at 19-20; LULAC, 548 U.S. at 425; Gonzalez, 535 F.3d at 600; Clarke, 40 F.3d at 812-13. However, unlike the leading cases on the VRA, only BLOC engages in any detailed analysis on electoral history. See LULAC, 548 U.S. at 423-29 (describing in detail the electoral history, by race, of an at issue congressional district to find a VRA violation); Cooper, 137 S. Ct. at 1470-72 (explaining the electoral history of an area to determine that a

25

majority-minority district fell outside the VRA and was thus unconstitutional).

¶104 The Governor presents, and the majority opinion accepts, zero evidence of election history to support the application of the Gingles factors to the current maps, the Legislature's maps, or other race-neutral alternatives to support his division of districts by race. Further, the Governor presents no electoral history evidence to prove the existence of the Gingles factors in any of the specific districts he drew. Such evidence is also lacking to show the Governor's maps comply with the VRA, as compared to BLOC's maps, which also include seven black-majority districts. In a twist of fate, this leaves open the possibility that VRA compliance is not met for the Governor's maps, even if the VRA is triggered and requires raced-based districts.

¶105 The only thing the Governor does do that approaches objective or scientific argument is cite population percentages of African-Americans in Wisconsin. The Governor thereby concludes that seven districts of a bare 51% BVAP can be drawn, and must be drawn. This notwithstanding that the United States Supreme Court has explicitly rejected the same logic on numerous occasions. De Grandy, 512 U.S. at 1016 (rejecting a claim that § 2 requires states to create "the maximum number of majority-minority districts"); Bartlett, 556 U.S. at 15 ("Nothing in § 2 grants special protection to a minority group's right to form political coalitions."); Gonzalez, 535 F.3d at 598 ("But neither § 2 nor Gingles nor any later decision of the Supreme Court

26

speaks of maximizing the influence of any racial or ethnic group."). Stopping here, the Governor has failed to provide any evidence specific to his proposed districts warranting a finding of white bloc voting that can effectively overcome a politically-cohesive black voting bloc, let alone strong and convincing evidence sufficient to overcome strict scrutiny. See Miller, 515 U.S. at 922. This alone should counsel the court to reject the Governor's map and adopt the race-neutral maps presented by either the Legislature or the CMS.

¶106 This is exactly the form of analysis that the Michigan Supreme Court recently applied. Detroit Caucus v. Indep. Citizens Redistricting Comm'n, ___ N.W.2d ___, 2022 WL 329915 (Mem) (Mich. Feb. 3, 2022). The court found that "a conclusory expert affidavit with no accompanying bloc-voting analysis" was insufficient to support the use of race to create additional majority-minority districts which the state could have drawn, but did not. Id. at *2. The Governor in this case has presented little more evidence than the inadequate VRA showing made in Detroit Caucus. Notably, when a full and complete election history analysis was performed in Michigan, "significant white crossover voting for Black-preferred candidates" was found. Id.

¶107 Furthermore, the Governor's maps actually reduce the percentage of African-American voters in the relevant districts from their existing levels. The VRA is invoked only when minorities, due to a mobilized and oppositional majority, cannot effectively participate and elect preferred candidates.

27

Gingles, 478 U.S. at 48; De Grandy, 512 U.S. at 1007. The maps adopted by the majority reduce this population allegedly overpowered by a white majority, instead of giving it a greater voice within the aggrieved districts. Of course then, the districts cannot be so aggrieved, and no evidence exists so to invoke the VRA. In other words, before a change is to be made under the VRA, there must be a violation of the VRA so to invoke its remedy. The remedy is to cure the suppressed voter effect by giving minority voters greater voice, not reducing their voice. Alone, this statistic puts a dagger in the Governor's map.

¶108 Lacking any support in the record, one might turn to the presentations made by BLOC, the only other party that supported racially-motivated district lines but also provided electoral evidence. In fact, the majority's sole citation to electoral history evidence relied on BLOC's expert report. See majority op., ¶45 (restating BLOC's statistics on the rate in which African-American preferred candidates are blocked). Yet even that evidence is flawed. BLOC selects eight oddly identified races from Milwaukee County (two comptroller races, and one race each for sheriff, democratic gubernatorial primary, state assembly, mayor, Milwaukee county executive, and state superintendent) to evidence the region's electoral history. Only one election was examined that involved the public offices at issue in this case: assembly, senate, and congressional elections. This is markedly at odds with traditional VRA analysis. See, e.g., Cooper, 137 S. Ct. at 1471-72 (examining

28

the electoral history of a congressional district at issue in the challenge); LULAC, 548 U.S. at 427-28 (explaining electoral history in the congressional district at issue); City of Euclid, 580 F. Supp. 2d at 598-600 (describing non-applicable elections in the context of a detailed review of city council elections at issue in the lawsuit); Harper v. City of Chicago Heights, 824 F. Supp. 786, 790, 799-800 (N.D. Ill. 1993) (examining the electoral history of specific city commissioner offices at issue).

¶109 While some elections may be of more probative value than others, the provision of only eight elections, and only one of which involving the elected offices at issue, can hardly demonstrate the extent to which black people, under existing and race-neutral maps, lack the same "opportunity . . . to participate in the political process and to elect representatives of their choice" as do white people. 52 U.S.C. § 10301(b); see Bone Shirt v. Hazeltine, 336 F. Supp. 2d 976, 996 (D.S.D. 2004) (explaining a common hierarchy of election history value, when such history is available, noting that "[e]ndogenous elections, contests within the jurisdiction and for the particular office that is at issue, are more probative than exogenous elections").[10]  Undoubtedly, dozens of elections have occurred in the Milwaukee-area state assembly, senate, and

---

[10] If this were otherwise, it is highly likely that governments would simply cite state-wide general election results (white versus minority percentages) to justify racially motivated district lines, in almost every state in almost every region of the country.  This would be a dramatic expansion of the permissible use of race in American election practices.

29

congressional districts at issue in the past 10 years alone.[11] The court's focus is on the "totality of the circumstances" and whether as a whole African Americans are denied the opportunity to effectively participate in electoral democracy. 52 U.S.C. § 10301(b). The consistent election of candidates of choice for the African-American community into public office in the districts at issue would be highly probative. Yet the record is completely devoid of any evidence that the voters in these districts were blocked from voting in the candidates of their choice in a way that would invoke the VRA.

¶110 Even under BLOC's selective analysis, white voters engaged in bloc voting to prevent the candidate of choice for African-Americans four times. That is around a 50% rate——hardly the kind of strong evidence needed to overcome strict scrutiny. Compare Clarke, 40 F.3d at 812-13 (even when considering applicable electoral history, concluding that minority-preferred candidates were not "usually" defeated when the minority-preferred candidate was selected in 47% of elections). BLOC disaggregated allegedly polarized election results for each individual district it drew for only three races (a Democratic gubernatorial primary, a Milwaukee county executive race, and a state superintendent race). But how can the court effectively perform an "intensely local appraisal" of district-specific evidence when election results for these districts are provided for a mere three races, none of which were for the elected

_____

[11] The dissent of Justice Roggensack, which follows this dissent, identifies many such elections of black-preferred candidates in districts that are predominantly white.

offices at issue? LULAC, 548 U.S. at 437. Of the three races selected for district-specific treatment, only one of them had a head-to-head race where voters did not split votes between several candidates (thus preventing a more complete picture of voter preferences).

¶111 The district-specific evidence of two races BLOC provided was limited only to BLOC's proposed assembly districts. BLOC did not provide detailed district analyses of the current maps, an alternative race-neutral map, nor any other party's maps outside one Democratic gubernatorial primary in 2018. In the process of this litigation, the court has not been made aware of a single case that found the existence of a strong evidentiary record, applied the VRA, and satisfied strict scrutiny through use of one election result, let alone a result from an exogenous election (from a partisan primary between candidates with strong support from the African-American community).[12] Compare LULAC, 548 U.S. at 427-28 (examining partisan general election results); Cooper, 137 S. Ct. at 1470-71 (reviewing partisan general election results); City of Euclid, 580 F. Supp. 2d at 598-99 (explaining electoral history for non-partisan general election results); Harper, 824 F. Supp.

---

[12] See Wisconsin Governor Exit Polls, CNN, https://www.cnn.com/election/2018/results/wisconsin/governor (last visited Feb. 10, 2022) (explaining how the Governor was elected statewide on the support of 85% of the African-American population).

at 790 (reviewing non-partisan general election results).[13]   To understate the point, this substantially limits the ability of the court to effectively judge if African-American voters are having their candidates blocked and their voices unlawfully stifled, therefore justifying race-based redistricting.  See, e.g., Comm. for Fair & Balanced Map, 835 F. Supp. 2d at 587

---

[13] Of course, considering the wide-sweeping scope of VRA review, primary elections may be valid considerations when determining if a racial group has equal opportunity to participate in elections.  See Thornburg v. Gingles, 478 U.S. 30, 59 (1986) (reviewing both general and primary election results).  However, party makeups can change dramatically over time.  At some points in history, a party may contain voters with markedly different views on the treatment of minorities. See, e.g., Glenn T. Eskew, George C. Wallace, Encyclopedia of Alabama, (Jun. 10, 2021) (describing the political history of George Wallace, an outspoken supporter of racial segregation and a lifelong Democrat).   BLOC's analysis presents serious questions of whether current Democratic primary elections in Wisconsin, standing alone, are substantially probative on the ability of African-Americans to have effective opportunities, voices, and representation in democratic government.

(concluding that white bloc voting was not met where an expert failed to provide evidence on specific districts at issue).[14]

---

[14] Furthermore, race-based redistricting under § 2 of the VRA applies only where voting is polarized to such an extent that a white majority blocks African-American-supported candidates so that the only way African-American individuals can effectively participate in democracy is to create majority-minority districts. See Bartlett v. Strickland, 556 U.S. 1, 19 (2009) (plurality) (holding that § 2 does not require the creation of below-majority "opportunity districts"); Cooper, 137 S. Ct. at 1464-65. A bare majority of African-American voters is unlikely, absent extraordinary polarization, to prevent white bloc-voting (if it exists) from stopping effective African-American representation. Along these lines, courts attempting to ensure VRA compliance have accepted the need to create VRA districts with BVAP percentages materially greater than a bare 51% majority. See, e.g., Comm. for a Fair & Balanced Map v. Ill. State Bd. of Elections, 835 F. Supp. 2d 563, 582 (N.D. Ill. 2011) ("60 percent of voting-age population is reasonably required to ensure minorities a fair opportunity to elect a candidate of their choice."); Hastert v. State Bd. of Elections, 777 F. Supp. 634, at 647 (N.D. Ill. 1991) (noting that a "65% minority population [or 60% minority voting-age population] concentration [is] generally regarded as necessary to ensure minorities a reasonable opportunity to control a district"); Baumgart v. Wendelberger, No. 01-C-0121, 2002 WL 34127471, at *5 (E.D. Wis. May 30, 2002) (recognizing expert testimony that "a minority district requires an African-American voting age population of at least 60% to guarantee the election of candidates of choice"); United States v. City of Euclid, 580 F. Supp. 2d 584, 594 n.11 (N.D. Ohio 2008) (explaining that the efficacy of a "narrow" majority-minority district is subject to question and this is remedied by majority-minority districts in excess of "60%"); Baldus v. Members of Wis. Gov't Accountability Bd., 849 F. Supp. 2d 840, 851 (E.D. Wis. 2012) (creating a majority-minority Hispanic district, effective at 67.7% voting-age population); African American Voting Rights Legal Defense Fund, Inc. v. Villa, 54 F.3d 1345, 1348 n.4 (8th Cir. 1995) ("[A] guideline of 65% of total population (or its equivalent) has achieved general acceptance in redistricting jurisprudence."); Ketchum v. Byrne, 740 F.2d 1398, 1403 (7th Cir. 1984) ("A guideline of 65% of total population has been adopted and maintained for years by the Department of Justice and by reapportionment experts and has been specifically approved by the Supreme Court."). When commenting on total voter population percentage, the court in Prosser explained that

¶112 Strikingly, under BLOC's analysis, the Governor's maps do not satisfy the VRA, and are thus unconstitutional. The majority not only lacks evidence to support the maps it adopts, but the only party who even attempted to prove a VRA need determined those maps were illegal.[15]

ii. Totality of the Circumstances

¶113 The Gingles factors are only "necessary prerequisites," they are not "sufficient" to justify a race-

_____

effective majority-minority districts require 65% minority populations "(50 percent plus 5 percent to reflect the lower average age of blacks and hence lower voting population, 5 percent to reflect a lower fraction of registered voters, and 5 percent to reflect a lower turnout)." Prosser v. Elections Bd., 793 F. Supp. 859, 869 (W.D. Wis. 1992). Even if evidence supported the race-based remedy offered by the Governor, his bare-majority districts fall outside the mainstream of accepted VRA redistricting measures.

[15] Even if, due to specific electoral statistics and community-based evidence in Milwaukee, a seventh high-BVAP district were required, that in no way explains why the remaining six high-BVAP districts must be drawn with a scalpel to reach exactly 51% BVAP. Racially motivated government action must be "narrowly tailored" to satisfy strict scrutiny. Grutter v. Bollinger, 539 U.S. 306, 326 (2003); see, e.g., Shaw v. Hunt, 517 U.S. at 916-18 (concluding that districts drawn on the basis of race were not "narrowly tailored" because the government drew district lines from scattered minority communities which may have different VRA needs and were thus not sufficiently compact). The VRA must be tied to individuals and their specific communities, not general categories of race. Shaw v. Hunt, 517 U.S. at 917 (affirming that the VRA protects "individual[s]" not "the minority as a group"); LULAC, 548 U.S. at 437 ("A local appraisal is necessary because the right to an undiluted vote does not belong to the minority as a group, but rather to its individual members."); De Grandy, 512 U.S. at 1016 (explaining that, even when the Gingles factors and the totality of the circumstances require race-based redistricting, the VRA does not support creating "the maximum number of majority-minority districts").

34

based remedy under the VRA. Gingles, 478 U.S. at 50; De Grandy, 512 U.S. at 1011. In addition to the Gingles factors, the VRA requires proof that the "totality of the circumstances" supports the drawing of districts on the basis of race. Gingles, 478 U.S. at 50; De Grandy, 512 U.S. at 1011; LULAC, 548 U.S. at 436; Bartlett, 556 U.S. at 24. Totality of the circumstances is an independent, separate requirement; to apply a race-based remedy a totality of the circumstances analysis must be provided. The majority's description of the totality of the circumstances is shockingly insubstantial.

¶114 Proportionality of majority-minority districts to the "citizen voting-age population" can be relevant to the totality of the circumstances analysis. LULAC, 548 U.S. at 436. The Legislature's expert notes that various data files show an African-American citizen voting-age population ("CVAP") of either 6.1% of 6.4% (taken from two different U.S. Census data files). The Governor fails to present evidence on the issue. While BLOC strenuously opposes the Legislature's numbers, their expert suggests an African-American CVAP of 6.5%. Even if BLOC's number were accepted, a proportionality analysis would not support seven assembly districts. There are 99 assembly districts, 6.5% of 99 is 6.4, which rounding to the nearest whole number would be 6. At the very least, a proportionality analysis does not provide strong support for a seventh district.

¶115 The majority notes that the African-American CVAP in Wisconsin falls between 6.1% and 6.5%, but it fails to complete the final step of a proportionality inquiry: multiplying the

35

CVAP by the relevant number of seats, here 99. Majority op., ¶48. It thus states a misleading statistic of 6.5% and hopes the reader confuses it for a complete proportionality analysis. Further, the majority relies heavily on population trends among black and white individuals, as well as demographic statistics in Milwaukee County. See majority op., ¶48 ("[A] significant proportion of Wisconsin's Black population lives in Milwaukee County where the subject districts are principally located."). Yet the United States Supreme Court in League of United Latin American Citizens v. Perry explicitly rejected the use of "regional" as opposed to "statewide" proportionality analysis for statewide districting plans. 548 U.S. at 436-38. And proportionality refers to the percentage of a given race in a state. Id. at 436 (explaining that the proportionality of a race is determined by comparing the number of minority districts to "the [minority] share of the citizen voting-age population"). Proportionality does not encompass an increase or decrease of anything, i.e., population trends amongst the African-American population. The majority both twists the natural meaning of English and refuses to comply with explicit Supreme Court directives.

¶116 Beyond proportionality, the majority fails to discuss any of the 1982 Senate Report factors relied upon by courts to determine if the VRA applies. Gingles, 478 U.S. at 43-45; LULAC, 548 U.S. at 426; see, e.g., City of Euclid, 580 F. Supp. 2d at 604-12 (providing a totality of the circumstances analysis). Those factors lay at the heart of a totality of the

36

circumstances analysis; they are the reason why racially motivated maps may satisfy strict scrutiny. Gingles, 478 U.S. at 50; De Grandy, 512 U.S. at 1011; LULAC, 548 U.S. at 426; Bartlett, 556 U.S. at 24. Nonetheless, the factors are completely ignored.

¶117 The majority shortcuts the required analysis and instead relies on the flawed belief that proportionality is the preeminent consideration for totality of the circumstances. Majority op., ¶46 n.28, ¶¶47-50 (stating that courts "focus[] . . . [their] attention on considerations not mentioned in the Senate Report, such as proportionality," and examining only proportionality in a totality of the circumstances analysis). That is flatly contradicted by established United States Supreme Court precedent. De Grandy, 512 U.S. at 1011-12 (rejecting the argument that proportionality is determinative of VRA compliance and noting that "[n]o single statistic provides courts with a shortcut"); Gingles, 478 U.S. at 47 ("The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives."); LULAC, 548 U.S. at 426, 436-42 (laying out the Senate Factors as considerations for totality of the circumstances analyses and examining both proportionality and several Senate Factors when determining the VRA required redrawing of certain districts in Texas). By statute, the VRA requires examination of the "totality of the circumstances," 52 U.S.C. § 10301; nowhere in

37

the statute does it state or imply that proportionality should be the primary "focus[] . . . of [the court's] attention." Majority op., ¶46 n.28.

¶118 There is a simple reason no real support is provided by the majority for the totality of the circumstances: there is none. The only party who even attempted to argue for VRA application under the totality of the circumstances was BLOC. The Governor presented no totality of the circumstance support for his districts. Either the majority does not rely on BLOC, and thus zero evidence is available to support the application of the VRA, or, in the alternative, the majority must rely solely on BLOC's analysis. In either case, there is no justification for use of race in drawing the Governor's maps.

¶119 BLOC's totality of the circumstances analysis is deeply flawed and is in the form of an expert opinion alone. This lone source of evidence is highly debatable, and strikes an unmistakable tone of partisanship, attacking political opponents and disfavored policies. Such conclusory opinion evidence does not amount to the kind of factual district-specific evidence that could support a conclusion that a VRA violation has occurred and the remedy must be creation of seven bare-majority districts. Cooper, 137 S. Ct. at 1471-72; LULAC, 548 U.S. at 432; Shaw v. Hunt, 517 U.S. at 917; City of Euclid, 580 F. Supp. 2d at 604-12; Comm. for Fair & Balanced Map, 835 F. Supp. 2d at 583.

¶120 For instance, BLOC claims Milwaukee's choice to close polling locations during the COVID-19 Pandemic and voter ID laws

38

demonstrate the existence of racially discriminatory election practices. No evidence or explanation is provided as to how these basic administrative and perfectly legitimate election practices "tend to enhance the opportunity for discrimination against the minority group." Gingles, 478 U.S. at 44-45. This is far cry from the "poll tax, an all-white primary system, and restrictive voter registration time periods," used in the past in parts of the country to mask disenfranchisement of African-American voters. LULAC, 548 U.S. at 439-40; see also De Grandy, 512 U.S. at 1018 ("In a substantial number of voting jurisdictions, that past reality has included such reprehensible practices as ballot box stuffing, outright violence, discretionary registration, property requirements, the poll tax, and the white primary; and other practices censurable when the object of their use is discriminatory, such as at-large elections, runoff requirements, anti-single-shot devices, gerrymandering, the impeachment of office-holders, the annexation or deannexation of territory, and the creation or elimination of elective offices.").

¶121 The State of Wisconsin must strive to eliminate any voting practice that facilitates unjust discrimination. According to BLOC, must the state control election administration in Milwaukee to prevent consolidation of polling locations and covert discriminatory practices? Must the state revoke its Voter-ID laws? See Frank v. Walker, 768 F.3d 744, 753-54 (7th Cir. 2014) (upholding a direct § 2 VRA challenge against Wisconsin's Voter-ID law, noting "[s]ection 2(b) tells

39

us that § 2(a) does not condemn a voting practice just because it has a disparate effect on minorities," there was no finding "blacks . . . have less 'opportunity' than whites to get photo IDs," and black individuals had equal if not higher voter registration and turnout in the 2012 election as compared to white individuals); Brnovich, 141 S. Ct. at 2345 (noting that "a distorted picture can be created" by the manipulative use of statistics, such as "[i]f 99.9% of whites had photo IDs, and 99.7% of blacks did, it could be said that blacks are three times as likely as whites to lack qualifying ID (0.3 ÷ 0.1 = 3)" (quotations omitted)); Crawford v. Marion Cnty. Elections Bd., 553 U.S. 181, 204 (2008) ("The application of [Indiana's Voter-ID law] to the vast majority of Indiana voters is amply justified by the valid interest in protecting the integrity and reliability of the electoral process.").

¶122 BLOC also looks at general socio-economic correlations between white and African-American individuals in Wisconsin, including the lower rates of African-American homeownership and lower average incomes, and concludes, without any substantial analysis on the extraordinary complexities of causation, that this is the result of current and past discrimination. The accepted fact that African-American individuals experienced despicable forms of discrimination, specifically racial housing covenants in the Milwaukee-area, is certainly a factor impacting VRA analyses, but mere conclusions of discriminatory effects for all African-American individuals in Milwaukee from race-based correlations is not substantial evidence of discriminatory

40

hindrances on the ability of African-American individuals "to participate effectively in the political process." Gingles, 478 U.S. at 44-45. It is the burden of those seeking to use race in district boundaries to prove the need for such practices. Mere inferences and assumptions cannot be sufficient.

¶123 Further, BLOC asserts proof of race baiting and racially motivated campaigning by pointing to statements from Republicans and conservatives critiquing the Black Lives Matter organization, taking knees during national anthems, and defunding the police. Notably, despite the fact that BLOC relies heavily on Democratic primary data to demonstrate bloc-voting and the need for race-drawn districts, the racial animus directed toward African-American individuals in campaigns and public messages all allegedly come from conservative Republicans. There is no evidence offered by BLOC that the Democratic public officials who at times defeat African-American preferred candidates, such as the Governor in his Democratic primary, are "unresponsive to the particularized needs of the members of" the African-American community. Gingles, 478 U.S. at 44-45; see LULAC, 548 U.S. at 426, 440 (explaining in detail that a current representative for a district subject to VRA scrutiny was "unresponsive" to the needs of the minority community). Shockingly, BLOC contends that African-American candidates have only had "mixed success" in the districts at issue. Relying on exogenous and state-wide elections, BLOC ignores the fact that the current assembly, senate, and

41

congressional districts have elected African-American office holders in the vast majority of elections.

¶124 The evidence offered by BLOC of the totality of the circumstances is hardly localized to the historical, societal, and economic experiences of specific neighborhoods in Milwaukee. Underlying BLOC's analysis is the assumption that all African-American individuals in Wisconsin have the same history, experiences, and effects of discrimination, and there is no need to go further than broad strokes of correlations, debatable assumptions, and talking-points. See LULAC, 548 U.S. at 432 (examining in a VRA analysis that different Hispanics in different parts of Texas had "differences in socio-economic status, education, employment, health, and other characteristics"); Comm. for Fair & Balanced Map, 835 F. Supp. 2d at 583 (noting that "northern and southern enclaves" of a Hispanic district had "a common heritage and share[d] common core value[s]"); City of Euclid, 580 F. Supp. 2d at 605-07 (explaining in detail, with numerous experts reports, record evidence, and testimony, forms of official discrimination against a discrete African-American community in Euclid, Ohio). Individuals, communities, and societal groups differ, even if they are the same race. In fact, the maps offered by the Legislature and CMS recognize that many of the African-Americans moved under the Governor's maps are located in discrete and compact neighborhoods. Following traditional redistricting criteria, and putting together those with shared communities, interests, and experience, the Legislature's and CMS's districts

42

fluctuate in BVAP to recognize this geographical reality.[16] By comparison, for their purported benefit, the majority chooses to displace many African Americans and move them into districts with little societal, cultural, and economic similarities.[17]

### iii. The Majority Opinion and Party Concessions

¶125 Despite all its faults, BLOC at least provided some evidence supporting their VRA claims. The Governor presented nothing, let alone district-specific evidence. This flies in the face of well-accepted precedent on overcoming strict scrutiny and proving VRA needs. See Vera, 517 U.S. at 965-83; Miller, 515 U.S. at 920-27; Shaw, 517 U.S. at 916; Cooper, 137 S. Ct. at 1471-72; Bartlett, 556 U.S. at 19-20; Perry, 548 U.S. at 432; Gonzalez, 535 F.3d at 600; Clarke, 40 F.3d at 812-13; City of Euclid, 580 F. Supp. 2d at 604-12; Committee for a Fair and Balanced Map, 835 F. Supp. 2d at 583; Harper, 824 F. Supp.

---

[16] See John Johnson, Neighborhoods Where Milwaukee Isn't Segregated, Marquette University Law School (Feb. 9, 2022), https://law.marquette.edu/facultyblog/2022/02/neighborhoods-where-milwaukee-isnt-segregated/ (describing the demographic makeup of the many unique neighborhoods in Milwaukee).

[17] In the process, to obtain his 51% BVAP districts, the Governor shifted white voters (referred to as "filler" voters at oral arguments) into new districts to achieve targeted racial proportions. The VRA by its text does not apply solely to any one race, and both the Equal Protection Clause and the Fifteenth Amendment's prohibition on racial discrimination in voting practices apply to all races. See 52 U.S.C. § 10301; U.S. Const. amend. XIV; U.S. Const. amend. XV; Shaw v. Reno, 509 U.S. 630, 657 (1993) ("Racial gerrymandering, even for remedial purposes, may balkanize us into competing racial factions; it threatens to carry us further from the goal of a political system in which race no longer matters—a goal that the Fourteenth and Fifteenth Amendments embody, and to which the Nation continues to aspire.").

43

At 790, 799-800. Yet that does not seem to bother the majority as they walk blindfolded into a buzz saw of Equal Protection law. Given that, under BLOC's analysis, the Governor's maps violate the VRA, the majority's maps may bear the usual stigma of violating the Equal Protection Clause and the VRA at the same time.

¶126 Counterintuitively, a linchpin of the majority's VRA analysis is an alleged lack of evidence and argument. The majority opinion may leave the reader with the misperception that all litigants at this court agreed that a racial gerrymander under the VRA was necessary. See majority op., ¶45 (noting "little . . . alternative data or analysis" to counter BLOC's election history and indicating that the "parties appeared to assume the VRA requires" race-based district lines). That is patently inaccurate. In briefing, the Legislature was clear that its maps both provided African-Americans equal opportunity "to participate in the political process and to elect representatives of their choice" (thus satisfying the VRA), 52 U.S.C. § 10301(b), and was not motivated by race (thus satisfying the Equal Protection Clause), Miller, 515 U.S. at 911-12. The Legislature asserted that the Governor's maps "reveal a policy of prioritizing mechanical racial targets above all other districting criteria (save one-person, one-vote), meaning there is ample evidence that race motivated the drawing of particular lines." Further, the Legislature claimed, correctly, that the Governor "offered zero evidence that the existing districts do not give all voters equal opportunity to

44

elect their candidate of choice." In the Legislature's reply brief, it argued the Governor presented "novel and likely unconstitutional" arguments in support of seven bare majority-minority districts, labeled by the Legislature as an "unconstitutional racial gerrymander." The Legislature reaffirmed in the same brief that its "redistricting plan was drawn without regard to race." Further, the Legislature's expert, John Alford, described in many pages of detail the computational and data concerns with the evidence submitted by BLOC to support application of the VRA. He stated explicitly, "[T]he election patterns detailed by [BLOC] raise serious doubts about whether the Gingles threshold standard is currently met in Milwaukee County." Finally, Mr. Alford observed that, even using BLOC's election data, the black-preferred candidate was blocked in less than 50% of elections.

¶127 The central goal of the Legislature's proposed maps was to conserve existing boundaries for districts with high BVAP, not draw districts to maximize majority-minority

45

districts. The Legislature's race-neutral intentions were confirmed at oral argument.[18]

¶128 But, even so, why is the majority attached to party briefing? They have a responsibility to read the law, understand available evidence, and come to the correct

---

[18] The majority adds in an argument that the Legislature's districts in some way "pack" African-American voters into a district with above 70% BVAP. Majority op., ¶49. The Legislature has one district at 71.5% BVAP. As the majority notes, it is well established that the VRA requires the creation of race-based districts where minorities are "fragment[ed] . . . among several districts where a bloc-voting majority can routinely outvote them," or where minorities are "pack[ed] . . . into one or a small number of districts to minimize their influence in the districts next door." De Grandy, 512 U.S. at 1007; see majority op., ¶49. But the United States Supreme Court has clarified that the VRA applies only to the creation of majority-minority districts; it does not require splitting up high minority-percentage districts to more effectively spread the minority's political influence. Bartlett, 556 U.S. at 19; Cooper 137 S. Ct. at 1471 (explaining that without the need for a majority-minority district sufficient white crossover would undermine the satisfaction of the Gingles factors). Thus, the inquiry is whether there has been presented evidence of effective white bloc voting to prevent minorities in a specific area and district from successfully electing candidates they support. Even if the Legislature drew a higher BVAP district following race-neutral redistricting criteria such as preserving continuity of interests, geographic compactness, and local government lines, without the requisite evidence of a VRA violation in a separate, neighboring district where a majority-minority district could be created, no race-based remedy under the VRA can be used. Here, there is no such district-specific evidence. The majority does not cite a single case holding that merely having a high BVAP district, without the need to prove the Gingles factors or the need for a race-based remedy under the totality of the circumstances, violates the VRA. See Ketchum, 740 F.2d at 1403-06, 1418 (case cited by the majority, noting the commonly accepted target of 65-70% minority population percentages in applying a VRA remedy, after a VRA violation in relevant districts has been established).

46

conclusion. See State v. Hunt, 2014 WI 102, ¶42 n.11, 360 Wis. 2d 576, 851 N.W.2d 434 ("Because it is our constitutional duty to say what the law is, we are not bound by a party's concessions of law."). They, not the litigants, are the government actors. U.S. Const. amend. XIV sec. 1 ("No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." (Emphasis added.)); Brentwood Academy v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 (2001) (noting that only those "outside formally governmental organizations" fall outside the coverage of the Fourteenth Amendment); Johnson v. California, 543 U.S. 499, 505 (2005) ("Under strict scrutiny, the government has the burden of proving that racial classifications are narrowly tailored measures that further compelling governmental interests." (Emphasis added.)). They are the ones choosing a map for the State of Wisconsin, endorsing district boundaries unambiguously motivated by race. See, e.g., De Grandy, 512 U.S. 997 (reviewing under traditional Equal Protection and VRA standards maps approved by the Florida Supreme Court). The court, acting on behalf of the State of Wisconsin, not the parties, must overcome strict scrutiny. See Grutter, 539 U.S. at 326 (describing strict scrutiny demands when the government treats individuals differently on the basis of race); Vera, 517 U.S. at 978 ("Strict scrutiny remains, nonetheless, strict."); see, e.g., Cooper, 137 S. Ct. at 1464; Miller, 515 U.S. at 920-27; Shaw v. Hunt, 517 U.S. at 916.

47

¶129 Ultimately, the majority's focus on the parties' positions is a tactic of distraction. The majority may understand that it lacks sufficient evidence to support race-driven maps proposed by the Governor, so to compensate, it turns around and reasons that the Governor's maps cannot be rejected with what it views as inadequate argument on the part of the Legislature and other parties. But this merely begs the question: why is the court adopting a racially motivated map without support in the record? The majority does not cite a single case standing for the proposition that a state action can survive strict scrutiny by pointing to the fact that other private, non-state actors did not present evidence or arguments in favor of a constitutional course of action. Under the majority's logic, could the Legislature, when it passes maps at the next redistricting cycle, draw districts on the basis of race, without evidence supporting the application of the VRA, by simply allowing third-party stakeholders an opportunity to object? The majority's reasoning is foreign to constitutional jurisprudence.

¶130 The majority also cites a prior Wisconsin federal court decision that adopted districts in the 1990s with majority BVAP. Prosser v. Elections Bd., 793 F. Supp. 859 (W.D. Wis. 1992); see majority op., ¶45. That decision did not analyze the Gingles factors, the history of electoral success for African-American preferred candidates, or the totality of the circumstances, as is required to prove the need for a VRA remedy. Cooper, 137 S. Ct. at 1471-72; Bartlett, 556 U.S. at

48

19-20; LULAC, 548 U.S. at 432; Gonzalez, 535 F.3d at 600; Clarke, 40 F.3d at 812-13. It was also issued prior to almost every major United States Supreme Court precedent on the VRA, for example: Shaw v. Reno, Shaw v. Hunt, Johnson v. De Grandy, Miller v. Johnson, Bush v. Vera, League of United Latin American Citizens v. Perry, Bartlett v. Strickland, and Cooper v. Harris. Nonetheless, the contention that a decision from the 1990s on conditions warranting a race-based remedy supports the same remedy today is similar to asserting that a race-based remedy in Michigan warrants the same in Wisconsin. Both theories are antithetical to a proper VRA analysis. The circumstances of the actual individuals on the ground today, in their specific communities, is what drives a VRA review, not assumptions derived from how other individuals of the same race were treated at different times, in different places, and under different circumstances. Cooper, 137 S. Ct. at 1471-72; LULAC, 548 U.S. at 432; Shaw v. Hunt, 517 U.S. at 917; City of Euclid, 580 F. Supp. 2d at 604-12; Comm. for Fair & Balanced Map, 835 F. Supp. 2d at 583. No caselaw is cited for the proposition that "historical practice," relied upon by the majority, can either support race-based district lines or satisfy strict scrutiny. Majority op., ¶45. Surely, many governments in the past would have relied on such an argument to support racially motivated policies and practices.

¶131 History is littered with racial animus, hostility, discrimination, and desperate treatment. The Equal Protection Clause demands that governments in the United States rise above

49

the human temptation of dividing by race and treat individuals how basic dignity demands they be treated: as individuals. Only in specific cases, with exacting and quantifiable information, and with narrowly targeted remedies, may government discard equal protection guarantees. Fisher, 570 U.S. at 309-10; Miller, 515 U.S. at 911-12, 922; Shaw v. Reno, 509 U.S. at 653. Lowering the bar for equal protection and allowing it to be ignored without extraordinary evidence, and relying primarily on conclusory analysis and a court's subjective observations, would mark a material turn for equal protection jurisprudence and an unwelcome departure from foundational American principles. See majority op., ¶¶43-49 (relying heavily on party concessions, incomplete evidence, and an out of context standard of "good reasons" to justify unambiguous racial classifications). If that path is followed, a Pandora's box of racial grouping, jealousy, division, and animosity may open more fully. And we all may look back in regret at the day equal protection was made into an insubstantial and secondary interest.

¶132 Given the serious lack of evidence supporting the need to draw districts as explicitly based on race as is done by the Governor, this court should abide by its constitutional duty to treat all Wisconsinites the same regardless of race. Vera, 517 U.S. at 965-83; Miller, 515 U.S. at 922; Shaw v. Reno, 509 U.S. at 653; Cooper, 137 S. Ct. at 1464; Fisher, 570 U.S. at 309-10. The court has no lawful, constitutional basis to adopt any other

maps than the race-neutral, constitutional, least change maps submitted by the Legislature or, in the alternative, CMS.

B. Least Change Is More Than One Core Retention Number.

¶133 Core retention is the percentage of individuals that are retained in the same legislative districts as the maps in existence prior to this lawsuit. Never before oral argument did we conclude that the core retention number alone was the sole factor to be considered. In our November 30 opinion, we stated that "our judicial remedy should reflect the least change necessary for the maps to comport with relevant legal requirements." Johnson, 399 Wis. 2d 623, ¶72. We did not limit the factors and considerations that can be taken into account when determining whether a map made as little changes as possible while complying with the law. Certainly, we did not hold that the map that moves the lowest number of people will be selected, regardless of any other change or constitutional consideration. Our majority opinion on November 30 simply never mentioned that phrase, "core retention." A majority of this court nonetheless takes a myopic approach and refuses to look beyond core retention or even evaluate the underpinnings of how those numbers were achieved. See majority op., ¶24 ("[L]east change approach should guide our decision" and "[c]ore retention is central to analysis.").

¶134 Fundamental jurisprudence instructs that the data that underlies the core retention numbers may be considered, but in conjunction with other valid considerations such as county and municipality division and population deviation. Such routine

51

considerations are valid, as is discussed in caselaw, and more importantly, they are constitutionally required. The author of the majority opinion now distances himself from these basic principles and even his own writing, which explicitly indicated "traditional redistricting criteria" would be considered. Johnson, 399 Wis. 2d 623, ¶83 (Hagedorn, J., concurring).[19]

---

[19] The majority opinion's author refused to sign onto small parts of the November 30 opinion and wrote a separate concurrence because, in that Justice's view, the November 30 opinion unduly limited the court's discretion in selecting a new map. "Legal standards establish the need for a remedy and constrain the remedies we may impose, but they are not the only permissible judicial considerations when constructing a proper remedy," the November 30 concurrence declared triumphantly. Johnson v. Wis. Elections Comm'n, 2021 WI 87, ¶83, 399 Wis. 2d 623, 967 N.W.2d 469 (Hagedorn, J., concurring). In fact, there was a specific factor the concurrence gave special favor to: "one universally recognized redistricting criterion is communities of interest," i.e., local communities and governments. Id. (Hagedorn, J., concurring). The concurrence contemplated reliance on this factor when multiple maps were comparable on the issue of least change:

> Suppose we receive multiple proposed maps that comply with all relevant legal requirements, and that have equally compelling arguments for why the proposed map most aligns with current district boundaries. In that circumstance, we still must exercise judgment to choose the best alternative. Considering communities of interest (or other traditional redistricting criteria) may assist us in doing so.

Id. (Hagedorn, J., concurring).

Despite the urge to make this apparently principled opinion known in a concurrence, the same logic is absent in the majority opinion. Not only does the opinion cast as insignificant basic constitutional interests in maintaining local government boundaries, but it also adopts maps with substantially greater divisions of communities of interests, all the while having immaterial differences on the (now controlling) least-change metric of core retention. Time changes all things, but presumably not that quickly.

¶135 Now, four of my colleagues inexplicably adopt core retention as the sole factor even though the phrase cannot be found in the November 30 majority or concurring opinions. This comes out of thin air and much to the surprise of three members of the court. While the Governor retains 85.8% of individuals in their existing districts, the Legislature retains 84.2%, a 1.6% difference. However, the Legislature scores better than the Governor in the senate, moving several thousand less individuals.[20] The Governor moves around 95,000 less people in the assembly. Thus, overall, combining the figures for the senate and assembly, the Governor moves less people than the Legislature, although they are fairly close in measure. By comparison, CMS has a 61% core retention in the assembly and a 74.3% core retention in the senate.

¶136 One is left to wonder: If the Legislature knew that core retention was the only criteria to be used, might it have submitted different maps if given the chance? Recall, all parties had the benefit of knowing the Legislature's maps before submitting their own. The Legislature advanced support for maps

---

The parties in this lawsuit submitted maps under guidance on what they viewed as the deciding factors for the author of the November 30 concurrence. It was not an unreasonable inference that that Justice's vote may decide the outcome of this case. Yet now that Justice, writing the majority opinion, claims soft, non-legal factors such as communities of interest are not of material importance when the court can identify a map with the lowest core retention. This is a classic example of shifted standards.

[20] I recognize that the percentages in the senate are very close; with rounding the Governor and the Legislature have a 92.2% core retention in the senate.

53

passed by the Assembly and Senate in 2021, which all parties could examine in advance. No such privilege was afforded to the Legislature vis-a-vis the Governor's maps.

¶137 To be clear, core retention is a useful statistic for evaluating the amount of changes in a given map, but it cannot be the only consideration for the court. Our November 30 opinion made clear that any map must not only consider statistics reflecting the amount of change, but it must do so while comporting best with other legal interests such as per capita representation and retaining local communities. Johnson, 399 Wis. 2d 623, ¶¶24-38, 72 (describing legal considerations in detail). The November 30 opinion made clear that the constitutional requirements must be met. Id., ¶38 ("In determining a judicial remedy for malapportionment, we will ensure preservation of these justiciable and cognizable rights explicitly protected under the United States Constitution, the VRA, or Article IV, Sections 3, 4, or 5 of the Wisconsin Constitution."). We made clear that in remedying any malapportionment in the existing maps we must not "inadvertently choose a remedy that solves one constitutional harm while creating another." Id., ¶34. As explained below, while the Governor has higher core retention numbers than the Legislature and CMS, he did so by sacrificing other constitutional considerations. As we stated in our November 30 opinion, the law does not countenance such a result.

C. One-Person-One-Vote

¶138 The United States Supreme Court has continuously and unambiguously reminded us that, in apportioning state legislative districts, "the overriding objective must be substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the State." Reynolds v. Sims, 377 U.S. 533, 579 (1964); see also Baumgart, 2002 WL 34127471, at *2 (quoting Connor v. Finch, 431 U.S. 407, 409 (1977)) ("With respect to reapportionment, population equality is the 'most elemental requirement of the Equal Protection Clause.'"). The Constitution "does not permit a State to relegate considerations of equality to secondary status and reserve as the primary goal of apportionment the service of some other state interest." Mahan v. Howell, 410 U.S. 315, 340, modified, 411 U.S. 922 (1973) (Brennan, J., concurring in part).

¶139 The United States Supreme Court, recognizing the interests of federalism and respect for state sovereignty, has acknowledged that "some leeway in the equal-population requirement should be afforded States in devising their legislative reapportionment plans . . . [and that] when state legislative districts are at issue we have held that minor population deviations do not establish a prima facie constitutional violation." Chapman v. Meier, 420 U.S. 1, 23 (1975). Likewise, the Court has explained that "the Constitution permits 'such minor deviations only as may occur in recognizing certain factors that are free from any taint of arbitrariness or discrimination.'" Swann v. Adams, 385 U.S.

55

440, 444 (1967) (quoting Roman v. Sincock, 377 U.S. 695, 710 (1964)). The State of Wisconsin has an independent requirement of population equality. Article IV, Section 3 of the Wisconsin Constitution states that new maps must be "apportion[ed] . . . according to the number of inhabitants."

¶140 In analyzing the deviation and the extent to which minor deviations are acceptable under the United States Constitution, courts follow a two-step process. The first step is to calculate the ideal population. 81A C.J.S. States § 140. This is done through simple math: population of the state divided by the number of applicable districts. Once the ideal population is calculated, it is then possible to determine the extent to which a given district population deviates from the ideal. Id. There is not a mathematical formula extracted from the Equal Protection Clause establishing "what range of percentage deviations is permissible, and what is not." Mahan, 410 U.S. at 329.

¶141 While we do know that "[c]ourt-enacted maps are held to a higher standard . . . the Supreme Court has not explained how much higher." Essex v. Kobach, 874 F. Supp. 2d 1069, 1082 (D. Kan. 2012) (citing Connor, 431 U.S. at 414). District courts around the country have generally sought to adopt maps that, at most, include a 2% deviation. See, e.g., Colleton Cnty. Council v. McConnell, 201 F. Supp. 2d 618, 655 (D.S.C. 2002).

¶142 However, while courts have attempted to reach at most 2% population deviation when drawing maps, this does not mean

that courts reach it and then quit. The continual goal of courts when drawing maps is minimizing population disparities. In Smith v. Cobb Cnty. Bd. of Elections & Registrations, the United States District Court for the Northern District of Georgia was tasked with drawing the maps for Cobb County, Georgia. 314 F. Supp. 2d 1274 (N.D. Ga. 2002). Like other courts, it declared that the "most important goal in fashioning this remedial plan was to minimize the population deviations among the four districts . . . ." Id. at 1300. Among the plans presented to it by the parties was a plan that kept population deviation at 1.77%. Id. However, in following its declared goal, the court still redrew the maps itself and ended with a population deviation of 1.51%. Id. at 1302.

¶143 Further, the State of Wisconsin has an independent requirement of population equality. Article IV, Section 3 of the Wisconsin Constitution states that new maps must be "apportion[ed] . . . according to the number of inhabitants." Federal courts, respecting the independent sovereignty of states, have permitted greater deviations than what would be permitted for congressional districts. But that does not imply that the Wisconsin Constitution does not place independent demands on Wisconsin's own legislative districts. Chapman, 420 U.S. at 23. Notably, while the demands of population equality under the United States Constitution are based on the Equal Protection Clause, the demands under the Wisconsin Constitution are derived from Article IV, Section 3 on the apportionment of districts, not equal protection. See Evenwel v. Abbott, 578

57

U.S. 54, 58-61 (2016) (describing the different legal standards for state and federal districts under the United States Constitution). When the federal government interprets and applies its own apportionment clause in Article I, Section 2 of the United States Constitution, it demands "as close to perfect equality as possible," with little leniency for excess deviation. Id.

¶144 In line with these principles, the November 30 opinion stated that the population deviation should be "as close an approximation to exactness as possible" under the Wisconsin Constitution. Johnson, 399 Wis. 2d 623, ¶28 (quotations omitted). Minimizing population deviation as much as practicable has been established for over a century in Wisconsin and at least since State ex rel. Attorney General v. Cunningham, 81 Wis. 440, 484, 51 N.W. 724 (1892).

¶145 In Wisconsin, federal courts have played a role in drawing the legislative maps for the past three redistricting cycles. The federal courts' determinations came only after the Wisconsin Supreme Court chose not to take up the issue. The federal courts recognize redistricting is our responsibility, if the legislative and executive branches fail. Nonetheless, each time, the federal panel has stated that population equality remained its chief goal and adopted plans as consummate with that goal as practicable. See Wis. State AFL-CIO v. Elections Bd., 543 F. Supp. 630, 637 (E.D. Wis. 1982) (describing that their plan with a population deviation of 1.74% exemplifies the "condition that, in a representative form of government, the

58

vote of each person be, to the extent reasonably possible, equal in weight to the vote of another"); Prosser, 793 F. Supp. at 866 (stating that "[b]elow 1 percent, there are no legally or politically relevant degrees of perfection," and adopting a map with deviation of 0.52 percent); Baumgart, 2002 WL 34127471, at *7 (detailing that the court's "attempt to keep population deviation between districts as low as possible" yielded a deviation of 1.48%). Last cycle, in 2011, the Legislature enacted a map with a "maximum deviation for assembly districts [of] 0.76% and 0.62% for senate districts." Baldus v. Members of Wis. Gov't Accountability Bd., 849 F. Supp. 2d 840, 851 (E.D. Wis. 2012). The existing levels of deviation, by surviving the constitutional and political processes, are a useful basis for comparison when evaluating the deviations proposed in the respective maps. Our November 30 opinion stated that the population deviation should be "as close an approximation to exactness as possible" under the Wisconsin Constitution. Johnson, 399 Wis. 2d 623, ¶28 (quotations omitted); see also Cunningham, 81 Wis. at 484.

¶146 With this law in hand, the Governor's maps that have been adopted by a majority of this court are highly concerning. They contain some of the largest deviations from one-person-one-vote that were presented to us: 1.883% for the assembly districts and 1.179% for the senate districts, over double the deviations adopted in the prior maps. Apparently, to the majority, this dramatic departure from the existing maps is not relevant to the least change inquiry. Meanwhile, the

59

Legislature (0.759% for the assembly districts and 0.574 for the senate districts) and CMS (0.736% for the assembly districts and 0.501% for the senate districts) have substantially lower population deviations.

¶147 It is clear from the comparisons between the 2011 maps, historically adopted maps, and the maps proposed by the parties, the Governor failed to heed the instructions this court gave in Cunningham and repeated in its November 30 opinion. While the Governor keeps population deviations below a largely arbitrary line of 2 percent, this is by no means the end of the analysis. See Cunningham, 81 Wis. at 484; Cobb Cnty., 314 F. Supp. 2d at 1300-02. The Governor fails to provide any explanation for why his maps have over double the magnitude in population distortions compared to the 2011 maps other than vaguely asserting compliance with "least change." Notably, the Legislature was able to design maps with almost the same core retention, while also keeping deviation orders of magnitude lower. The Legislature's effort is proof positive that the Governor's population deviations among districts were entirely unnecessary. Given advanced software, there is little doubt that if the Governor were not striving for other goals, based at least in part on race and likely in large part on politics, his core retention could have remained the same while lowering population deviations. But while political considerations are not included in the constitution, population equality is. See Johnson, 399 Wis. 2d 623, ¶53 (explaining that partisanship is

not a legally recognized interest found in the Wisconsin or United States Constitutions).

¶148 The court's interest is in making populations "as nearly as [equal] as possible," and thus, the court should adopt either the Legislature's map or CMS's map. Abrams v. Johnson, 521 U.S. 74, 98-99 (1997); Johnson, 399 Wis. 2d 623, ¶28. The population deviations included in the Governor's maps allow him to inflate his core retention numbers, undercut the Legislature's numbers, and assert he has provided the least change maps. In the process, however, he ignored interests recognized in both the United States and Wisconsin Constitutions that individuals should have as close to equal influence in elections as possible. We should embrace this foundational democratic value, not just explain it away.[21]

### D. Dividing Local Communities

¶149 Under Article IV, Section 4 of the Wisconsin Constitution, assembly districts must be drawn "to be bounded by county, precinct, town or ward lines." As we explained in our November 30 opinion:

> Applying the one person, one vote principle may make bounding districts by county lines nearly impossible. See Wis. State AFL-CIO v. Elec. Bd., 543 F. Supp. 630, 635 (E.D. Wis. 1982) (stating the maintenance of county lines is "incompatib[le] with population equality"); see also 58 Wis. Att'y Gen. Op. 88, 91 (1969) ("[T]he Wisconsin Constitution no longer may be

---

[21] Particularly if we adopted the approach endorsed by the November 30 concurrence, whereby the court may consider "traditional redistricting criteria" when selecting between two least-change maps. Johnson, 399 Wis. 2d 623, ¶83 (Hagedorn, J., concurring).

61

considered as prohibiting assembly districts from crossing county lines, in view of the emphasis the United States Supreme Court has placed upon population equality in electoral districts."). Nonetheless, the smaller the political subdivision, the easier it may be to preserve its boundaries. See Baumgart v. Wendelberger, No. 01-C-0121, 2002 WL 34127471, at *3 (E.D. Wis. May 30, 2002) ("Although avoiding the division of counties is no longer an inviolable principle, respect for the prerogatives of the Wisconsin Constitution dictate that wards and municipalities be kept whole where possible.").

Johnson, 399 Wis. 2d 623, ¶35.

¶150 Courts have recognized for many years that this provision serves to protect local communities, which are central features of individual identity for voters and are the building blocks of Wisconsin's democracy. State ex rel. Reynolds v. Zimmerman, 22 Wis. 2d 544, 555, 126 N.W.2d 551 (1964) (explaining that the primary goal of "per capita equality of representation" must still comply with the Wisconsin Constitution's "geographical limitations" under Article IV, Section 4); Jensen v. Wis. Elections Bd., 2002 WI 13, ¶6 n.3, 249 Wis. 2d 706, 639 N.W.2d 537 (explaining that the Wisconsin Constitution demands "respect for municipal boundaries"); Baumgart, 2002 WL 34127471, at *3 (stating that in redistricting after the 1980 and 1990 censuses, conducted in federal court, the courts "did not divide any wards in their respective reapportionment plans, and the 1992 panel rejected a proposed plan that achieved 0% population deviation by splitting wards"); Prosser, 793 F. Supp. at 863 ("To be an effective representative, a legislator must represent a district that has a reasonable homogeneity of needs and interests; otherwise the

62

policies he supports will not represent the preferences of most of his constituents.").

¶151 Given this constitutional interest in preserving communities of interest and local governments, it is not surprising that the Legislature, when it drew the existing maps in 2011, sought to limit the amount of county and municipal splits. The Legislature in 2011 permitted 46 county splits in its senate map and 58 county splits in its assembly map. It created 48 municipal splits in the senate and 78 municipal splits in the assembly. Although the number of municipal splits increased over time as local governments changed size and annexed new areas, it is clear from past practice that the state has strived to minimize divisions of local communities.

¶152 The Governor, and the majority who adopted his maps, do not seem to care. Without detailed explanation, they divide an inordinate number of local communities. In the adopted map, they included 42 county splits in the senate and 53 in the assembly. There were 117 municipal splits in the senate and 175 in the assembly, and they split 179 wards in the senate and 258 in the assembly. See Prosser, 793 F. Supp. at 866 (explaining that wards are "the basic unit of Wisconsin state government for voting purposes . . . [y]ou vote by ward"). On January 10, 2022, we permitted the Governor to amend his map, and he used the opportunity to reduce local government divisions. However, according to the Governor's own numbers, he still retained 76 municipal splits in the senate and 115 in the assembly. Like population deviation, the Governor's stark departure from

63

standards for local government divisions used to draw the existing maps is of little concern to the majority's least change analysis. Only core retention is considered by the majority.

¶153 My colleagues on the other side devalue these extraordinary divisions concluding that they are of no consequence. I disagree because local changes at polling places are of great significance to those affected and are deserving of consideration. For people living in Brookfield, Glendale, and De Pere, their communities are now divided. Their neighbors sharing common interests, government, and organizations must seek representation from different officials representing different constituencies across unique geographies. Many Wisconsinites may no longer engage in the most fundamental form of democratic engagement: discussing and deliberating shared election choices with those having similar interests and identities. Although division of local governments may appear to be simply a number, it most assuredly is not. It is a constitutional requirement, not some policy choice. Wis. Const. art. IV, § 4.

¶154 With the adoption of the Governor's maps, local communities are the losers. The majority finds this of no consequence, yet Wisconsin is made up of few large cities and many local municipalities. Dividing a town or a county in localities of hundreds of thousands of inhabitants may not be noticeable by all those residents; however, that is not true for the many, many small communities around the state. In accepting

64

the Governor's maps, the majority opinion chooses to favor the big city interests over more rural identities.

¶155 By contrast, the maps offered by the Legislature and CMS keep divisions of local communities to a minimum. The Legislature has comparable county splits to the Governor, with 42 county splits in the senate and 53 splits in the assembly. CMS outperforms all parties in this metric by including 28 county splits in the senate and 40 in the assembly. Where the parties diverge substantially is in municipalities. The Legislature includes a striking low number of municipal splits with 28 in the senate and 48 in the assembly.[22] CMS, by comparison, has 31 municipal splits in the senate and 70 in the assembly. Finally, while the Governor demonstrated little to no concern for ward lines, both the Legislature and CMS divided zero current ward boundaries. Given the minimal difference in core retention between the Legislature and the Governor, and the obvious technical ability to limit local government divisions, the Legislature's and CMS's maps provides powerful evidence that the drastic number of local government splits made by the Governor's maps were entirely unnecessary and represented significant change. If those drawing the Governor's maps were not so motivated by race and politics, perhaps they may have considered the Wisconsin Constitution.

¶156 Further, if my colleagues would consider constitutional mandates as more than a policy choice, they would

---

[22] Among municipalities, the Governor split 50 towns. The Legislature, by contrast, split only 16. At the time the 2011 maps were passed, they contained 30 town splits.

65

be required to conclude that the Governor's maps are not constitutionally compliant. In addition, they would be forced to recognize that the core retention figures of their preferred maps are artificially inflated at the expense of the people and their local communities. Nonetheless, the majority proceeds to adopt the Governor's maps, carving up Wisconsin communities for the stated and unstated interests of the Governor.

¶157 Both the Legislature and CMS demonstrated that mapmakers could have minimized the changes to existing maps while still respecting in large respect the boundaries by which Wisconsinites organize themselves at the local level. While, under existing one-person-one-vote jurisprudence from the United States Supreme Court, local government boundaries cannot be retained in full, that in no way implies that local government divisions are of no concern to this court, as the majority appears to believe. Johnson, 399 Wis. 2d 623, ¶35. In our November 30 opinion, we reaffirmed decades of caselaw that the citizens of Wisconsin have a constitutionally protected interest in "preserv[ing] [local government] boundaries." Johnson, 399 Wis. 2d 623, ¶35 (noting "respect for the prerogatives of the Wisconsin Constitution dictate that wards and municipalities be kept whole where possible"); Reynolds, 22 Wis. 2d at 555; Jensen, 249 Wis. 2d 706, ¶6 n.3; Baumgart, 2002 WL 34127471, at *3; Prosser, 793 F. Supp. at 863.

¶158 The Legislature and CMS took our directives and constitutional demands seriously. The Governor did not. In adopting the Governor's maps through its fixation on core

66

retention, the majority turns a blind eye to the constitution's clear call to consider these boundary line changes.

### III. CONGRESSIONAL MAPS

¶159 Only four parties submitted congressional maps: the Congressmen; the Governor; Hunter; and CMS. The Governor's map is unconstitutional under the Equal Protection Clause, and the court should adopt the Congressmen's map, or in the alternative, CMS's map.

### A. Least Change

¶160 As explained in the analysis on state maps, least change is not defined by a single statistic. Johnson, 399 Wis. 2d 623, ¶72. Nowhere in the November 30, 2021 opinion did we hold that core retention is the sole determinant of a least change inquiry. Id.

¶161 Among other factors and considerations, core retention can be a useful statistic to consider. Here, the Governor has the highest core retention with 94.5%. The Congressmen come in second with 93.5%, followed by Hunter at 93% and CMS at 91.5%. Thus, the Governor moves around 50,000 fewer people than the Congressmen.

¶162 Of note, however, the Congressmen attempted to introduce an amended map, which would have had the lowest core retention of any maps. Given the extraordinary importance of this case, and the need to fairly consider all positions and evidence presented by the parties, the court should have no issue accepting such requests. Our duty is to consider how best to redistrict, and more information is better than less.

67

¶163 The Congressmen's amended map moved almost 100,000 fewer people than the Governor's map. Furthermore, both the Governor and BLOC were permitted to amend their maps, mostly to reduce their local government splits and make their maps more attractive for the court to adopt. Nonetheless, the court, in a January 10, 2022 order, chose not to consider the second map submitted by the Congressmen. Johnson v. Wis. Elections Comm'n, No. 2021AP1450-OA, unpublished order (Wis. Jan. 10, 2022). Due to this ruling, only the first map submitted by the Congressmen is reviewed. However, the majority is not relegated to adopting only one party's map. It is endowed with the authority to draw the best map, yet it failed to do so.

¶164 Even though the majority is purportedly driven by the single statistic of core retention, it apparently is not concerned enough to seek out or adopt the map that scored best on that metric. The court, post argument, regularly allows supplemental submissions. We did in this case. If there ever was a case to ensure that we have the best possible information at our disposal, this is it. Curiously, a majority of the court does not want it.

## B. One-Person-One-Vote

¶165 The Governor's map cannot be accepted because he has an unnecessary and unexplained deviation from perfect population equality. Population equality for congressional districts is governed by Article I, Section 2 of the United States Constitution, not the Equal Protection Clause. Evenwel, 578 U.S. at 58-61.

¶166 In our November 30 opinion, we quoted the United States Supreme Court in declaring that, "[There is] no excuse for the failure to meet the objective of equal representation for equal numbers of people in congressional districting other than the practical impossibility of drawing equal districts with mathematical precision." Johnson, 399 Wis. 2d 623, ¶25 (quoting Mahan, 410 U.S. at 322). "[P]opulation alone" is the "sole criterion of constitutionality in congressional redistricting under Art. I, § 2[.]" Id. CMS aptly argues that the Governor's congressional map should not pass scrutiny because it "fail[s] to satisfy even this fundamental requirement [by exhibiting] more than the mathematical minimum population deviation between districts."

¶167 The Supreme Court, in recognizing that a zero deviation will not always be possible, gave the following instructions for evaluating a plan that varies from the precision of mathematical equality:

> First, the court must consider whether the population differences among districts could have been reduced or eliminated altogether by a good-faith effort to draw districts of equal population. Parties challenging apportionment legislation must bear the burden of proof on this issue, and if they fail to show that the differences could have been avoided the apportionment scheme must be upheld. If, however, the plaintiffs can establish that the population differences were not the result of a good-faith effort to achieve equality, the State must bear the burden of proving that each significant variance between districts was necessary to achieve some legitimate goal.

Karcher v. Daggett, 462 U.S. 725, 730-31 (1983). The court further reaffirmed that "there are no de minimis population

69

variations," so long as those variations can "practicably be avoided." Id. at 734.

¶168 A useful example of this burden shifting mechanism can be found in Larios v. Cox, 300 F. Supp. 2d 1320 (N.D. Ga.), aff'd, 542 U.S. 947 (2004). In Larios, a three-judge panel heard several challenges to the congressional and state legislative reapportionment plans enacted by the Georgia General Assembly in 2001 and 2002. Id. at 1321. In the relevant portion of the opinion, the panel examined whether the plaintiff's challenge to the congressional maps enacted by the state legislature complied with the United States Constitution's one-person-one-vote requirement. "[T]he total population deviation for the [legislature's] final Congressional Plan was only seventy-two people." Larios, 300 F. Supp. 2d at 1354. At the trial, expert testimony concluded that:

> [I]t would be possible to draw a congressional map for the State of Georgia with a population deviation of plus or minus one person that (1) complied with the Voting Rights Act; (2) split fewer counties than the present plan; (3) is more compact than the present plan; and (4) divides fewer voting precincts than the present plan.

Id. at 1354.

¶169 Under the Karcher framework, the panel reasoned that "[t]he fact that such a plan could have been produced all but invalidates any argument that the [legislature] made a good faith effort to achieve a zero deviation." Larios, 300 F. Supp. 2d at 1354 (citing Karcher, 462 U.S. at 736). On this basis, the panel determined that the plaintiffs had met their burden and that the burden was now put on the Legislature to

70

show that a "consistently applied legislative policy" justified the deviation. Id. The State of Georgia contended that

> it did not further reduce the population deviation because to do so would have required either splitting more precincts [which Georgia has a history of not doing] or further splitting existing split precincts along something other than an easily recognizable boundary [as doing so would make it hard for voters and election officials to accurately ascertain which voting district they reside].

Id. Additionally, the court found that, although the plaintiffs showed that the population deviation could be remedied, they did not prove that it could be done without splitting precincts along something other than recognizable boundary lines. Id. at 1355. Therefore, the panel found that "[g]iven the relatively small total deviation of only seventy-two people and the importance of the state's interest in avoiding voter confusion, we find that the congressional districts do not violate plaintiffs' rights under the one-person, one-vote principles of Art. I, § 2." Id.

¶170 In this case, the Legislature and CMS can point to the fact that their maps have a mathematically precise population deviation as a means of invalidating any argument that the Governor made a good-faith effort to achieve zero deviation. Therefore, the burden of explaining what "consistently applied" state policy justifies the larger than minimum population deviation falls on the Governor.

¶171 Rather than address this deviation, the Governor denies that it exists. The Governor's population deviation is two. Population deviation (taken as a range of deviation) is

71

determined by taking the Governor's maximum deviation above the ideal (one person) and adding it to the Governor's minimum deviation below the ideal (one person). See Evenwel, 578 U.S. at 59 (explaining that population deviation, when conducting a population equality analysis, is calculated by a comparison "between the largest and smallest district"). 1 + 1 = 2. However, the Governor, in his briefs, asserts that his deviation is the same as the Congressmen's: one person. This assertion stems from the incorrect, semantic wordplay of his expert who, in her initial report, calculated that "[t]he largest deviation is 1 person, with all districts ranging from 1 person below to 1 person above the ideal population." The "largest" difference between the average population may be one person, but that is not the relevant statistic. Population deviation is the difference between the smallest and largest district. Importantly, this range of deviation is later acknowledged in the Governor's expert report.

¶172 Despite this burden and the need to explain why his districts have greater than necessary population inequality, the Governor at oral argument stated a population deviation of two was included because the Governor did not believe a lower population deviation was required under law. No explanation or details were provided as to why the deviation was necessary, applying reasonable priorities such as "making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent Representatives." Karcher, 462 U.S. at 740. As explained

above, the United States Constitution requires exactness of population absent the "practical impossibility of drawing equal districts with mathematical precision." Johnson, 399 Wis. 2d 623, ¶25. Both CMS and the Congressmen showed a lower population deviation could be done, and they too achieved high core retention.

¶173 Given advanced software technology and the immense financial resources put to use in this litigation, it was abundantly possible for the Governor to achieve a deviation of one while retaining the same least change characteristics, such as core retention. Due to a misunderstanding of law, and misstatement of the definition of population deviation, the Governor overlooked the driving consideration of drawing congressional districts "with populations as close to perfect equality as possible." Evenwel, 578 U.S. at 59. But carelessness cannot satisfy the Governor's burden of proving "with some specificity that the population differences were necessary to achieve some legitimate state objective." Tennant v. Jefferson Cnty. Comm'n, 567 U.S. 758, 760, 763-65 (2012) (per curium) (quotations omitted) (holding that a congressional map in West Virginia was legal where the state justified its deviations by pointing to protection of local communities, limiting incumbent pairings, and reducing change in district lines). By contrast, the Governor's deviation was not the result of "a good-faith effort to achieve absolute equality" and is thus insufficient. Id. (quoting Karcher, 462 U.S. at 730).

73

¶174 The majority picks sides and litigates for the Governor, claiming that the two person deviation was necessary for least change. See majority op., ¶24 ("[The Governor's] minor population deviation is justified under Supreme Court precedent by our least change objective.") This is a whitewash: the Governor admitted that a lower deviation could be done without issue, but permitted a deviation of two because he did not believe a lower deviation was necessary. Neither the Governor nor any other party argued that a deviation of two individuals was required to ensure a least change map. Furthermore, it is facially preposterous: with advanced computer technology, the Governor could have readily reduced his population deviation while maintaining his core retention. Simply put, the Governor failed to present a "legitimate state objective" for his unnecessary deviation. Tennant, 567 U.S. at 760; see also Karcher, 462 U.S. at 730-31 ("[T]here are no de minimis population variations.")

¶175 Only the Congressmen's map and CMS's map should be considered by this court. The Congressmen have higher core retention than CMS and should be adopted. Nonetheless, CMS offers a reasonable alternative. The Governor's maps are fatally and constitutionally flawed. The majority errs in adopting them.

## IV. CONCLUSION

¶176 For the foregoing reasons, I respectfully dissent.

¶177 I am authorized to state that Justices PATIENCE DRAKE ROGGENSACK and REBECCA GRASSL BRADLEY join this dissent.

¶178 PATIENCE DRAKE ROGGENSACK, J. *(dissenting).* The 2020 census shows that Wisconsin's growth in population requires reapportionment of its congressional and state legislative districts. Reapportionment presents a three dimensional puzzle, each piece of which has statutory and constitutional requirements. I write to address one error of Governor Evers's map reapportioning Wisconsin's Assembly Districts, which four members of this court have adopted. In Wisconsin's single member districts, the Assembly map conflicts with the Voting Rights Act of 1965, formerly set out in 42 U.S.C. § 1973, now within 52 U.S.C. § 10301. In adopting the Governor's map, a majority of this court engages in racial gerrymandering contrary to the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, which prohibits separating voters into different voting districts based on the race of the voter. Bethune-Hill v. Virginia State Bd. of Elections, 580 U.S. __, __, 137 S. Ct. 788, 797 (2017). It is my hope that the United States Supreme Court will be asked to review Wisconsin's unwarranted racial gerrymander, which clearly does not survive strict scrutiny.

¶179 The United States Constitution requires that apportionment be as equal as practicable because population disparity in voting districts for the same legislative body dilutes the power of some voters. Concerns about voter inequality have been the foundation of the Supreme Court's one-person-one-vote decisions. Reynolds v. Sims, 377 U.S. 533, 558

1

(1964) (explaining that the concept of voter equality "can mean only one thing——one person, one vote").

¶180 The Supreme Court has required near mathematical equality for congressional maps. Abrams v. Johnson, 521 U.S. 74, 98 (1997). Somewhat more leeway is given when drawing boundaries for state legislative districts. Evenwel v. Abbott, 578 U.S. 54, 59 (2016). However, court-drawn maps are held to a more exacting standard of population equality than are legislatively drawn maps. Abrams, 521 U.S. at 98.

¶181 The Voting Rights Act prohibits any standard, practice or procedure that results in denial or abridgement of the right to vote on account of race. 52 U.S.C. § 10301(a); Cooper v. Harris, 137 S. Ct. 1455, 1464 (2017).[1] Subsection (b) provides the required examination for assessing whether race is precluding equal opportunity for a protected class:

> A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, [t]hat nothing in this section establishes a right to have members of a protected

---

[1] The provisions of 52 U.S.C. § 10301 have been referred to as Section 2 of the Voting Rights Act of 1965 subsequent to the 1982 amendment. See Johnson v. De Grandy, 512 U.S. 997, 1009-10 (1994).

2

class elected in numbers equal to their proportion in the population.

§ 10301(b).

¶182 Over the years, the Supreme Court has addressed the Voting Rights Act in decisions that explain how it is to be applied in various contexts. Thornburg v. Gingles, 478 U.S. 30 (1986), is the seminal Supreme Court case that sets the analytical framework that is required when the Voting Rights Act is addressed.[2] Gingles establishes all three threshold "prerequisites" that must be affirmatively proved before further consideration of a claim of, or potential remedy for, a violation of § 2 of the Voting Rights Act can be addressed in reapportionment. First, there must be proof that a minority group is "sufficiently large and geographically compact to constitute a majority [in a single-member district];" second, the minority group must be "politically cohesive"; and third, the "white majority [] vote[ed] sufficiently as a bloc to [enable it] usually [to] defeat the minority's preferred candidate." Cooper, 137 S. Ct. at 1470 (citing Gingles, 478 U.S. at 51); Johnson v. De Grandy, 512 U.S. 997, 1009-10 (1994) (also citing Gingles, 478 U.S. at 51).

¶183 Cooper is particularly helpful in its instructions about how to employ the Gingles "prerequisites." Cooper sets out the "three threshold conditions" for proving voter dilution[3]

---

[2] Thornburg v. Gingles, 478 U.S. 30 (1986) arose in a challenge to multi-member districts. Its analysis has been applied to single-member district challenges as well. De Grandy, 512 U.S. at 1000.

[3] Voter dilution, a violation of § 2 of the Voting Rights Act, may occur when a cohesive minority group is fragmented

3

and then explains that these showings are needed to establish that racially polarized voting prevents the minority group's choice in the district as actually drawn because the minority group is submerged in a larger white voting population. Cooper, 137 S. Ct. at 1470.

¶184 In determining whether the third Gingles "prerequisite" was met, the Court reviewed the success of black candidates in past elections. Id. It noted that in North Carolina, where Cooper arose, "electoral history provided no evidence that a § 2 plaintiff could demonstrate the third Gingles prerequisite——effective white bloc-voting." Id. The Supreme Court in Cooper concluded that when an elective district "functioned, election year in and election year out, as a 'crossover' district, in which members of the majority help a 'large enough' minority to elect its candidate of choice . . . it is difficult to see how the majority-bloc-voting requirement could be met——and hence how § 2 liability could be established." Id. (citing Bartlett v. Strickland, 556 U.S. 1, 13, 16 (2009)).

¶185 The three Gingles prerequisites are factual conditions that must be proved in order to establish the first step of a claim under § 2 of the Voting Rights Act. All three preconditions must be met before considerations of race could lawfully affect drawing district boundaries. As the Supreme Court has explained, "In a § 2 case, only when a party has

among several districts or packed into too few districts. Id. at 1002.

4

established the Gingles requirements does a court proceed to analyze whether a violation has occurred based on the totality of the circumstances." Bartlett, 556 U.S. at 11-12. However, to escape the parties' failure to establish the Gingles requirements, the majority resorts to protesting that "no party saw fit to develop an argument" that the Gingles requirements were not satisfied.[4] Nevertheless, if we permit this abdication to form the basis of the law of the State of Wisconsin, the results in this case will effect an unconstitutional, racially gerrymandered map. Our judgments are precedents, and the proper interpretation of the law as it relates to these judgments cannot simply be left to the parties. Young v. United States, 315 U.S. 257, 259 (1942). Instead, as this state's highest court, it is our duty to ensure the proper interpretation of the law.

¶186 Milwaukee is Wisconsin's only county that has a sufficiently large and geographically compact black population of voters that could meet the Gingles preconditions. The black voters of Milwaukee do vote cohesively for candidates of their choice. However, Milwaukee's history for at least the last ten years is that of crossover voting where white voters help black voters elect candidates of their choice.

¶187 Notwithstanding the Supreme Court's clear instructions, the majority opinion ignores the historical record of black voters choosing candidates of their choice and assigns voters based solely on their race to create seven majority-

---

[4] Majority op., ¶45.

5

minority voting assembly districts in Milwaukee County. The Supreme Court "has made clear that unless <u>each</u> of the three <u>Gingles</u> prerequisites is established, 'there neither has been a wrong nor can be a remedy.'" <u>Cooper</u>, 137 S. Ct. at 1472 (quoting <u>Growe v. Emison</u>, 507 U.S. 25, 41 (1993) (emphasis in <u>Cooper</u>)). The Supreme Court in <u>Cooper</u> struck down North Carolina's racial gerrymander "whose necessity is supported by no evidence and whose raison d'etre is a legal mistake." <u>Cooper</u>, 137 S. Ct. at 1472.

¶188 The map adopted by the majority opinion violates the Voting Rights Act for the same reason as North Carolina's choice did in <u>Cooper</u>. Factually, Wisconsin has had significant experience with electing black candidates through white crossover voting.

¶189 For example, in 2016, Gwen Moore, a black congresswoman, was elected to Congressional District 4, which has only 33.3% black residents. However, she received 76.74% of the vote.[5] She was reelected in 2018 with 75.61% of the vote; and reelected in 2020 for a third time with 74.65%. That her vote totals exceed the percentage of black residents in her district evidences that white voters have crossed over to support her elections.

---

[5] The record of votes achieved by black candidates comes from state public records of election outcomes and are therefore "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Wis. Stat. § 902.01.

6

¶190 Mandela Barnes, a black state-wide candidate, is another example of white crossover voting. In 2018, Mandela Barnes was elected over a white primary opponent for Lieutenant Governor with 67.86% of the vote.[6]

¶191 David Clarke, a black county-wide candidate, provides repetitive examples of white crossover voting. Clarke was elected Milwaukee County Sheriff in 2006 with 77.85% of the vote; reelected in 2010 with 80.42% and reelected again in 2014 with 79.12% of the vote. Each time he was elected with the assistance of white crossover voting, as shown by his percentage victories that are well above the black resident percentage of Milwaukee County.[7] White crossover voting also helped elect David Crowley, a black candidate, as the Milwaukee County Executive in 2020. He formerly held a position in Wisconsin's Assembly.

¶192 Since 2012, Lena Taylor, a black state senator, has been elected repeatedly to Senate District 4 with vote totals showing white voter support. For example, in 2012, Lena Taylor obtained 86.6% of the vote; in 2016 she obtained 98.33% of the vote; and in 2020, she obtained 98.34% of the vote. 61.7% of the residents of Senate District 4 are black.

¶193 La Tonya Johnson, a black state senator, has been elected repeatedly to public office with vote totals showing

---

[6] Wisconsin's black population of voting age is approximately 6.4%.

[7] Approximately 26% of Milwaukee County's residents are black.

7

support from white voters. For example, in 2014, she was elected to Assembly District 17 with 87.25% of the vote, and in 2016 she was elected to Senate District 6 with 98.89% of the vote. 65.4% of the residents of Assembly district 17 are black and 62.1% of Senate District 6 are black residents. Leon Young, a black assemblyman was elected to Assembly District 16 in 2014, unopposed.[8] In 2014, Jason Fields, a black assemblyman, was elected to Assembly District 11, unopposed.[9]

¶194 The majority opinion ignores Milwaukee County's historical record of white crossover voting that has provided repeated support for black candidates during at least the last ten years. The majority opinion does so in order to create seven majority-minority districts in Milwaukee County. In so doing, the majority opinion comes squarely within the prohibition that assigning voters to voting districts by race violates the Equal Protection Clause of the Fourteenth Amendment.

¶195 The majority opinion says that it relies on Cooper for the racial gerrymander that it creates in Milwaukee County. The majority opinion clearly misunderstands Cooper, which overturned racial gerrymandering that occurred in North Carolina. Let's look at Cooper and why the majority opinion fails to follow it.

¶196 Justice Kagan begins her discussion in Cooper with the Equal Protection Clause of the Fourteenth Amendment, which she explains, "limits racial gerrymanders in legislative districting

---

[8] 61.5% of the residents of Assembly District 16 are black.

[9] 63.7% of the residents of Assembly District 11 are black.

8

plans." Id. at 1463. As Justice Kagan explained, the Equal Protection Clause "prevents a State, in the absence of 'sufficient justification,' from 'separating its citizens into different voting districts on the basis of race.'" Id. (quoting Bethune-Hill, 137 S. Ct. at 797). When allocation of voters by race has occurred, that allocation must withstand strict scrutiny such that the State must prove "its race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end." Id. at 1464.

¶197 In order to meet the narrow tailoring for the racial assignment of voters, the State must establish by factual proofs that it had "good reasons" to believe that the Voting Rights Act would be violated if voters were not assigned based on their race. Id. Cooper explained what it means by "good reasons" sufficient to satisfy strict scrutiny. First, Cooper emphasized that the "good reason" to which it referred was factual proof of "good reason to think that all the 'Gingles preconditions' are met, then so too it has good reason to believe that § 2 requires drawing a majority-minority district. . . . But if not, then not." Id. at 1470. Second, as the Supreme Court said as it examined factual evidence, "[h]ere, electoral history provided no evidence that a § 2 plaintiff could demonstrate the third Gingles prerequisite——effective white bloc-voting." Id.

¶198 It is Cooper's "good reason" phrase that the majority opinion picked up as its foundation for assigning voters to districts based on race. The majority said, "we conclude there are good reasons to believe a seventh majority-Black district is

9

needed to satisfy the VRA."[10]  It did so without understanding that factual proofs of the Gingles preconditions are necessary before it could satisfy "good reason" for assigning voters by race in districting.

¶199 The majority showed how limited its understanding of Cooper is by its dismissive treatment of Cooper's requirement to factually prove the three Gingles preconditions.[11]  Factual proof is exactly what "good reasons" requires and what the majority lacks as it contravenes the Equal Protection Clause by assigning voters to districts based on their race.  As Cooper carefully explained, there must be proof of effective white bloc-voting that prevents the minority's ability to elect the candidate of its choice before a § 2 violation can arise.  Id.

¶200 As the factual evidence above showed, black voters in Milwaukee are able to elect candidates of their choice, election year in and election year out, for congresswoman, state senators, state assembly persons, sheriff and Milwaukee County Executive to name only a few.  Just as in North Carolina in Cooper, proof of the third Gingles precondition to § 2 liability is absent from the majority opinion.  The Voting Rights Act is violated by the majority opinion just as it was by the State of North Carolina in Cooper.

¶201 It is beyond dispute that the Governor's districting plan adopted by a majority of this court assigns voters to districts based on race.  "Racial classifications are

---

[10] Majority op., ¶10.

[11] Id., ¶45.

10

antithetical to the Fourteenth Amendment, whose 'central purpose' was 'to eliminate racial discrimination emanating from official sources in the States.'" Shaw v. Hunt, 517 U.S. 899, 907 (1996). Such an assignment violates the Equal Protection Clause of the Fourteenth Amendment unless the racial assignment serves a compelling state interest and is narrowly tailored to meet that interest. Cooper, 137 S. Ct. at 1464.

¶202 Just as it ignores the lack of factual proof for the three Gingles preconditions, the majority opinion identifies no compelling state interest to which its racial gerrymander is narrowly tailored. Instead, it asserts that if a seventh black majority district were not drawn, a § 2 violation may occur, but it "cannot say for certain on this record."[12]

¶203 To justify its weak position, the majority cites to the black population of Wisconsin increasing and the white state-wide population decreasing in the last ten years, both by less than five percent.[13] However, the majority does not identify whether any of that population change occurred in Milwaukee County; or whether if it occurred in Milwaukee County, it occurred in the area of Milwaukee County where the majority opinion creates a seventh black majority district.

¶204 This is not a small error because the means chosen to accomplish a race-based purpose "must be specifically and narrowly framed to accomplish that purpose." Shaw, 517 U.S. at 908. To meet that standard, the racial assignment of voters

---

[12] Id., ¶47.

[13] Id., ¶48.

11

must be remedial to the specific location of the compelling state interest identified. Id. at 915.

¶205 However, just as in Shaw, the seventh district that the majority creates is not remedial to correcting an identified compelling state interest. Stated otherwise, creation of a seventh district in one area of Milwaukee County is not a narrowly tailored remedy for a population change for the entire State of Wisconsin, which the majority asserts as justification for creating the seventh district. The creation of the seventh black majority district in Milwaukee County cannot survive strict scrutiny.

¶206 Accordingly, because proof of meeting the third Gingles precondition has not been provided, as is required before voters may be assigned to voting district by race, and because the seventh black majority district does not survive a strict scrutiny inquiry, the majority errs, and I respectfully dissent.

¶207 I am authorized to state that Chief Justice ANNETTE KINGSLAND ZIEGLER and Justice REBECCA GRASSL BRADLEY join this dissent.

¶208 REBECCA GRASSL BRADLEY, J.   *(dissenting).*

> [H]e who would place the supreme power in mind, would place it in God and the laws; but he who entrusts man with it, gives it to a wild beast, for such his appetites sometimes make him; for passion influences those who are in power, even the very best of men: for which reason law is reason without desire.

Aristotle, <u>A Treatise on Government</u> Bk. III, ch. XVI (William Ellis trans., 1912) (circa 384-22 B.C.), https://www.gutenberg.org/files/6762/6762-h/6762-h.htm#link2H_INTR.

¶209 Just three months ago, we said this court "will confine any judicial remedy to making the minimum changes necessary in order to conform the existing congressional and state legislative redistricting plans to constitutional and

statutory requirements."[1]  Johnson v. Wis. Elections Comm'n, 2021 WI 87, ¶8, 399 Wis. 2d 623, 967 N.W.2d 469.  Now, the majority overrides the United States Constitution, the Wisconsin Constitution, and federal statutory law in favor of a policy

---

[1] In a deceptive caricature of our November 30, 2021 opinion, Justice Ann Walsh Bradley (joined by two other justices) claims "'least change,' as set forth in the court's prior order, is unmoored from any legal requirement for redistricting.  The parties struggled with reconciling it with the United States Constitution, Wisconsin Constitution, and Voting Rights Act."  Concurrence, ¶58.  Although in this opinion the new majority indeed untethers the least-change approach from the law, in this court's November 30 opinion (not an "order"), we consistently defined "least change" to mean "making only those changes necessary for the maps to comport with the one person, one vote principle while satisfying other constitutional and statutory mandates."  Johnson v. Wis. Elections Comm'n, 2021 WI 87, ¶8, 399 Wis. 2d 623, 967 N.W.2d 469; see also id., ¶¶4, 8, 64, 72, 81.  Although the majority corrupts the least-change approach by "unmoor[ing]" it from the law——treating a single measure of least change, core retention, as an extra-legal criterion taking precedence over the law——that is not the way we described it three months ago.  Any "struggle[]" to "reconcil[e]" the least-change approach with the law stems not from our "prior order" but from a misapplication of the least-change approach that allows core retention (an extra-legal criterion) to override the United States Constitution, the Wisconsin Constitution, and the VRA.  Contrary to the concurrence's disingenuous description, we never said core retention was a "metric" that would carry any weight, let alone "more weight than others."  Concurrence, ¶59.  We never told the parties that core retention was "preeminent," id., ¶63; we told them to submit maps that made only those changes necessary to comply with the law.  Although three justices in the majority believe core retention plays far too great a role in the majority's analysis, they join it anyway, then lament about it in a separate writing.  Despite six justices agreeing core retention should not be the sole governing criterion in this case, a majority nevertheless selects the Governor's maps ostensibly on this basis.  Contrary to the concurrence, nothing in our November 30 opinion compels this; properly applied, our November 30 opinion stands in opposition to the majority's decision.

goal it deems "commendable"[2]——"core retention"[3]——a phrase appearing nowhere in either our November 30, 2021 opinion nor even in Justice Hagedorn's concurrence to that opinion (which no one joined).  Elevating their subjective policy preferences over the law, members of the majority abandon a remedy for malapportionment grounded in the law and instead entangle themselves in legislative (and therefore blatantly political) policymaking by choosing maps based upon what the majority deems "best,"[4] justified by what the majority determines are "good reasons,"[5] and using criteria the majority deems "helpful."[6]

¶210 In doing so, the majority flouts not only this court's precedent but the constitutional separation of powers.  "Because the judiciary lacks the lawmaking power constitutionally conferred on the legislature" we promised to "limit our remedy to achieving compliance with the law rather than imposing policy choices."  Id.  The majority now reneges on that promise, relegating constitutional mandates to "policy choices" that may be protected or disregarded at the whim of the majority of this court.[7]  The majority's decision represents a startling departure

---

[2] Majority op., ¶35.

[3] Id., ¶¶7-8, 13 & n.9, 14-15, 22, 24, 26-30, 33.

[4] Id., ¶6.

[5] Id., ¶45.

[6] Id., ¶13.  The majority is most transparent about its "involvement" in making "numerous policy and political decisions," see id., ¶4, thereby abandoning its neutral role.

[7] Id., ¶35.

from the rule of law and an alarming affront to the people of Wisconsin who elected us to uphold the constitutions.

¶211 The majority's dispositive guidepost——core retention——exists nowhere in the United States Constitution, the Wisconsin Constitution or any statutory law. Absent from the law, it does not appear in our November 30 opinion among the purely legal criteria we directed the parties to employ in proposing maps. Nevertheless, the majority belatedly invokes core retention as justification for its preferred maps, allowing an extra-legal criterion to take precedence over the Equal Protection Clause, the Voting Rights Act (VRA), and Article IV——the "exclusive repository" of "the standards under the Wisconsin Constitution that govern redistricting." Id., ¶63. "It is 'the province and duty of the judicial department to say what the law is[,]' and not what we think it should be." Town of Wilson v. City of Sheboygan, 2020 WI 16, ¶51, 390 Wis. 2d 266, 938 N.W.2d 493 (Rebecca Grassl Bradley, J., concurring) (quoting Marbury v. Madison, 5 U.S. (Cranch) 137, 177 (1803)) (modification in the original). Instead of following the law this court declared just three months ago, the majority instead adopts maps based on its subjective policy preferences, fulfilling the fears of many citizens concerned about a judicially-partisan outcome.

¶212 Remedying unconstitutional malapportionment——inequality in the number of citizens in each legislative or

4

congressional district——was this court's sole task in this case,[8] and would not have been a particularly challenging one, if the majority had confined itself to applying the law. The majority flunks every constitutional test by adopting maps that are not even remedial, exhibiting avoidable population inequality (in violation of Article IV, Section 3 of the Wisconsin Constitution, Article 1, Section 2 of the United States Constitution, and the Equal Protection Clause) and excessive county, town, and ward splits (in violation of Article IV, Section 4 of the Wisconsin Constitution).

¶213 For over a century, this court has required "as close an approximation to exactness as possible" in apportioning population by legislative districts under the Wisconsin Constitution. State ex rel. Attorney General v. Cunningham, 81 Wis. 440, 484, 51 N.W. 724 (1892). The only justification for deviating from exactness is compliance with other constitutional requirements (mainly, Section 4). State ex rel. Lamb v. Cunningham, 83 Wis. 90, 150, 53 N.W. 35 (1892). Similarly, nearly fifty years ago the United States Supreme Court declared there is "no excuse for the failure to meet the objective of equal representation for equal numbers of people in congressional districting other than the practical impossibility

---

    8 The entire point of this proceeding was to "remedy . . . malapportionment, while ensuring the maps satisfy all other constitutional and statutory requirements." Johnson, 399 Wis. 2d 623, ¶4. Instead, the majority overrides the constitutional command of one person, one vote because "population deviation is not an indicator of least change." Majority op., ¶32 n.18. The constitution is not expendable at the majority's caprice.

5

of drawing equal districts with mathematical precision." Mahan v. Howell, 410 U.S. 315, 322 (1973) (emphasis added). The majority conveniently does not address these precedents other than to pay lip service to them.

¶214 Irrefutably, the majority could have adopted maps with practically perfect population equality; the Citizen Mathematicians and Scientists drew such maps. Not only does the majority adopt an assembly map and a congressional map with unconstitutional population deviations, it also inflicts a constitutional harm not present in the 2011 maps by severing the boundaries of numerous local communities with no lawful justification for doing so. The Governor did not sacrifice population equality to preserve local communities, so his population deviation is unjustifiable and therefore unconstitutional.

¶215 If all of these constitutional failings weren't enough to disqualify the Governor's maps, their constitutionally impermissible dilution of the Black vote in Milwaukee County should be. In Johnson v. De Grandy, the United States Supreme Court rejected the "rule of thumb apparently adopted by the District Court" in that case (and by the majority in this case) "that anything short of the maximum number of majority-minority districts consistent with the Gingles conditions would violate § 2 [of the VRA]" as "caus[ing] its own dangers, and they are not to be courted." 512 U.S. 997, 1016 (1994). Expanding the number of Black opportunity districts to seven may on the surface appear to augment Black voting strength, but in reality

6

it jeopardizes the effectiveness of each district by spreading the population too thin,[9] with each of the Governor's opportunity districts hovering just above or just below 50%.[10]

¶216 I also write to address an issue with recurring significance beyond redistricting. Justice Hagedorn's November 30 concurring opinion——which no one joined——is not the "controlling" opinion of this court.[11] Setting aside Justice Hagedorn's departure from his November 30 position in announcing new views as the majority author at this late stage of the case, his November 30 concurrence was simply that and the majority opinion controls the issues presented. The apparent confusion

---

[9] Some elected officials characterized plans to reduce the Black voting-age population percentages in Milwaukee as part of "a national effort to dilute minority communities to create more Democratic seats." See, e.g., Assembly Floor Session, at 2:18:05 (Nov. 11, 2021) (statement of Rep. Sylvia Ortiz-Velez (AD8)), https://wiseye.org/2021/11/11/wisconsin-state-assembly-floor-session-42.

[10] The parties present slightly different ways of measuring Black voting-age population. According to the Legislature, this population includes "non-Hispanic Black" and "non-Hispanic (Black + White)." Legislature's Resp. Br., at 22. The Legislature omits other "multi-race subcategories[.]" Id. In contrast, other parties, including BLOC, ask that these subcategories be included. BLOC's Reply Br., at 8 n.1. If the goal is to draw seven majority-minority districts (which the majority suggests is the case), this definitional dispute is critical. In fact, according to the Legislature's definition, none of the Governor's seven supposedly VRA-mandated Black opportunity districts are above 50.0% (although one is exactly 50.0%). Legislature's Resp. Br., at 22.

[11] The Hunter Intervenor-Petitioners expressly labelled Justice Hagedorn's concurrence "controlling[.]" Hunter Intervenor-Petitioners' Resp. Br., at 6. A number of other parties treated it as controlling without giving it that label.

7

caused by his concurrence derailed the case presentations of several parties.

¶217 To prevent the court's policy-driven mapmaking in the future, the next time this court resolves a redistricting dispute it should consider withdrawing language from State ex rel. Reynolds v. Zimmerman, which prohibited the Legislature from implementing state legislative redistricting plans by joint resolution. 22 Wis. 2d 544, 569-70, 126 N.W.2d 551 (1964). That precedent should be revisited because it does not comport with the constitutional text, which assigns the Legislature alone the responsibility of redistricting. The Legislature suggested this court may need to revisit Zimmerman, depending on how it decided to proceed in this case.[12] This issue is worthy of the court's attention.

¶218 As a final matter, in the interest of ensuring procedural due process, this court should have allowed all parties to submit substantive modifications to their proposed remedial maps. The majority disingenuously states, "we invited all parties to this litigation to submit one proposed map for each set of districts[.]"[13] True, we asked each party to submit only "one" set of proposed remedial maps; however, we permitted the Governor and BLOC to make critical changes that went well beyond correcting drafting errors. For example, the Governor

---

[12] Legislature's 10/26/21 Br., at 20-22 ("Zimmerman is on shaky ground in light of the language of . . . Article IV, § 3 and historical context.").

[13] Majority op., ¶4 (emphasis added).

originally proposed a remedial assembly map that split 80 towns, but his modified map splits 50, a reduction of nearly 40%.[14] The Congressmen asked to submit a modified map, but the same majority that now adopts the Governor's modified maps denied the Congressmen this opportunity.[15] Instead, the majority inexplicably rushes to select the Governor's unlawful maps, eschewing reasoned law for its own desires. I dissent.

## I. THE MAJORITY'S REMEDY VIOLATES THE CONSTITUTIONS

¶219 The majority guts state constitutional mandates. In our November 30th opinion, we outlined the "discrete requirements" of Article IV, Sections 3 and 4. Johnson, 399 Wis. 2d 623, ¶63. Section 3 requires state legislative districts to be drawn "according to the number of inhabitants." Section 4 requires assembly districts "to be bounded by county, precinct, town, or ward lines[.]"[16] We declared these sections "explicitly protect[] . . . justiciable and cognizable rights,"[17]

---

[14] Johnson v. WEC, No. 2021AP1450-OA, unpublished order, at 3 (Wis. Jan. 10, 2022) (Roggensack, J., dissenting).

[15] Id.

[16] In one of this court's seminal cases on redistricting, Chief Justice Lyon explained a precinct was a form of local government that ceased to exist when a part of Article IV of the Wisconsin Constitution became fully operative. State ex rel. Attorney General v. Cunningham, 81 Wis. 440, 520, 51 N.W. 724 (1892) (Lyon, C.J., concurring) ("[T]he precinct of the constitution disappeared when the uniform system of town and county government prescribed, by the constitution (art. 4, sec. 23) became fully operative. We have now no civil subdivisions, other than towns and wards, which are the equivalent of the precinct of territorial times."). Under Article IV, "precinct" does not mean election precinct.

[17] Johnson, 399 Wis. 2d 623, ¶38.

9

dedicated eleven paragraphs to expounding how these sections are satisfied,[18] and repeatedly promised Wisconsinites we would uphold these sections when selecting remedial state legislative maps.[19] The majority in this opinion reverses course, treating Sections 3 and 4 as mere hortative statements with no operative effect. The majority goes so far as to suggest Section 4 may not even be a commendable policy goal——at least, not as commendable as core retention.[20] Despite the constitutional command, the majority actually frowns upon minimizing the number of county, town, and ward splits to the extent such an effort produces more change from prior maps than the majority deems acceptable.[21] Least change is an approach designed to minimize changes to predecessor maps, but it should go without saying that the court must in all respects comply with the law. The Wisconsin Constitution is the supreme law of this state, which all members of this court swore an oath to uphold. The people of Wisconsin should be alarmed at the majority's dismissiveness toward the constitution.

---

[18] Id., ¶¶28-38.

[19] Id., ¶¶8, 34, 38, 81. Justice Hagedorn agreed without reservation, writing in his solo concurrence, "remedial maps must comply with . . . Article IV, Sections 3, 4, and 5 of the Wisconsin Constitution[.]" Id., ¶82 n.4 (Hagedorn, J., concurring).

[20] Majority op., ¶32 ("[T]he Legislature argues that we should weigh as a measure of least change the number of counties and municipalities split under each proposal. We fail to see why this is a relevant least-change metric, however.").

[21] Id. ("If a municipality was split under the maps adopted in 2011, reuniting that municipality now——laudable though it may be——would produce more change, not less.").

¶220 In 1892, this court rejected the majority's current construction of Article IV, Sections 3 and 4 as mere recommendations for being a "dangerous doctrine," which "should not be encouraged even to the extent of discussing the question" because "[t]he convention, in making the constitution, had a higher duty to perform than to give . . . advice." Cunningham, 81 Wis. at 485. It expressly held, "the restrictions on the power . . . to make an apportionment, found in sections 3[] [and] 4 . . . are mandatory and imperative, and are not subject to . . . discretion[.]" Id. at 486. Later that same year, this court declared the requirements of these sections are "absolutely binding" and even the Legislature has "no power . . . to dispense with any one of them." Lamb, 83 Wis. at 148. The majority now endorses this "dangerous doctrine," effectively overruling the Wisconsin Constitution. The majority barely mentions Cunningham or Lamb, despite implicitly withdrawing language from both seminal decisions.

¶221 The majority's departure from precedent is, indeed, dangerous. Wisconsin's founders knew political actors would act politically.[22] They did not impose a partisan fairness requirement on the redistricting process, Johnson, 399 Wis. 2d 623, ¶¶53-63, because telling partisans in the Legislature not to act for partisan advantage would have been like ordering water to be dry. Cf. The Law and Policy of Redistricting Reform, Fed. Soc'y, at 1:06:20 (Apr. 26, 2019),

---

[22] Gerrymandering was a common practice by 1840. Rucho v. Common Cause, 588 U.S. __, 139 S. Ct. 2484, 2495 (2019) (citation omitted).

11

https://www.youtube.com/watch?v=nOi-BEo8ZFc&t=1618s (statement of Larry Obhof). The founders did, however, impose the requirements of Article IV, Sections 3 and 4 to limit the extent to which one party could take control of the state by gerrymandering.[23] Cunningham, 81 Wis. at 486.

¶222 The majority assures future political actors they can adopt state legislative redistricting plans with population deviation nearing 2% that cannot be justified by a good-faith attempt to preserve political boundaries. For comparison, the assembly map passed by the Legislature and signed by the Governor in 2011 had a population deviation of 0.76%. Baldus v. Members of Wis. Government Accountability Bd., 849 F. Supp. 2d 840, 851 (E.D. Wis. 2012). Instead of mentioning this feature of the 2011 map, the majority resorts to a legislatively-drawn map from the 1970s that purportedly had a 2% population deviation.[24] Every assembly map drawn by a federal court in the history of Wisconsin has had a lower population deviation than the map the majority adopts. Baumgart v. Wendelberger, No. 01-C-0121, 2002 WL 34127471, at *7 (E.D. Wis. May 30, 2002) (1.48%); Prosser v. Elections Bd., 793 F. Supp. 859, 866 (W.D. Wis. 1992) (0.52%); Wis. State AFL-CIO v.

---

[23] They also adopted Article IV, Section 5, which states, in relevant part, "no assembly district shall be divided in the formation of a senate district." No one has ever treated Section 5 as anything less than an absolute constitutional requirement. Not a single assembly district is divided in the formation of any senate district in any proposed remedial plan submitted to this court.

[24] Majority op., ¶36.

12

Elections Bd., 543 F. Supp. 630, 637 (E.D. Wis. 1982) (1.74%).
The majority's assurances that "the Governor's maps are
consistent with . . . court-sanctioned requirements
for . . . population equality"[25] is simply false. This court has
never recognized a safe harbor for population deviation——until
now. H. Rupert Theobald, Equal Representation: A Study of
Legislative and Congressional Apportionment in Wisconsin, in
Wisconsin Blue Book 71, 72 (1970) ("The Wisconsin
Constitution has, since 1848, required districts 'according to
the number of inhabitants', and it does not recognize a 'minimal
deviation' which could be disregarded.").[26]

¶223 A 2% automatic safe harbor is quite the gift to
political actors, affording them unprecedented map-drawing
discretion. Although all but one member of the current majority

---

[25] Id.

[26] According to the majority, this court has never required
less population deviation than is present in the maps it adopts.
Id., ¶36 n.20. However, this court has not decided a
redistricting case since the rise of the one person, one vote
principle. Even before the United States Supreme Court
established the primacy of this principle in the 1960s, this
court never recognized any sort of safe harbor, below which maps
are per se constitutional. Instead, it has always examined
whether other constitutional criteria (not extra-legal criteria
such as core retention) justify the population deviation.
Neither the Governor nor the majority has pointed to any such
criteria as justification. The question is not whether "better
performance on population deviation is . . . possible." Id. As
the majority acknowledges, it "certainly" is. Id. The question
is whether any legal rationale supports the deviation the
majority asserts is permissible——not just for the Governor's
maps but for any map. There isn't any. Under controlling
precedent, population deviation cannot be judged in isolation,
without consideration of all other constitutional criteria.

13

decried the 2011 maps as "sharply partisan,"[27] they now embrace a tool for promoting partisan gerrymanders.[28] When a partisan gerrymander coexists with population inequality, a subset of the people become more politically powerful than the rest of the population, raising serious concerns that the people, as a whole, have lost control over their own government. Minimizing population deviation is the key limitation on partisan gerrymandering, as evidenced by England's "infamous rotten boroughs." Johnson, 399 Wis. 2d 623, ¶30 (citing The Federalist No. 56, at 349 (James Madison) (Clinton Rossiter ed., 1961)).

¶224 The constraints on the Legislature's redistricting power are "very simple and brief;" undermining any one of them grants the body significantly more leeway than the constitution permits. Id., ¶58 (quoting Cunningham, 81 Wis. at 511 (Pinney, J., concurring)). While this court is bound by the least-change approach, the Legislature is not. At any time, the Legislature and the Governor may implement redistricting plans through the political process, which would supplant this court's remedy.[29] Id., ¶19 (majority opinion) (quoting State ex rel. Reynolds v. Zimmerman, 23 Wis. 2d 606, 606, 128 N.W.2d 16 (1964) (per

---

[27] Johnson, 399 Wis. 2d 623, ¶¶88, 106 (Dallet, J., dissenting) (citations omitted).

[28] Of course, notwithstanding a partisan gerrymander, when map drawers comply with the constitutional command to achieve population equality, "[v]oters retain their freedom to choose among candidates irrespective of how district lines are drawn." Id., ¶55 (majority opinion) (citation omitted).

[29] Majority op., ¶52 ("This order shall remain in effect until new maps are enacted into law or a court otherwise directs.").

14

curiam)). Under the majority's new redistricting paradigm, one side of the political aisle may be politically obliterated, much like the words "according to the number of inhabitants" under the majority's atextual interpretation. The majority's opinion is a wolf that does not even try to masquerade as a sheep. See Morrison v. Olson, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting).

¶225 The majority rationalizes constitutionally impermissible population inequality by declaring "the Governor's maps are consistent with historical practice and court-sanctioned requirements for compactness, respect for local boundaries, and population equality."[30] So much for the constitution. The majority points to maps this court approved long ago, with substantial population inequality, which the majority proclaims constitutes a baseline by which to measure proposed remedial maps in this case. The majority's reliance on cases predating the primacy placed by the United States Supreme Court on population equality undermines its analysis entirely.

¶226 In Cunningham and Lamb, this court explained that Article IV, Sections 3 and 4 exist in tension. While Section 3 requires population equality, Section 4 renders political boundary lines inviolable——specifically, the lines dividing counties, towns, and wards. Grouping people into perfectly equal districts while respecting political boundaries, in which unequal populations live, is challenging. In Cunningham and Lamb, this court gave Sections 3 and 4 near equal weight: "[I]t

---

[30] Id., ¶36.

15

is impossible to secure exact and equal representation, by reason of the constitutional hindrances mentioned [mainly, Section 4]; and it is because of such hindrances, and only because of such hindrances, that the legislature, under the constitution, are at liberty to depart from equality of representation." Lamb, 83 Wis. at 150 (emphasis added); see also id. at 155 ("It follows that the constitution requires the legislature to apportion the state into senate and assembly districts 'according to the number of inhabitants,' as nearly as can be done consistently with other provisions of the constitution mentioned."). In particular, this court prohibited county splits, at the expense of population equality. Id. at 148 ("It was determined in the former case [Cunningham], and is now conceded, that no county line is to be broken in the formation of any assembly district.").

¶227 This court twice reaffirmed Cunningham and Lamb. In 1932, this court declared the Legislature "bound by constitutional mandate to avoid unnecessary inequalities in representation;" however, it also noted "it was recognized in [Cunningham and Lamb] that the Constitution contains other provisions which militate against absolute equality . . . . For example, the requirement that the districts be bounded by county, . . . town, or ward lines[.]" State ex rel. Bownman v. Dammann, 209 Wis. 21, 27, 243 N.W. 481 (1932).

¶228 A few decades later, this court reiterated that "the constitution itself commits the state to the principle of per capita equality of representation subject only to some

16

geographic limitations in the execution and administration of this principle." Zimmerman, 22 Wis. 2d at 556 (emphasis added). That statement was not a passing remark. This court emphasized the importance of population equality multiple times:

> It is assumed by all parties and understood by this court that a mathematical equality of population in each senate and assembly district is impossible to achieve, given the requirement that the boundaries of local political units must be considered in the execution of the standard of per capita equality of representation.
>
> It is equally clear, however, that a valid reapportionment 'should be as close an approximation to exactness as possible, and [that] this is the utmost limit for the exercise of legislative discretion.'
>
> . . . .
>
> [T]he legislature must apportion in direct ratio to population, subject only to (1) practical limitations in execution of this principle, and (2) precise constitutional restrictions about observance of governmental boundaries in drawing district lines.

Id. at 563–66. Until the United States Supreme Court ruled otherwise, substantial population inequality was permissible, but it had to be justified almost entirely by the preservation of political boundaries. Our November 30 opinion stressed the importance of the principle articulated in Zimmerman, although we also recognized federal constitutional law uprooted the balance this court had struck between Article IV, Sections 3 and 4, rendering population equality of paramount importance in redistricting. Johnson, 399 Wis. 2d 623, ¶¶35, 38 (citations omitted).

17

¶229 Post-Zimmerman, federal constitutional law changed. No longer may Article IV, Sections 3 and 4 be given approximately equal weight. In 1964, the United States Supreme Court held, "the Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as practicable." Reynolds v. Sims, 377 U.S. 533, 577 (1964). That same year, the Court confirmed even state senate districts had to comply with the one person, one vote principle. Maryland Comm. for Fair Representation v. Tawes, 377 U.S. 656, 674-75 (1964). On the eve of Wisconsin's next redistricting cycle, the assembly requested an opinion from the attorney general regarding the application of Sections 3 and 4 in light of these binding precedents. 58 Wis. Att'y Gen. Op. 88 (1969). The attorney general responded, "[i]n my opinion, the Wisconsin Constitution no longer may be considered as prohibiting assembly districts from crossing county lines, in view of the emphasis the United States Supreme Court has placed upon population equality among electoral districts." Id. at 91. In another opinion two years later, the attorney general explained town and ward lines still needed to be followed but only "insofar as may be consistent with population equality[.]" 60 Wis. Att'y Gen. Op. 101, 106 (1971); see also Michael Gallagher, Joseph Kreye & Staci Duros, Redistricting in Wisconsin 2020 17 (2020), https://docs.legis.wisconsin.gov/misc/lrb/wisconsin_elections_pr oject/redistricting_wisconsin_2020_1_2.pdf (explaining respect for the unity of political subdivisions is "by no means

18

obsolete" but that these boundaries were followed "much more meticulously in Wisconsin, and elsewhere, before the advent of one person, one vote"); Theobald, A Study of Legislative and Congressional Apportionment in Wisconsin, at 72 ("As long as they do not conflict with the equal population requirements, all other apportionment provisions of the Wisconsin Constitution must be given full effect." (emphasis added)). Accordingly, every proposed remedial map in this case splits substantially more counties, towns, and wards than would have been permissible under Cunningham and Lamb.

¶230 Under the original understanding of Article IV, Section 3, population inequality was permissible only if a "constitutional hindrance[]," i.e., compliance with another constitutional requirement, compelled it. Lamb, 83 Wis. at 150. In Reynolds, the United States Supreme Court changed the calculation, but the majority nevertheless chooses maps in accordance with a bad interpretation of bad law, embracing both population inequality and fractured political boundaries.

¶231 While the truth may be inconvenient for the majority, pretending Zimmerman sanctions the Governor's maps because the maps approved in Zimmerman had "substantially larger population deviations"[31] ignores binding precedent of the United States Supreme Court. The majority relegates the United States Supreme Court's directive on population equality to a single footnote, acknowledging "the geographic limitations in the Wisconsin

---

[31] Id.

19

Constitution can no longer be fully enforced"[32] as a result. The majority neglects to acknowledge that those "geographic limitations" in Article IV, Section 4 can no longer justify the extent of population inequality approved in Zimmerman.

¶232 While federal constitutional law precludes us from giving perfect effect to Article IV's original meaning, we could nonetheless achieve population equality while preserving political boundaries, something the majority makes no attempt to do. The remedial maps proposed by the Governor, which the majority adopts as its own, have both greater population deviation and more splits than the Legislature's proposed remedial maps. The Governor offers no explanation for his population deviation other than a passing reference to least change, despite this court's direction to the parties to be mindful of both Sections 3 and 4. Specifically, the Governor's assembly map has more than twice the population deviation of the Legislature's map (1.88% compared to the Legislature's 0.76%),[33] and double the municipal splits (115 compared to the Legislature's 52),[34] and hundreds more ward splits (the Legislature split zero wards).[35] The ward splits are particularly difficult to justify because "the smaller the

---

[32] Id., n.19 (citing Johnson, 399 Wis. 2d 623, ¶35).

[33] Resp. Expert R. Thomas M. Bryan, at 3.

[34] Suppl. R. Supp. Governor Evers's Proposed Corrected State Legislative District Plans, at 5; Expert R. Thomas M. Bryan, at 18.

[35] The Governor and the Legislature split the same number of counties.

political subdivision, the easier it may be to preserve its boundaries." Johnson, 399 Wis. 2d 623, ¶35 (citing Baumgart, 2002 WL 34127471, at *3). While one person, one vote necessitates breaking up counties (large units of people), it does not necessitate dividing the smallest political units recognized in the state.

¶233 The Governor argues town splits are relevant but not village and city splits based on the language of Article IV, Section 4. His interpretation is consistent with Lamb, 83 Wis. at 148. Even so, he asks this court to split 50 towns by adopting his proposed remedial assembly map——and the majority obliges.[36] In comparison, the Legislature's map has 52 total municipal splits, of which only 16 are town splits (the rest are village and city splits).[37] At the time of adoption, the 2011 assembly map split 30 towns.[38] A 67% increase in town splits hardly reflects "least change."

¶234 The majority mischaracterizes the record to justify the high number of splits. It states:

> Particularized data about how many counties or municipalities remain unified or split may be a useful indicator of least change. But no party saw fit to provide that data. What we did receive was raw counts of total county and municipal slits under each

---

[36] Suppl. R. Supp. Governor Evers's Proposed Corrected State Legislative District Plans, at 5.

[37] Expert R. Thomas M. Bryan, at 18.

[38] See Legislature's Reply Br., at 13 ("How many towns were split by Act 43 is ascertainable by reading the statute, identifying in text every town split. There were 30[.]" (citing Wis. Stat. § 4.001, et seq.)).

21

proposal, and that information provides no insight into which map makes the least change to existing district boundaries.[39]

Problematically, the majority seems to sanction an illegal map——containing an unlawful number of splits——because the map performs well on a single extra-legal criterion, core retention. The majority's approach violates its duty to uphold the Wisconsin Constitution.[40]

¶235 Contrary to the majority's assertion, the Legislature did provide detailed split analyses,[41] which it discussed at length in its response brief. Its expert provided a breakdown of every county and municipal split in every proposed remedial map (except for the Governor's modified maps).[42] To determine whether a proposed map retained an existing split or added one may be tedious, but it is not particularly difficult to ascertain. The current statutes explicitly state when a split

---

[39] Majority op., ¶32 (second emphasis added).

[40] Adding together the number of county, town, and ward splits, the assembly map the majority adopts likely has more splits than any map ever implemented in this state. While the majority compares population deviation in its maps with past maps, it does not endeavor to make analogous comparisons for splits.

[41] Resp. Expert R. Thomas M. Bryan, at App. 2.

[42] This expert report was submitted before the Governor was allowed to modify his maps to reduce the number of splits. The fact that this court allowed the Governor to modify his maps while denying other parties the opportunity illustrates the serious due process problems triggered by the majority's acceptance of the Governor's modified maps. They have not been subjected to the same level of adversarial scrutiny as other maps. The Governor's motion to file modified maps was filed on January 6, 2022——conveniently, two days after the deadline for submitting reply briefs and reply expert reports.

22

occurs. For example, Wis. Stat. § 4.44(1) declares the 44th Assembly District includes "[t]hat part of the town of Harmony comprising U.S. census tract 1202, blocks 3004 and 3095," while Wis. Stat. § 4.45(1)(a) declares the 45th Assembly District includes "[t]he towns of Albany, Decatur, Jefferson, Spring Grove, and Sylvester." By comparing the split analyses to the existing statutes, the Legislature explained in its response brief "[t]he Governor would split 7 new municipalities in Waukesha County's Assembly District 99, including Oconomow[o]c and Pewaukee. Similarly, the Governor would add 8 municipal splits in Dane County, including Stoughton and Sue Prairie, even though not previously split[.]"[43]

¶236 Adding to its infirmities under the law, the majority's map effectuates a racial gerrymander. The Governor admits he drew his proposed remedial assembly map with the express purpose of creating seven Black majority-minority assembly districts. Such race-driven redistricting must survive strict scrutiny. The United States Supreme Court has assumed compliance with the VRA can be a compelling state interest. Abbott v. Perez, 138 S. Ct. 2305, 2315 (2018). However, VRA violations "never can be assumed, but specifically must be proved in each case in order to establish a redistricting plan dilutes minority voting strength in violation of § 2 [of the VRA]." Shaw v. Reno, 509 U.S. 630, 653 (1993). A state must have "a strong basis in evidence" demonstrating that without explicit consideration of race, a redistricting plan would

---

[43] Legislature's Resp. Br., at 16.

23

transgress the VRA. <u>Cooper v. Harris</u>, 137 S. Ct. 1455, 1464 (2017) (quoting <u>Alabama Legislative Black Caucus v. Alabama</u>, 135 S. Ct. 1257, 1274 (2015)).

¶237 The majority assumes a remedial assembly map with fewer than seven Black majority-minority districts would violate the VRA. This assumption is inappropriate, and the Governor has failed to establish "a strong basis in evidence" for a seventh district. The majority suggests the VRA requires the drawing of a seventh Black majority-minority district because Wisconsin's Black voting-age population approaches seven percent. However, Section 2 of the VRA declares "That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 52 U.S.C. § 10301(b). In <u>De Grandy</u>, the United States Supreme Court held the failure to maximize the number of opportunity districts is not a VRA violation.[44] 512 U.S. at 1017. Opportunity is generally measured, the Court said, against

---

[44] Maximization has been rejected because it carries a heavy price: "if the number of minority-majority districts is maximized, then it necessarily follows that black influence is elsewhere minimized, which reduces the number of districts in which blacks, fully participating in an integrated process, can hold the balance of power." <u>In re Apportionment of the State Legislature—1992</u>, 486 N.W.2d 639, 654 n.66 (1992) (citation omitted)). In turn, even if Black voters collectively perform better, a portion of the Black voting population is "relegate[d]" to the status of "second class . . . wards of the political/electoral system." <u>Id.</u> Many Black voters object to their votes being diluted "within . . . their district merely to secure the chance that . . . their allies in other districts . . . [are] able to vote more like-minded partisans to the legislature." <u>Cf.</u> Larry Alexander & Saikrishna B. Prakash, <u>Tempest in an Empty Teapot: Why the Constitution Does Not Regulate Gerrymandering</u>, 50 Wm. & Mary L. Rev. 1, 27 (2008).

24

"rough" proportionality. See id. at 1000, 1023. The author of the majority opinion in De Grandy, writing in dissent in another VRA case, explained:

> Several baselines can be imagined; one could, for example, compare a minority's voting strength under a particular districting plan with the maximum strength possible under any alternative. Not surprisingly, we have conclusively rejected this approach; the VRA was passed to guarantee minority voters a fair game, not a killing. See Johnson v. De Grandy, 512 U.S. 997, 1016-1017, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994). We have held that the better baseline for measuring opportunity to elect under § 2, although not dispositive, is the minority's rough proportion of the relevant population. Id., at 1013-1023, 114 S.Ct. 2647.

Bartlett v. Strictland, 556 U.S. 1, 29 (2009) (Scouter, J., dissenting) (citation omitted). The majority skims over De Grandy.[45]

¶238 The Black voting-age population is between 6.1% and 6.5%, as Chief Justice Ziegler explains in her dissent.[46] Wisconsin has 99 assembly seats——not 100——so, even taking the high estimate of 6.5%, the proportional share of Black assembly districts, rounded to the nearest whole number, would be six, not seven (99 × 0.065 = 6.4). Accordingly, even if the Gingles

---

[45] Some United States Supreme Court justices have been quite critical of the emphasis placed on proportionality; nonetheless, it is the law we are bound to follow. Holder v. Hall, 512 U.S. 874, 943-44 (1994) (Thomas, J., concurring) ("Few words would be too strong to describe the dissembling that pervades the application of the 'totality of the circumstances' test under our interpretation of § 2. It is an empty incantation——a mere conjurer's trick that serves to hide the drive for proportionality that animates our decisions.").

[46] Chief Justice Ziegler's dissent, ¶114.

preconditions were satisfied, six districts is sufficient to constitute rough proportionality. See, e.g., Bodker v. Taylor, No. Civ.A.1:02-CV-999ODE, 2002 WL 32587312, at *8-9 (N.D. Ga. June 5, 2002) (noting Black people constituted 45.2% of the population and had only 42.35% of the seats but nonetheless finding "the court's map conforms with Section 2 of the Voting Rights Act" because rough "proportional representation" was achieved and while not "dispositive," proportionality is "strong evidence" that "minorities have an equal opportunity to participate" particularly "where there is simply no evidence before the court about social, historical or other circumstances that might impact whether minorities in Fulton County are denied equal opportunity for political participation").[47] Justice Roggensack provides many "good reasons" to believe the majority's conclusory analysis of the third Gingles precondition is wanting.

¶239 Rough proportionality is not a safe harbor, but it is "obviously an indication that minority voters have an equal opportunity, in spite of racial polarization, 'to participate in the political process and to elect representatives of their choice,' 42 U.S.C. § 1973(b)[.]" De Grandy, 512 U.S. at 1020.

---

[47] BLOC referred to Bodker in its brief and included a copy of the opinion in its appendix. It also referred to and provided a copy of Stenger v. Kellett, No. 4:11CV2230, 2012 WL 601017, at *12 (E.D. Mo. Feb. 23, 2012) ("[B]ecause the African American 'effective minority' districts are in approximate proportion to their population of St. Louis County, the plan would likely not violate the Voting Rights Act even if the Gingles factors were met, given the totality of the circumstances in this case.").

Just like least change is not reflected by a single number, a proper VRA analysis is not governed by a "single statistic[.]" Id. Nevertheless, the "central teaching" of De Grandy is clear: "[P]roportionality . . . is always relevant evidence in determining vote dilution . . . . Thus, in evaluating . . . the totality of the circumstances a court must always consider the relationship between the number of majority-minority voting districts and the minority group's share of the population." Id. at 1025 (O'Connor, J., concurring) (citing Thornburg v. Gingles, 478 U.S. 30, 99 (1986) (O'Connor, J., concurring in judgment)). The requisite proportionality analysis is missing from the majority opinion.

¶240 "[E]xplicit race-based districting embarks us on a most dangerous course." Id. at 1031 (Kennedy, J., concurring in part and concurring in the judgment). "[R]acial classifications violate the very essence of the lofty ideals of individual equality for which this country strives. The concept of racial classification ought to be repugnant to all Americans." Robert Redwine, Comment, Constitutional Law:  Racial and Political Gerrymandering——Different Problems Require Different Solutions, 51 Okla. L. Rev. 373, 399 (1996). In the absence of strong evidence demonstrating a VRA violation will result from the lack of a seventh district, this court should "unerringly and unapologetically . . . exalt[] the ideal of individual equality without regard to race." Id. Exhibiting highly suspect racial classifications, the majority's remedy violates the Equal Protection Clause.

27

## II. JUSTICE HAGEDORN'S SOLO CONCURRENCE

¶241 Justice Hagedorn wrote a solo concurrence to our November 30 opinion, which many parties treated as the controlling opinion. No justice joined it, and it does not constitute binding precedent. In Wisconsin, a solo concurrence can <u>never</u> be controlling. A point of law is the opinion of this court only if a majority of justices both agree on the point and join the mandate. <u>State v. Dowe</u>, 120 Wis. 2d 192, 194 352 N.W.2d 660 (1984) (per curiam) (citations omitted); <u>Piper v. Jones Dairy Farm</u>, 2020 WI 28, ¶22, 390 Wis. 2d 762, 940 N.W.2d 701 (citations omitted). Justice Hagedorn joined all but six of the 81 paragraphs comprising our November 30 opinion. The 75 paragraphs joined by four justices in the majority constitute the majority opinion of the court.

¶242 Perhaps the parties mistakenly assumed the position of the United States Supreme Court on this issue applies to Wisconsin Supreme Court cases. The United States Supreme Court will consider and count concurring opinions in cases lacking an opinion joined by a majority. In <u>Marks v. United States</u>, the Court held, "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds[.]'" 430 U.S. 188, 193 (1977) (quoting <u>Gregg v. Georgia</u>, 428 U.S. 153, 169 n.15 (1976) (plurality)). Federal courts understand the so-called <u>Marks</u> Rule differently. Some give precedential effect to the narrowest opinion that joined the mandate; others search for a "common denominator"

28

that "must embody a position implicitly approved by at least [a majority] of Justices who support the judgment." See United States v. Epps, 707 F.3d 337, 348 (D.C. 2013) (quoting King v. Palmer, 950 F.2d 771, 781 (D.C. Cir. 1991) (en banc)).

¶243 The Marks Rule does not apply to this case, but even if it did, Justice Hagedorn's solo concurrence would not be controlling. This court has never applied the Marks Rule to interpret its own precedent, but only to interpret federal precedent. See State v. Griep, 2015 WI 40, ¶36, 361 Wis. 2d 657, 863 N.W.2d 567. Even if this court had adopted the Marks Rule (which has been the subject of substantial scholarly criticism),[48] it would not apply. On many points, Justice Hagedorn's concurrence is broader than the majority opinion, and some of its conclusions lack any common rationale with the majority. For example, Justice Hagedorn said extra-legal criteria could be considered in selecting a map——but only those extra-legal criteria he deemed important in his subjective judgment.[49] Three justices in the majority would have stuck to

---

[48] The parties' reliance on Justice Hagedorn's solo concurrence illustrates one problem with the Marks Rule. Justice Hagedorn represents one-seventh of this court, yet his opinion has nonetheless been treated as controlling by most of the parties in this case. The "least popular view[s]" of a single justice do not reflect the law. See Richard M. Re, Beyond the Marks Rule, 132 Harv. L. Rev. 1943, 1944 (2019).

[49] Although Justice Hagedorn believes this court can define what constitutes a community of interest and then protect that community in selecting a map, he acknowledges, "[i]t is not a legal requirement[.]" Johnson, 399 Wis. 2d 623, ¶83 (Hagedorn, J., concurring). In contrast, Justice Hagedorn was unwilling to consider another extra-legal criterion: partisan fairness. Id., ¶87. This inconsistency has never been explained. Justice Hagedorn agrees this court lacks the institutional competency to

29

the law alone, showing an unbridgeable philosophical divide regarding the propriety of extra-legal criteria advanced by the concurrence.

¶244 In fairness to the parties who mistook Justice Hagedorn's solo concurrence for the opinion of this court, perhaps their confusion stemmed from Justice Hagedorn's own words. In his concurrence, he "invited" the parties to submit proposed remedial maps and briefing in conformity with his idiosyncratic views[50]——never mind that only this court, acting through a majority of participating justices, can "invite" parties to do anything. Justice Hagedorn may have cast the deciding vote in this case, but he does not have the power to act as a supreme court of one.

¶245 Justice Hagedorn's solo concurrence is also inconsistent with the views he now expresses as the majority author. Never once did he mention "core retention" in his concurrence——nor did the majority, and the dissent used the phrase only once, in passing.[51] In contrast, today's rather

---

define what constitutes partisan fairness and which political communities deserve special consideration. For the same reasons, "it is not for the Court to define what a community of interest is and where its boundaries are, and it is not for the Court to determine which regions deserve special consideration." Id., ¶71 n.7 (majority opinion) (quoting In re Legislative Districting of the State, 805 A.2d 292, 298 (Md. 2002)).

[50] Id., ¶63 (Hagedorn, J., concurring).

[51] Id., ¶97 (Dallet, J., dissenting) (citation omitted).

30

short majority opinion[52] uses the phrase a striking 27 times.[53]
Justice Hagedorn now says, as the majority author, core
retention is the "preeminent . . . metric"[54] and "especially
helpful."[55] We never determined "core retention is . . . central
to least change review,"[56] despite some parties stating in
briefing before our November 30 opinion that it might be
important to consider, nor did we determine that it is a
"preeminent . . . metric" or "especially helpful." We never
mentioned it at all, until now.

¶246 While we determined that the least-change approach
should guide this court's decision, no one thought that meant
maximizing core retention——not even Justice Hagedorn. There is
a reason the majority does not direct the reader to any portion
of our November 30 opinion to support the proposition that core
retention is dispositive:  this majority made it up.

¶247 Justice Hagedorn's concurrence contemplates a
situation that should (as a statistical matter) never occur if

---

[52] The majority opinion addresses several issues but spans a
mere 32 pages. In contrast, the three-judge federal district
court opinion in Singleton v. Merrill, one of the most recent
successful VRA challenges in the context of redistricting, is
225 pages. __ F. Supp. 3d __, 2022 WL 265001 (N.D. Ala. Jan.
24) (per curiam), stayed sub nom. pending cert. review, Merrill
v. Milligan, 142 S. Ct. 879 (Mem). In this case, the only full-
fledged VRA analyses come from the three dissents.

[53] Majority op., ¶¶7-8, 13 & n.9, 14-15, 22, 24, 26-30, 33.

[54] Id., ¶33.

[55] Id., ¶13.

[56] Id.

31

core retention is the "preeminent . . . metric" in selecting maps——a tie:

> Suppose we receive multiple proposed maps that comply with all relevant legal requirements, and that have equally compelling arguments for why their proposed map most aligns with current district boundaries. In that circumstance, we still must exercise judgment to choose the best alternative. Considering communities of interest (or other traditional redistricting criteria) may assist us in doing so.

Johnson, 399 Wis. 2d 623, ¶83 (Hagedorn, J., concurring). Justice Hagedorn envisioned parties presenting "equally compelling arguments" regarding least change, which is an odd turn of phrase if he really meant, "I will vote for whichever maps have the best core retention." The chance of two proposed remedial maps having the same core retention probably approaches the chance of winning the lottery. No reasonable person would read Justice Hagedorn's concurrence and think a slight difference in core retention would be dispositive, yet that is exactly what the majority now holds.

¶248 Justice Hagedorn's misunderstanding of the least-change approach, first displayed in his concurrence, infects the majority opinion in a more fundamentally erroneous way than equating least change with core retention. The majority spends substantial time discussing Tennant v. Jefferson County Commission, 567 U.S. 758, 764-65 (2012) (per curiam). Specifically, the majority states:

> In Tennant[,] . . . the Supreme Court upheld a 4,871-person deviation in West Virginia's congressional districts, noting the deviation advanced the state's interests in maximizing core retention and maintaining whole counties. . . .

32

> The United States Supreme Court held that maximizing core retention was an acceptable justification for far greater deviation in <u>Tennant</u>.[57]

There are multiple problems with the majority's reliance on <u>Tennant</u>.

¶249 First, our November 30 opinion did not recognize least change, let alone core retention, as a "state interest." The least-change approach reflects this court's limited power to remedy violations of law, which does not include the power to write statutes out of whole cloth. <u>Johnson</u>, 399 Wis. 2d 623, ¶8 (majority opinion) ("Because the judiciary lacks the lawmaking power constitutionally conferred on the legislature, we will limit our remedy to achieving compliance with the law rather than imposing policy choices."). "A least-change approach is nothing more than a convenient way to describe the judiciary's properly limited role in redistricting." <u>Id.</u>, ¶72.

¶250 The majority errs by treating core retention as a state interest of critical importance, at the expense of applying the text of the Wisconsin Constitution. At most, core retention may indicate whether this court has exceeded its jurisdiction by delving into political decision-making. In choosing the Governor's maps, the majority does not limit itself to "making only those changes necessary for the maps to comport with the one person, one vote principle while satisfying other constitutional and statutory mandates (a 'least-change' approach)," <u>id.</u>, ¶5, but instead implements Justice Hagedorn's

---

[57] <u>Id.</u>, ¶¶22, 24.

33

previously articulated view, which permits tipping the scales with concededly extra-legal criteria. Id., ¶83 (Hagedorn, J., concurring).[58]

¶251 Second, the West Virginia State Legislature drew the map under review in Tennant. 567 U.S. at 760-61. Courts have long been held to higher standards than legislative bodies when drawing maps precisely because courts do not get to determine, in the first instance, what constitutes a state interest (at least not normally).[59] The majority's reliance on Tennant is misplaced.

¶252 That Justice Hagedorn's majority opinion is a perversion of least change is self-evident from the opinion's very structure. The majority "begin[s] [its] analysis by probing which map makes the least change from current district boundaries. From there, [it] examine[s] the relevant law[.]"[60] As in any case, the court is supposed to begin with the law. Without first knowing what the law requires, there is no way for the court to "mak[e] only those changes necessary for the maps to comport with the [law]." Johnson, 399 Wis. 2d 623, ¶5 (majority opinion). The majority's fundamentally flawed analysis produces an illegitimate remedy.

---

[58] Justice Ann Walsh Bradley confirms the majority privileged policy over the law in her concurrence, which is joined by all members of the majority except Justice Hagedorn.

[59] Chief Justice Ziegler's Dissent, ¶141.

[60] Majority op., ¶12.

III. ZIMMERMAN

¶253 Nearly sixty years have passed since this court last resolved redistricting litigation. In that case, this court declared a redistricting plan cannot be implemented by joint resolution. Zimmerman, 22 Wis. 2d at 559. While Zimmerman has been precedent for many years, it is the only case to address that issue, and this court has never had the opportunity to revisit it because every redistricting case that followed was heard exclusively in federal court. Unlike a fine wine, precedent does not necessarily get better with age.[61]

¶254 With respect to state legislative redistricting plans,[62] the foundation for Zimmerman is weak. The text of Article IV, Section 3 does not contemplate a role for the Governor in the drawing of assembly and senate maps. Compare Wis. Const. art. IV, § 3 ("[T]he legislature shall apportion and district anew the members of the senate and assembly[.]"), with e.g., id. art. I, § 21(1) ("Writs of error . . . shall be issued by such courts as the legislature designates by law." (emphasis

_____

[61] See Montejo v. Louisiana, 129 S. Ct. 2079, 2093 (2009) (Alito, J., concurring) ("The dissent, finally, invokes Jackson's antiquity, stating that 'the 23-year existence of a simple bright-line rule' should weigh in favor of its retention. Post, at 2098. But in Gant, the Court had no compunction about casting aside a 28-year-old bright-line rule. I can only assume that the dissent thinks that our constitutional precedents are like certain wines, which are most treasured when they are neither too young nor too old, and that Jackson, supra at 23, is in its prime, whereas Belton, supra at 28, had turned brownish and vinegary.").

[62] Article IV, Section 3 governs assembly and senate districts, not congressional districts.

35

added)). While the Legislature's prerogative to enact laws is subject to a gubernatorial veto, the constitution does not describe the Legislature's duty to redistrict as lawmaking, suggesting the constitution denies the Governor a role in the process.[63]

¶255 In contrast, at the time the Wisconsin Constitution was adopted, Article XIV, Section 11 expressly provided congressional redistricting would involve both the Legislature and the Governor. Wis. Const. Art. XIV, § 11 (1848), repealed 1982 (declaring the state's two congressional districts, and saying they shall be in force "until otherwise provided by law" (emphasis added)). Differences in language typically signal differences in meaning, particularly when two provisions of the same document use different language to describe analogous concepts. See Parsons v. Associated Banc-Corp., 2017 WI 37, ¶26, 374 Wis. 2d 513, 893 N.W.2d 212 (quoting Antonin Scalia & Bryan A. Garner, Reading Law 170 (2012)) ("'A word or phrase is presumed to bear the same meaning throughout a text; a material variation in terms suggests a variation in meaning.' . . . The fact that the same section of the state constitution refers generally to a matter being 'prescribed by law' and specifically to the legislature 'provid[ing]' something 'by statute' strongly

---

[63] Legislature's 10/26/21 Br., at 21 ("The Legislature's power to reapportion its districts is specifically enumerated in the state constitution, distinct from its lawmaking power. . . . [The text of Article IV, Section 3] does not provide that 'the legislature should enact legislation to apportion anew' or 'the legislature shall by law apportion anew.'").

suggests that 'law' in that section has a broader meaning than simply 'statutory law.'" (modification in the original)).

¶256 The difference between the text of Article IV, Section 3 and the now repealed Article XIV, Section 11 is particularly telling in light of early Wisconsin history. Under territorial law, the Governor had an explicit role in reapportionment. Although he did not draw districts, the Governor was responsible for assigning a number of representatives to each district. The law provided, in relevant part:

> As soon as practicable after having been furnished with the enumeration of the inhabitants of the Territory, . . . the Governor of the Territory shall apportion the thirteen members of the Council, and twenty-six members of the House of Representatives, among the several electoral districts as organized by law, according to their population, as near as may be, as shown by the census taken by virtue of this act.

1842 Laws Wis. Terr. 50. Wisconsin's founders did not preserve this particular gubernatorial role, and we should be skeptical of the idea they gave him an entirely different role——the power of vetoing redistricting plans——without using language even nearly as explicit.[64] See generally James T. Austin, The Life of

---

[64] The Legislature did not try to enact redistricting plans by joint resolution until the 1960s, despite gubernatorial vetoes of redistricting legislation. State ex rel. Reynolds v. Zimmerman, 22 Wis. 2d 544, 553, 126 N.W.2d 551 (1964). To some extent, this customary practice may inform original meaning, but it is evidence of lesser value and of course secondary to the plain meaning of the words, as illuminated by historical context surrounding their adoption. See, e.g., SEIU v. Vos, 2020 WI 67, ¶28, 393 Wis. 2d 38, 946 N.W.2d 35 (Hagedorn, J., majority op.) ("The text of the constitution reflects the policy choices of the people, and therefore constitutional interpretation similarly focuses primarily on the language of the constitution." (citation omitted)); Coulee Catholic Schs. v. LIRC, 2009 WI 88, ¶57, 320 Wis. 2d 275, 768 N.W.2d 868 ("The

*Elbridge Gerry* 347 (1829) (explaining Governor Elbridge Gerry signed the first so-called "gerrymander" into law because, in light of "precedents," he doubted whether he could veto the legislation).

¶257 The Legislature alone has the constitutionally-prescribed duty to enact a state legislative redistricting plan each decade. *Johnson*, 399 Wis. 2d 623, ¶13. While a veto may frustrate the Legislature's policy agenda, it does not normally hinder the Legislature from fulfilling an obligation assigned to it by the supreme law. Whether the Governor actually has the power to inhibit a co-equal branch's ability to perform its duty, absent express constitutional authorization, is questionable.

¶258 The Legislature's duty was critical to an argument advanced by several "legal scholars"[65] in an amicus brief. They claimed, "the whole reason for this litigation is that the

---

authoritative, and usually final, indicator of the meaning of a provision [of the Wisconsin Constitution] is the text——actual words used." (citation omitted)); *Jacobs v. Major*, 139 Wis. 2d 492, 504, 407 N.W.2d 832 (1987) ("We need go no further than holding that Art. I, sec. 3 has [a] plain, unambiguous meaning[.]"); *Black v. City of Milwaukee*, 2016 WI 47, ¶54, 369 Wis. 2d 272, 882 N.W.2d 333 (Rebecca Grassl Bradley, J., concurring) ("I give priority to the plain meaning of the words[.]" (citation omitted)). The Legislative and Executive branches cannot, through tacit understanding, change the constitutional allocation of powers. *Bartlett v. Evers*, 2020 WI 68, ¶210, 393 Wis. 2d 172, 945 N.W.2d 685 (Kelly, J., concurring/dissenting).

[65] The legal scholars include (in the order listed in the brief's appendix) Richard Briffault, Joseph Fishkin, James A. Gardner, Michael S. Kang, D. Theodore Rave, David Schultz, Kate Shaw, and Robert Yablon.

legislature breached its constitutional duty to redistrict by failing to pass a bill with gubernatorial support or a veto-proof majority."[66]  This viewpoint is peculiar, but it highlights a problem with Zimmerman.  The Legal Scholars blame this litigation solely on the Legislature, but an analogous charge could be levied against the Governor if in fact the executive has any constitutional role to play in redistricting despite the absence of a provision granting him one.  As long as this court's precedent permits the Governor to veto redistricting plans, redistricting is as much his duty as it is the Legislature's——but that is inconsistent with the way we have described the duty.  E.g., Johnson, 399 Wis. 2d 623, ¶79 ("[T]he legislature must implement a redistricting plan each cycle.").

¶259 This court's precedent significantly increases the likelihood of judicial involvement in what should be a purely political process.[67]  If the political process fails to produce

---

[66] Amicus Br. Legal Scholars, at 5.  The majority similarly misstates the Legislature's duty, saying "[w]e have given the political branches a fair opportunity to carry out their constitutional responsibilities.  They have not done so." Majority op., ¶2.  Actually, the Legislature has.  The Legislature fulfilled its constitutional duty to "apportion and district anew the members of the senate and assembly, according to the number of inhabitants," but the Governor vetoed the Legislature's plans.  See Wis. Const. Art. IV, § 3.  The majority describes our responsibilities as an "unwelcome task," majority op. ¶2, which is a strange way of describing the job we were elected to perform.

[67] Johnson v. WEC, No. 2021AP1450-OA, unpublished order, at 11 (Wis. Sept. 22, 2021, amended Sept. 24) (Rebecca Grassl Bradley, J., concurring) (explaining Zimmerman creates "a constitutional conundrum").

39

redistricting plans, this court has a duty to remedy constitutional and other legal defects in the existing maps; however, if this court's precedent defines the process differently than the Wisconsin Constitution, this court has a duty to align its precedent with the text of the constitution. We cannot mistake "the law" for "the opinion of the judge" because "the judge may mistake the law."[68] Introduction, William Blackstone, Commentaries *71; see also Bryan A. Garner et al., The Law of Judicial Precedent 397 (2016) ("The primary and most important factor to weigh in considering whether to overrule an earlier decision is its correctness.").

## IV. CONCLUSION

¶260 Our November 30 opinion in this case cabined the court's redistricting decision-making to the confines of the law. Unfortunately prophetic, it also cautioned that if four

---

[68] The 2011 assembly and senate maps were adopted by law and are codified as statutes (except for a minor change to the assembly map made by a federal court). Johnson, 399 Wis. 2d 623, ¶14 (majority opinion). A joint resolution cannot replace duly enacted law——even when that law has been declared unconstitutional. Id., ¶72 n.8. Contra id., ¶93 n.3 (Dallet, J., dissenting) ("[B]oth the Wisconsin and U.S. Constitutions require that all maps be redrawn every ten years to account for population shifts since the prior census. These are the sunset provisions. In this respect, the 2011 maps are unlike an ordinary unconstitutional statute, since they were enacted without any expectation of longevity." (citations omitted)).

Perhaps this court should consider, as a remedy, allowing the Legislature to redistrict by joint resolution. Unless a court adopts the Governor's maps as it did in this case, a court-ordered remedy ultimately denies the Governor control anyway. Zimmerman does not prohibit the Legislature from implementing redistricting plans by joint resolution in the event of an impasse.

40

members of this court cast aside those confines, "judges would refashion this court as a committee of oligarchs with political power superior to both the legislature and the governor." Johnson, 399 Wis. 2d 623, ¶80 (citation omitted). In this opinion, the majority abandons the law, perverts the least-change approach into a license for policymaking, and subordinates constitutional commands, statutory restrictions, and precedent to the majority's preferences. I dissent.

¶261 I am authorized to state that Chief Justice ANNETTE KINGSLAND ZIEGLER and Justice PATIENCE DRAKE ROGGENSACK join this dissent.